**GESS MATTINGLY & ATCHISON, P.S.C.**
A TRADITION *of* EXCELLENCE

EXHIBIT 1

William W. Allen
Guy M. Graves
John T. Hamilton
Jeffrey R. Walker
James W. Taylor
J. Thomas Rawlings
Richard A. Whitaker
Stephen P. Stoltz
Lori B. Shelburne
Samuel G. Carneal
Donald M. Wakefield
Benjamin D. Allen
Stefan J. Bing
M. Katherine Bing
Blake C. Nolan

Of Counsel:
C. Timothy Cone
William R. Hilliard, Jr.
Bernard F. Lovely, Jr.
Spencer D. Noe

William B. Gess
(1906-1985)
John G. Atchison, Jr.
(1924-2002)
Jack F. Mattingly
(1921-2006)

October 30, 2018

Sent Via Email: *Pgalansk@travelers.com*
Mr. Paul Galanski
Travelers
P.O. Box 430
Buffalo, NY 14240-0430

Re:   **My Client**:   Laura Newberry-Woods
      **Insured**:     Dawson Newberry
      **Claim No.**:   HOA6087
      **Date of Loss**: December 18, 2016

Dear Mr. Galanski:

I am providing this correspondence in response to our last communication, whereby you informed me that Travelers has taken the position that it is only obligated to pay underinsured motorist benefits ("UIM") to my client, Laura Newberry-Woods ("Laura"), in the amount of $39,000.00. This position is based on Section C of the "Limit of Liability" Section of Coverage D1 of the Travelers Automobile Policy (Policy No. 996057891 203 1) (the "Policy"). According to Travelers, this policy provision permits it to reduce, or setoff, (hereafter "setoff") the total amount of underinsured motorist coverage ($100,000.00) available under the Policy against the total amount of benefits paid as a result of the tortfeasor's negligence. Given the foregoing, Travelers has only offered to pay $39,000.00 in UIM benefits to my client, which reflects in the company's view of $61,000.00 having been paid by or on behalf of the tortfeasor, Joshua Eaves ("Eaves"). The claimed setoff is reflective of payment of Eaves's liability limits ($50,000.00), no-fault/PIP/BRB benefits ($10,000.00), and med-pay benefits ($1,000.00).

In Connecticut, where the Policy was issued, setoff provisions may be enforceable if certain conditions are met. *See Conn. Agencies Regs.* § 38a-334-6(d)(1)(A)(2000) and *Conn. Gen. Stat.* § 38a-336. In Kentucky, however, setoff provisions are not enforceable because they are against this state's public policy. Kentucky's UIM statute, KRS 304.39-320, and companion interpretive case law make clear that UIM insurance carriers cannot reduce the available amount of

October 30, 2018
Letter to Travelers/Galanksi
Page 2 of 15

UIM coverage by taking a credit for the tortfeasor's liability limits against UIM policy limits. In Kentucky, all UIM "credits" are taken against the total amount of an injured party's damages. The provision in the Policy, as sought to be enforced by Travelers, seeks to do exactly what Kentucky law says cannot be done. Thus, a conflict of laws exists. Application of Kentucky's conflict of law analysis mandates that Kentucky law will be applied and that Travelers will pay the full $100,000.00 UIM policy limits to settle this claim. A detailed explanation of the reasoning supporting this conclusion follows; however, my client's position, distilled to its essence, is that Kentucky law applies to the legal claims of a Kentucky resident, injured in a Kentucky auto crash.

### A. UIM Benefits

A dispositive resolution of this matter requires that a choice-of-law analysis be undertaken. In *State Farm Mutual Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875 (Ky. 2013), the Kentucky Supreme Court provided the analytical framework for determining which state's law applies to the interpretation and enforcement of a contract provision in an out-of-state insurance policy. Under that case, when a Kentucky court is asked to interpret a contract term in an insurance policy, the law of the jurisdiction with the "most significant relationship to the transaction and the parties" will be applied. However, even if another state has the "most significant relationship" to the matter, a Kentucky court will apply Kentucky law if applying the law of another jurisdiction would violate Kentucky public policy. *Id.* at 878-79. To invoke what is known as the "public policy exception" to the choice of law analysis, a court must determine (1) whether there is legislation "expressly forbidding enforcement" of the contract term at issue and, if not, (2) whether the term is unenforceable because "the public policy asserted against it is clearly manifested by legislation or judicial decision and is sufficiently strong to override the very substantial policies in favor of the freedom of contract and the enforcement of private agreements." *Id.* at 880.

#### 1. *"Most Significant Relationship" Analysis*

Under the first level of analysis, a Kentucky court facing a conflict-of law question involving a contract must determine which state has the "most significant relationship to the transaction and the parties." *Id.* at 878. This "test" is based on factors identified in § 188 of the *Restatement (Second) of Conflict of Laws* (1971) which states "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." *Id.* Factors Kentucky courts consider under this test include "place or places of negotiating and contracting; the place of performance; the location of the contract's subject matter; and the domicile, residence, place of incorporation and place of business of the parties." *Id.* at 878-79. The Restatement factors, however, "need not be given equal weight in every

circumstance, nor are they intended to be exclusive… [the factors] are relatively elastic and in some cases equivocal." *International Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 604 (6th Cir. 1996).

Application of the above factors to the present claim mandates the application of Kentucky law. The "insured," or UIM claimant, Laura, was and continues to be a Kentucky resident. At the time of the accident, she worked in Kentucky and her husband, Andy, attended school at the University of Kentucky. The tortfeasor, Eaves, is a Kentucky resident. The collision occurred in Kentucky. All of the substantive facts concerning this claim, including physical evidence and witnesses, are located in Kentucky.

An examination of the remaining factors also mandates that Kentucky law be applied. Although the named insured is a Connecticut resident and was issued a Connecticut policy, the named insured has no cognizable interest in this case. Accordingly, the location of the named insured is much less significant to this analysis. *See Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d. 662, 672 (E.D. Ky. 2010) (holding that, where the named insured was no longer before the court, the location of the contract was less significant and did not determine the choice of law analysis). The place of performance and subject matter of the Policy are nationwide in scope. An insured's action against a UIM carrier is "appropriately labeled a breach-of-contract action." *State Farm Mutual Automobile Insurance Company v. Riggs*, 484 S.W.3d 724, 727 (Ky. 2016). Thus, it logically follows that the fundamental "performance" under a UIM policy is the payment of benefits to an insured. Any payment of benefits to the "insured" in this case will occur in Kentucky. The subject matter of the Policy, UIM coverage, traveled with the insured automobile. An automobile is transitory in nature and, accordingly, so is the insured risk.

The "transitory nature" of the risk is reflected in the language of the Policy. Under the "General Conditions" portion of the Policy in the "Policy Period and Territory Section," the "policy territory," is defined as the "United States of America, its territories or possessions." *See* Policy at Page GP-4. The "Out-of-State Coverage" section, contained in the Liability and Property Damage of the Policy, which does not apply to the presented facts of this claim, serves as an acknowledgement by its very existence that automobiles are mobile and that an insured could be subject to the laws of another jurisdiction. **There is no choice of law provision in the Policy**. The only time application of Connecticut law is mentioned in the Policy is when both the "insured" and Travelers agree to arbitration; absent that agreement, all disputes are to be resolved in "a court of competent jurisdiction." *See* Policy at Page UIM-3. The absence of a choice-of-law provision is significant because the omission signifies that there is no clear indication that the parties intended for Connecticut law to apply. In *National Union Fire Ins. Co. v. Watts*, the Sixth Circuit Court of Appeals concluded that where an insurance contract failed to include a choice of law provision "the

insurer intended its coverage to be governed by the state in which the claimant was using his vehicle." 963 F.2d 148, 151 (6th Cir. 1992). "It seems reasonable that parties providing coverage anywhere in North America would expect the policies to be given the effect under the law of any jurisdiction in which the insured required coverage." *Asher* at 671.

"[E]ven in a breach of contract action, the state where the tort giving rise to that action occurred has an interest in the outcome of the litigation." *Id.* at 670. Kentucky has a strong interest in protecting it citizens by insuring that the state's policies regarding automobile insurance coverage are applied equally to its residents. "Kentucky courts are egocentric concerning choice of law questions." *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). "Kentucky law will apply to a contract issue if there are sufficient contacts and no overwhelming interests to the contrary...." *Asher* at 669. Kentucky law applies to this claim, and thereby, requires that Travelers tender the full policy limits of $100,000.00 to my client.

### 2. *"Public Policy Exception" Analysis*

Even if Connecticut is determined to have the most significant relationship to this matter, the setoff provision in the Policy would still be unenforceable in Kentucky under the "public policy" exception of the conflict-of-law analysis. The setoff provision in the Policy is statutorily disallowed by KRS 304.39-320 and disfavored by Kentucky case law to such an extent that it is a "well-founded rule of domestic policy established to protect the morals, safety, and welfare of *our* people." *Hodgkiss-Warrick* at 882 (emphasis in original). *"Our people"* means residents of Kentucky. (Emphasis added.)

#### a. *Statutory Analysis*

Legislation "expressly forbidding enforcement" of an insurance exclusion exists where there is a constitutional provision, statute, or other legislation that directly and unequivocally forbids the sort of exclusion at issue. *Id.* at 880. In Kentucky, the search is short. Kentucky's UIM statute (KRS 304.39-320), which is contained in the Kentucky Motor Vehicle Reparations Act, KRS 304.39-010, *et seq.* ("MVRA"), prohibits the enforcement of setoff provisions. The UIM statute makes it clear Kentucky expressly prohibits underinsured motorist insurers from receiving a credit for the tortfeasor's liability limits or otherwise that reduces the total amount of UIM coverage available to an injured party.

The obligation of underinsured motorist insurance carriers to their insureds is outlined by Subsections (2) and (5) of the UIM statute. Subsection (2) of KRS 304.39-320 provides as follows:

> Every insurer shall make available upon request to its insureds underinsured motorist coverage, **whereby subject to the terms and conditions of such coverage not inconsistent with this section** the insurance company agrees to pay its own insured for such **uncompensated damages** as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of the other vehicle exceeds the liability policy limits thereon, **to the extent of the underinsurance policy limits** on the vehicle of the party recovering.

(Emphasis added.) By its plain language, Subsection (2) allows a UIM insurer to impose only terms and conditions that are not inconsistent with the UIM statute (and more broadly the MVRA). Subsection (2) unambiguously defines a UIM carrier's responsibility to its insured. The carrier must pay for the insured's "uncompensated damages" to the extent of policy limits. The obligation of the carrier contained in Subsection (2), however, must be read in conjunction with Subsection (5) of the statute. Subsection (5) reads as follows:

> The underinsured motorist insurer **is entitled to a credit against total damages** in the amount of the limits of the underinsured motorist's liability policies in all cases to which this section applies, even if the settlement with the underinsured motorist under subsection (3) of this section or the payment by the underinsured motorist insurer under subsection (4) of this section is for less than the underinsured motorist's full liability policy limits. The term **"total damages"** as used in this section means the full amount of damages determined to have been sustained by the injured party, regardless of the amount of underinsured motorist coverage. **Nothing in this section, including any payment or credit under this subsection, reduces or affects the total amount of underinsured motorist coverage available to the injured party**.

Accordingly, Subsection (5) allows a UIM carrier to take only a "credit" in the "amount of the limits of the underinsured motorist's liability policies" against the injured party's "total damages." The phrase "total damages" is a defined term within the statute, and means "the full amount of damages determined to have been sustained by the injured party, regardless of the amount of underinsured motorist coverage." Subsection (5) concludes by mandating that no payment or credit taken by a UIM insurer may reduce the total amount of available UIM coverage to the injured party. Accordingly, in Kentucky, the injured party's "total damages" are the baseline against which UIM carriers may take credits or deductions for amounts already paid to the injured insured, not available the injured insured's UIM policy limits. Said another way, KRS 304.39-

320 reflects a "damages less limits" view of UIM coverage as opposed to a "limits less paid" view of UIM coverage. Under a "damages less limits" approach, the right to UIM benefits accrues once the tortfeasor's liability limits are exhausted. Under a "limits less paid" approach, a UIM carrier's credit for monies paid on account of the underinsured driver is taken against available UIM coverage limits. The injured party's total damages are not taken into account. The Policy provision which Travelers argues is enforceable is reflective of a "limits less paid" approach.

To demonstrate the mechanics of the above concepts, three hypothetical scenarios are included below. The first two hypothetical scenarios represent how credits are taken by UIM carriers under Kentucky's UIM statute. The third demonstrates how the credit to which Travelers purports to be entitled is in direct contravention of Kentucky's UIM statute and is void as being against Kentucky public policy.

<u>Hypothetical No. 1</u>
<u>(Total Damages $125,000.00)</u>

$125,000.00 (Total Damages)

-$50,000.00 (Liability Limits)

-$10,000.00 (PIP)

-$1,000 (Med-Pay)

_____

$64,000.00 (Uncompensated Damages)

<u>Total Due from UIM Insurer to Claimant</u>: $64,000.00 (of $100,000.00 policy limits)

<u>Remaining Uncompensated Damages</u>: $0.00

In Kentucky, under Hypothetical No. 1, if a jury awards an injured UIM insured total damages of $125,000.00, a UIM carrier, such as Travelers, would be "entitled to a <u>credit</u> against total damages in the amount of the limits of the underinsured motorist's liability policies." Per Kentucky law, the $125,000.00 judgment would be offset by $61,000.00 (representative of liability and PIP/Med-Pay). After the offset, the UIM insurer would only be required to pay $64,000.00 of the available $100,000.00 policy limits because the insured only has $64,000.00 in "uncompensated damages" as that term is used in KRS 304.39-320(2). The claimant's total damages would be fully compensated. This hypothetical (by showing offset for PIP/Med-Pay) also addresses how Kentucky avoids the payment of duplicative benefits for the same damages. If the insured had received the full UIM policy limits and $61,000.00 in prior payments, she

would receive benefits in excess of her total damages. Hypothetical No. 2 addresses a different scenario.

**Hypothetical No. 2**
**(Total Damages $260,000.00)**

$260,000.00 (Total Damages)

-$50,000.00 (Liability Limits)

-$10,000.00 (PIP)

-$1,000 (Med-Pay)

_____

$199,000.00 (Uncompensated Damages)

Total Due from UIM Insurer to Claimant: $100,000.00 (of $100,000.00 policy limits)

Remaining Uncompensated Damages: $99,000.00

In Hypothetical No. 2 the injured insured's total damages are far in excess of the available coverage. Under this hypothetical, the injured insured's total damages are $260,000.00. Again, however, the UIM carrier is only entitled to a "credit" against "total damages" in the amount of the underinsured motorist's liability policy, and other benefits the insured has received, or $61,000.00. After applying the applicable credits against "total damages", the injured insured, per KRS 304.39-320(2), would still have "uncompensated damages" of $199,000.00. Because a UIM insurer in Kentucky must pay an insured for "uncompensated damages," "to the extent of the underinsurance policy limits," the UIM carrier would be required to tender the full $100,000.00 policy limits, leaving the insured with $99,000.00 in uncompensated damages. In essence, Hypothetical No. 3 applies a "limits less paid" approach to the same facts as Hypothetical No. 2.

**Hypothetical No. 3**
**(Total Damages $260,000.00)**

$100,000.00 (Available UIM Coverage)

-$50,000.00 (Liability Limits)

-$10,000.00 (PIP)

-$1,000 (Med-Pay)

_____

$39, 0000.00 (Available w/ "Limits Less Paid)

Total Due from UIM Insurer to Claimant: $39,000.00 (of $100,000.00 policy limits)

$260,000.00 (Insured's Total Damages)

-$61,000.00 (Total Amount Paid)

---

$199,000.00 (Remaining Uncompensated Damages)

-$39,000.00 (UIM Coverage under "Limits Less Paid")

---

$160,000.00 (Remaining Uncompensated Damages)

As demonstrated by the outcomes of Hypothetical Nos. 2 and 3, the outcome for a UIM insured under Kentucky's "damages less limits" approach and a "limits less paid" approach is dramatically different. Based on the statutory analysis above, Kentucky's UIM statute expressly reflects Kentucky's public policy against setoff provisions like the one contained in the Policy. The setoff provision in the Policy "reduces …the total amount of underinsured motorist coverage available to the injured party," as expressly forbidden by KRS 304.39.320, specifically Subsection (5) and therefore, the Policy provision is a "term or condition" inconsistent with the Kentucky UIM statute's language and the general purpose of the MVRA as prohibited by Subsection (2). Simply, the setoff provision is unenforceable in Kentucky as "clearly expressed" by Kentucky law. *Morris*, 990 S.W.2d at 627.

### b. *Case Law Analysis*

Kentucky's policy of rejecting setoff provisions in UIM policies is also well-supported by its case law. This rejection is especially highlighted by the Supreme Court of Kentucky's interpretation of the prior version of Kentucky's UIM statute. KRS 304.39-320 previously provided as follows:

> "[T]he insurance company agrees to pay its own insured for such uncompensated damages as he may recover on account of injury due to a motor vehicle accident because the judgment recovered against the owner of the other vehicle exceeds the policy limits thereon, to the extent of the policy limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against."

*LaFrange v. United States Auto Ass'n*, 700 S.W.2d 411, 413 (Ky. 1985). Prior to 1988, KRS 304.39-320 was interpreted to mean that UIM coverage was not triggered unless the policy limits of the insured's automobile exceeded the policy limits of the tortfeasor's policy. *Coots v. Allstate Inc. Co.*, 853 S.W.2d 895, 900 (Ky. 1993). Said another way, a UIM carrier's obligation to pay an insured for

"uncompensated damages" was "limited by the phrase, 'to the extent of the policy limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against.'" *Id.* Thus, prior to 1988, Kentucky was a "limits less paid" state. The Kentucky Supreme Court has held the effect of the pre-1988 UIM statute was as follows:

> This pre–1988 setoff provision had a twofold effect. First, it activated UIM coverage only when the tortfeasor's liability limits were less than the UIM policy limits. Second, it decreased the UIM benefits by the amount of the tortfeasor's liability coverage.

*Philadelphia Indemnity Ins. Co. v. Morris*, 990 S.W.2d 621, 627 (Ky. 1999) (internal citation omitted). When the UIM statute was amended in 1988, the "change in statutory language eliminated the offset problem." *Coots v. Allstate Ins. Co.*, 853 S.W.2d 895, 900 (Ky. 1993). "The General Assembly added Subsection (1) defining the term 'underinsured motorist,' and deleted from Subsection (2): 'to the extent of the policy limits on the vehicle of the party recovering less the amount paid by the liability insurer of the party recovered against.'" *Coots* at 899.

In *Philadelphia Indemnity Ins. Co. v. Morris*, decided in 1999, the Kentucky Supreme Court found an analogous UIM policy provision that allowed workers' compensation benefits to be setoff against UIM policy limits to be unenforceable because the provision was in "direct opposition to Kentucky public policy regarding UIM coverage." 990 S.W.2d 621, 627 (Ky. 1999). The Supreme Court specifically noted that Kentucky's policy toward UIM coverage was to promote "full recovery to the injured party," which was reflective of a "broad view" of UIM coverage. *Id.* The Court explained the distinction between the "narrow" and "broad" views of UIM coverage:

> Under the narrow view, the insured's UIM coverage is always setoff or reduced by the tortfeasor's liability limits. The purpose of the narrow view is to place the insured in the same financial condition that he would be in if the tortfeasor had liability limits equal to the insured's own UIM limits. Under the broad view, UIM coverage is triggered when the insured's damages exceed the tortfeasor's liability limits, at which point the insured is entitled, if damages require it, to receive the full amount of the UIM policy. The public policy underlying the broad view is to provide full recovery to the injured party.

*Id.* In analyzing the revised KRS 304.39-320, the Supreme Court noted:

> Our previous version of KRS 304.39–320 clearly was an example of the narrow view of UIM coverage. The 1988 revision of the

statutory language, however, transformed the statute into a representation of the broad view. The effect of the 1988 revision was to make available the policy limit of UIM coverage to the insured.

As the 1988 revision reflects a public policy of broad UIM coverage, the purpose of which is to provide full recovery for the insured, we now hold that an insurance carrier cannot set off workers' compensation benefits against the policy's face amount of UIM coverage. **To do so would be to violate the public policy of this Commonwealth as clearly expressed by the legislative revision of KRS 304.39–320.**

*Id.* at 627 (emphasis added). In finding the offset unenforceable as being against Kentucky public policy, the Supreme Court held that an insurance company must "pay its own insured for uncompensated damages to the extent of the UIM policy limit," and that it is "the express mandate of KRS 304.39-320 that an insurance company pay the insured uncompensated damages to the extent of the UIM policy limits [and] thus [it] cannot be circumvented by a contract provision..." *Id.* "[A] [setoff] contract provision would contravene the direct language of KRS 304.39–320 and defeat its purpose of paying uncompensated damages. Moreover, any term or condition in a UIM policy may not be inconsistent with the fundamental requirements of the statute." *Id.* Although *Morris* dealt with the setoff of workers' compensation benefits against UIM policy limits, the Kentucky Supreme Court's logic and analysis for rejecting that setoff provision applies equally to this claim.

The court's holding in *Morris* is buttressed by the fact that the UIM statute was amended again in 1998. The 1998 amendment, which would not have been applicable to the *Morris* case when it was before the Kentucky Supreme Court in 1999, added Subsections (3), (4), and (5) to the UIM Statute. Thus, at the time the *Morris* court reached its decision that UIM setoff provisions were against Kentucky public policy, it did so relying only on KRS 304.39-320(2), without the added clarification provided by KRS 304.39-320(5). Again, Subsection (5) makes clear that any credits taken by UIM carriers can only be taken against an insured's "total damages," and that any credit taken cannot reduce the total amount of underinsured motorist coverage available to the injured party. KRS 304.39-320(5).

Kentucky's public policy against enforcement of UIM setoff provisions is further exemplified in other case law as well. Indeed, in *Hodgkiss-Warrick*, where the Kentucky Supreme Court applied Pennsylvania rather than Kentucky law to permit enforcement of a "regular use provision" in a UIM policy, the court noted that while UIM coverage could be limited by "terms and conditions," those "terms and conditions" may "not [be] inconsistent with the remainder of KRS 304.39–320." *Hodgkiss-Warrick* at 881. In a footnote to that sentence, the court

specifically identified setoff provisions as being plainly impermissible in Kentucky citing Subsection (2) of the UIM statute:

> Other subsections of the section include subrogation provisions and, as quoted, subsection (2) precludes any set off from the underinsured policy limits for the available liability coverage. *See Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d at 437 (discussing the 1988 statutory amendment precluding set off).

*Id.* at 881, n. 5.

Most recently, in *Ward v. Nationwide*, 2014 WL 7339283 (Ky. App. 2014), the Kentucky Court of Appeals addressed the enforcement of a setoff provision in a UIM policy in light of *Hodgkiss-Warrick*. In *Ward*, the UIM claimant was a Virginia resident who made a claim for UIM benefits under his Virginia UIM policy after being in an automobile wreck with a Kentucky resident in Kentucky. Nationwide, the UIM insurer, argued that Ward was not entitled to UIM benefits because of a setoff provision in his policy. In applying the *Hodgkiss-Warrick* conflict of law analysis to the facts of the *Ward* case, the Court of Appeals determined, citing *Morris*, that the Supreme Court had "declared void as against public policy any 'UIM endorsement requiring setoff[.]'" *Id.* at *4. "Stated differently, Kentucky's legislature and courts have plainly declared the narrow view [of UIM benefits], to which Virginia continues to adhere, to be against this Commonwealth's public policy." *Id.* This being the case, the Court of Appeals then turned to the second prong of the analysis - "whether the public policy [is] so strong as to require a Kentucky court to interject Kentucky law into a dispute having none but a fortuitous connection with Kentucky." *Id.* (citing *Hodgkiss-Warrick* at 882).

Ultimately, the *Ward* court found that Kentucky's "public policy" was not strong enough to interject Kentucky law in that case *only because* Ward was not a Kentucky resident. "Since here no Kentucky resident is affected, nothing requires a Kentucky court to interfere with the balance [Virginia] has chosen for its citizens." *Id.* (citing *Hodgkiss-Warrick* at 883). Laura's claim is factually distinct in a significant way on this issue. Laura is a resident and citizen of Kentucky. The significance of this distinction is crucial. The laws of this state apply to the claims of its citizens.

Returning to the application of the "public policy exception" to this claim, the analysis above demonstrates that Kentucky's policy against setoff provisions is both "expressly stated" and "clearly manifested" in its statutes and judicial precedent. This public policy is "sufficiently strong to override the very substantial policies in favor of the freedom of contract and the enforcement of private agreements." *Hodgkiss-Warrick* at 880. Kentucky's public policy on this issue is a "well-founded rule…established to protect the morals, safety or welfare

… *our* people." See *Hodgkiss-Warrick* at 882 (emphasis in orginal). Kentucky's law and judicial precedent reflect the state's "broad" view of UIM coverage and its belief that full recovery after an automobile wreck is best for the welfare of its residents. Moreover, the UIM statute, as part of the MVRA, "is remedial legislation which should be generally construed to accomplish [the MVRA's] stated purposes." *Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d 437, 457 (Ky. 1997). KRS 304.39-010, which outlines the broad purposes of the MVRA, specifically provides that the MVRA is designed "[t]o encourage prompt medical treatment and rehabilitation of the motor vehicle accident victim by providing for prompt payment of needed medical care and rehabilitation." KRS 304.39-010(3). The UIM statute is part of the MVRA so this purpose applies to UIM coverage as well. In providing guidance on this last aspect of the analysis, the Kentucky Supreme Court has held, "Where no Kentucky resident has been affected, rarely will that standard be met." *Id.* Again, this case is factually distinct—a Kentucky resident is affected to her detriment by application of the setoff provision in the Policy. Applying all relevant analytical factors, the "public policy exception" will apply to this claim, and Kentucky law will be applied by a Kentucky court.

In conclusion, under the conflict of law analysis of *Hodgkiss-Warrick*, a Kentucky court will apply Kentucky law to the Policy in this case. The connection of this claim to Kentucky is not merely fortuitous as demonstrated under the "most significant relationship" analysis herein. A Kentucky resident is asking that Kentucky law apply to her claims against a foreign domiciled insurance carrier. Kentucky's public policy against these provisions is not a "general consideration … of supposed public interest," rather "it is clearly expressed in the applicable law." *Hodgkiss-Warrick* at 881. All proper avenues of analysis demand that Kentucky law be applied. Travelers must pay, under Kentucky law, the full $100,000.00 of available UIM coverage to my client.

### 2. **PIP/Med-Pay**

Similarly, Travelers may not setoff PIP or Med-Pay from its Policy limits. This is true for two reasons. First, such a setoff is prohibited by Kentucky statute. Second, even if Kentucky law does not apply, the Policy itself does not provide that Travelers is entitled to such a set off.

Kentucky law prohibits Travelers from claiming a setoff for amounts paid to Laura for PIP or Med-Pay. "[U]nder the Kentucky No–Fault Act, an injured party is not entitled to an award of damages from the defendant in the trial on liability for any item of damages which was compensated by BRB." *Progressive Cas. Ins. Co. v. Kidd,* 602 S.W.2d 416, 417 (Ky. 1980). Thus, again, Travelers is only permitted to take a credit for the payment of PIP/Med-Pay payments against the "total damages" sustained by the injured party. In this regard, no duplicate benefits have been paid. *See Ky. Motor Veh. Ins. Law §11.11*(2017-18 ed.) ("The common thread which runs through all the cases is that the injured person may

receive all benefits available to him from other coverages ... in addition to BRB [also known as PIP] so long as they do not duplicate items of damages already recovered in BRB payments."). "The only interdiction [for no-fault benefits] is that there is no double recovery for the same item of damages." *Id.* The credit Travelers may take because of payment of no-fault coverages as a UIM carrier is distinct from how it may actually receive reimbursement for the payment of these damages to Laura.

PIP and Med-Pay benefits are no-fault insurance coverages, meaning, as the term implies, that those benefits are paid without regard to fault. No negligent act by a third party is required to trigger entitlement to those benefits in Kentucky, only a bodily injury arising from certain specified uses of a covered motor vehicle. Given that fact, if a PIP/Med-Pay insurer, or reparations obligors as they are referred to in the applicable statutes, would be permitted to seek reimbursement from their own insureds, who received the benefit, then the coverage would be utterly illusory. The insured would be no better off for having received the benefits if the reparations obligor could take them back. Reimbursement in that manner would defeat a stated purpose of the MVRA. *See* KRS 304.39-010(2) ("To provide prompt payment to victims of motor vehicle accidents without regard to whose negligence caused the accident in order to eliminate the inequities which fault-determination has created"). Actual reimbursement of no-fault benefits paid by a reparations obligor and the concept of a "credit" bring taken by a UIM carrier are distinctly separate concepts.

The mechanics by which a reparations obligor, such as Travelers, can actually seek reimbursement for the payment of no-fault benefits is set forth in KRS 304.39-070. As Travelers voluntarily paid PIP benefits that are not set forth in the Policy, it has conceded the applicability of the MVRA to this occurance. That statute specifically identifies from which parties a PIP/Med-Pay insurer, or reparations obligor, may seek reimbursement:

(1) "<u>Secured person</u>" means the owner, operator or occupant of a secured motor vehicle, and any other person or organization legally responsible for the acts or omissions of such owner, operator or occupant.

(2) A reparation obligor which has paid or may become obligated to pay basic reparation benefits shall be subrogated to the extent of its obligations to all of the rights of the person suffering the injury against any person or organization <u>other than a secured person.</u>

(3) <u>A reparation obligor shall have the right to recover basic reparation benefits paid to or for the benefit of a person suffering the injury from the reparation obligor of a secured</u>

> person as provided in this subsection, except as provided in KRS 304.39-140(3). The reparation obligor shall elect to assert its claim (i) by joining as a party in an action that may be commenced by the person suffering the injury, or (ii) to reimbursement, pursuant to KRS 304.39-030, sixty (60) days after said claim has been presented to the reparation obligor of secured persons. The right to recover basic reparation benefits paid under (ii) shall be limited to those instances established as applicable by the Kentucky Insurance Arbitration Association as provided in KRS 304.39-290.

KRS 304.39-070 (emphasis added). Based on the foregoing, Travelers, as reparations obligor, may seek actual reimbursement from Eaves's insurer, USAA, for PIP/Med-Pay benefits paid to Laura or for her benefit because he is a "secured person" under the statute. If he had not been insured as mandated by law, Travelers could have sought reimbursement directly from Eaves. Accordingly, Travelers is due a "credit" or "setoff" for no-fault benefits paid from Laura's total damages and actual reimbursement for the amounts paid in no-fault benefits from USAA, not from Laura.

As noted above, even if Kentucky law does not apply, the Policy itself does not permit the PIP/Med-Pay setoffs to which Travelers claims it is entitled. Section E (Exclusions), Section E (Limit of Liability), and Section C (Limit of Liability) of the UIM Coverage D1 Section of the Policy are three possible provisions upon which Travelers may rely, but none of them permit these setoffs. *See* Policy, at UIM-2. Section C (Limit of Liability), upon which Travelers relies for its claim that it is entitled to setoff payments made by USAA on behalf of the tortfeasor, does not permit a setoff for PIP/Med-Pay benefits. That section only permits a setoff for payments paid to Laura "by or on behalf of persons or organizations *who may be legally responsible.*" *See* Policy, at UIM-2 (emphasis added). PIP and Med-Pay benefits are no-fault benefits, and are thus not paid "by or on behalf of persons or organizations who may be legally responsible." In this case, the person or organization who is "legally responsible" are Eaves and his insurer, USAA.

For that same reason, Section E (Limit of Liability) also does not apply. That provision limits Travelers from making "duplicate payment ... for any element of loss for which payment has been made by or on behalf of persons or organizations who may be legally responsible." *See* Policy, at UIM-2. This provision also does not apply because, as addressed in great detail in this letter, Laura's total damages exceed the total amount of available insurance coverage, and no payments made by Travelers to Laura will ever amount to a "duplicate payment."

October 30, 2018
Letter to Travelers/Galanksi
Page 15 of 15

Finally, Section E (Exclusions) does not permit the setoff because PIP and Med-Pay are not covered by any "bodily injury liability bonds or policies applicable to the 'underinsured motor vehicle.'" *See* Policy, at UIM-2 (emphasis added). Again, PIP and Med-Pay are benefits to which Laura was entitled regardless of liability, and such payments are not made pursuant to an insurance liability policy on Eaves's vehicle.

Accordingly, even if Kentucky law does not apply to the subject collision, which it does, there is no provision in the Policy that permits Travelers to setoff amounts paid to Laura for no-fault PIP or Med-Pay benefits. Travelers is not entitled to a $11,000.00 credit.

### 3. Conclusion

In conclusion, Kentucky law applies to this claim, and Laura is entitled to payment of the full $100,000.00 of declared UIM benefits. I hope this letter has been of assistance in understanding your duties in this matter. Accordingly, Laura renews her demand for payment of the full UIM limits under the Policy. It is not Laura's preference to institute litigation against Travelers, but she will be compelled to do if this disagreement is not promptly resolved.

Finally, please clarify in writing that Travelers's tender of policy limits will include a waiver of subrogation rights.

Please do not hesitate to call me to discuss.

Sincerely,

Stephen P. Stoltz
M. Katherine Bing