**Enante Darout   10/18/2021**

---

**1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO. 5:18-cv-658-JMH

LAURA N. WOODS,              )DEPOSITION TAKEN ON BEHALF
                            )    OF THE PLAINTIFF
        PLAINTIFF           )     BY:  NOTICE
                            )
                            )
                            )
                            )
VS.                         )
                            )
                            )
                            )
THE STANDARD FIRE           )
INSURANCE COMPANY,          )
                            )WITNESS:
        DEFENDANT           )ENANTE DAROUT

        *  *  *  *              *  *  *  *

        The deposition of ENANTE DAROUT was taken
via digital videography via videoconference on
behalf of the plaintiff before MARYBETH C. SOWARDS,
Certified Court Reporter and Notary Public in and
for the State of Kentucky at Large, on Monday,
October 18, 2021, commencing at the approximate
hour of 9:45 a.m.
        Said deposition was taken pursuant to
notice previously filed, pursuant to the Federal
Rules of Civil Procedure, in the above-styled
action now pending before the United States
District Court, Eastern District of Kentucky,
Central Division at Lexington.

        *  *  *  *              *  *  *  *

---

**2**

1              APPEARANCES
2
         ON BEHALF OF THE PLAINTIFF:
3
            (Via Videoconference)
4
         Mr. Stephen P. Stoltz
5          Mr. Stefan J. Bing
    Gess Mattingly & Atchison, PSC
6            Suite 102
        201 West Short Street
7   Lexington, Kentucky   40507
8
    ON BEHALF OF THE DEFENDANT:
9
            (Via Videoconference)
10
         Mr. Stephen C. Keller
11   Schiller Barnes Maloney, PLLC
        1600 One Riverfront Plaza
12        401 West Main Street
    Louisville, Kentucky   40202
13
14
15            VIDEOGRAPHER:
16
17          (Via Videoconference)
18
19       Mr. John S. Sowards
20
21
22   *   *   *   *          *   *   *   *
23
24
25

---

**3**

1                    INDEX
2
  Caption. . . . . . . . . . . . . . . . . . . . . . .1
3 Appearances. . . . . . . . . . . . . . . . . . . . .2
  Index. . . . . . . . . . . . . . . . . . . . . . . .3
4 Exhibits . . . . . . . . . . . . . . . . . . .3 -   4
  Introduction . . . . . . . . . . . . . . . . .5 -   6
5 Examination by Mr. Stoltz. . . . . . . . . . .6 - 187
  Examination by Mr. Keller. . . . . . . . . .187 - 190
6 Reporter's Certificate . . . . . . . . . . . . . .191
  Videographer's Certificate . . . . . . . . . . . .192
7 Signature Page . . . . . . . . . . . . . . . . . .193
8                  EXHIBITS
9
  Plaintiff's Exhibit No. 25 . . . . . . . . . . . . .53
10
  (Galanski offer document)
11
  Plaintiff's Exhibit No. 26 . . . . . . . . . . . . .55
12
  (E-mail chain between Mr. Stoltz and
13  Mr. Galanski dated 10/5-30/18 with
    attached letter dated 10/30/18)
14
  Plaintiff's Exhibit No. 27 . . . . . . . . . . . . .64
15
  (Request for Legal Advice form dated 10/31/18)
16
17 Plaintiff's Exhibit No. 28 . . . . . . . . . . . . .49
18
19 (Letter from Ms. Darout to Mr. Parsons dated
20  11/28/18)
21
22 Plaintiff's Exhibit No. 29 . . . . . . . . . . . . 107
23
24 (Twenty-eight days document)
25

---

**4**

1  Plaintiff's Exhibit No. 30 . . . . . . . . . . . 109
2  (Excerpts from Newberry automobile insurance
   policy)
3
   Plaintiff's Exhibit No 31. . . . . . . . . . . . 167
4
   (Memorandum Opinion and Order dated 8/14/19)
5
   Plaintiff's Exhibit No. 32 . . . . . . . . . . . 138
6
   (Kentucky State and Federal Conflicts of Laws
7   Authorities Cited list)
8  Plaintiff's Exhibit No. 33 . . . . . . . . . . . .89
9  (LaCrosse v. Owners Insurance Company Opinion)
10 Plaintiff's Exhibit No. 34 . . . . . . . . . . . .93
11 (Thaxton v. Allstate Insurance Company Opinion)
12 Plaintiff's Exhibit No. 35 . . . . . . . . . . . 166
13 (Statute 304.39-250, Deduction and set-off)
14 Plaintiff's Exhibit No. 36 . . . . . . . . . . . 166
15 (Statute 304.39-320, Underinsured motorist
    coverage - Effect of settlement of claims)
16
   Plaintiff's Exhibit No. 37 . . . . . . . . . . . 158
17
   (Statute 304.12-230, Unfair claims
18  settlement practices)
19 Plaintiff's Exhibit No. 38 . . . . . . . . . . . .38
20 (Personnel record regarding Ms. Darout)
21 Plaintiff's Exhibit No. 39 . . . . . . . . . . . 128
22 (Uninsured Motorist Worksheet)
23
        *  *  *  *          *  *  *  *
24
25

---

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

**Enante Darout   10/18/2021**

---

Page 5

1 　　　　VIDEOGRAPHER:  We're now on the
2 video record.  Today's date is October
3 18, 2021, and the time is 9:45 a.m.  My
4 name is John Sowards, today's
5 videographer, and all parties are
6 appearing via videoconferencing
7 pursuant to FRCP 30(b)(4) for the
8 deposition of Enante Darout pursuant to
9 notice in the United States District
10 Court, Eastern District of Kentucky,
11 Case 5:18-cv-658-JMH, styled, Laura N.
12 Woods, Plaintiff, versus The Standard
13 Fire Insurance Company, Defendant.
14 　　　　Our court reporter is Marybeth
15 Sowards, and I'd ask counsel to please
16 introduce themselves and state whom
17 they represent.
18 　　　　MR. STOLTZ:  Good morning.  Steve
19 Stoltz and Stefan Bing for the
20 plaintiff, Laura Woods.
21 　　　　MR. KELLER:  Good morning.  Stephen
22 Keller for defendant, Standard Fire
23 Insurance Company.
24 　　　　VIDEOGRAPHER:  All right; thank
25 you.  The court reporter will now swear

---

Page 6

1 in the witness.
2 　　　-----------------------
3 　　　　　ENANTE DAROUT,
4 having been first duly placed under oath, was
5 examined and testified as follows:
6 　　　　　EXAMINATION
7 BY MR. STOLTZ:
8 Q　　Please state your name.
9 A　　Enante Darout.
10 Q　　Good morning, Ms. Darout.  As I said,
11 my name is Steve Stoltz.  This is a deposition.
12 You're an attorney; correct?
13 A　　Correct.
14 Q　　And are you familiar with the
15 deposition procedure?
16 A　　I am.
17 Q　　Okay.  So I'm not going to go through
18 the rules about say yes and no, not huh-uh and
19 uh-huh, and that sort of thing.
20 　　　　Are you -- are you under any kind of
21 condition or taking any medication that might
22 affect your ability to give truthful testimony
23 today?
24 A　　No.
25 Q　　I need to ask you a few personal

---

Page 7

1 questions.  I don't mean to be personal, but just
2 in terms of your background, what year were you
3 born?
4 A　　██████
5 Q　　And where were you born?
6 A　　Elizabeth, New Jersey.
7 Q　　Where'd you grow up?
8 A　　New Jersey.
9 Q　　Travelers was kind enough to share some
10 of your personnel records as part of the case, and
11 I saw that some of the records said that you had a
12 home address on Windsor Station Drive in Windsor,
13 Connecticut.  Is that -- is that current?
14 A　　No, it is not.
15 Q　　What is your current address?
16 A　　████████████████████████
17 　　　████
18 Q　　We won't contact you unless for some
19 reason you left Travelers and -- and we needed to
20 -- to find you.
21 　　　　Also there were some phone numbers in
22 the records, and I just wanted to check with you
23 and see if any of these are current.  One ends in
24 8122.
25 A　　Yes.

---

Page 8

1 Q　　That's current?  Okay.  And another
2 ends in 0553.
3 A　　No, that is not.
4 Q　　Okay.  And then another ends in 0668.
5 A　　Yes, that is.
6 Q　　Okay.  If Mr. Keller and I are not
7 successful in resolving this matter between the
8 parties we'll have a trial and need to pick a jury,
9 and I just need to ask you if you have any family
10 that live in Kentucky.
11 A　　No, I don't.
12 Q　　Okay.  Want to ask you a few questions
13 about your education.  Is that okay?
14 A　　Sure.
15 Q　　You are a Rutgers grad, went undergrad?
16 A　　Yes.
17 Q　　And you were there from 2004 to 2009?
18 A　　Correct.
19 Q　　Linguistics major?
20 A　　Yes.
21 Q　　And French?
22 A　　I'm sorry?
23 Q　　Did you also major in French?
24 A　　No.
25 Q　　Any other majors?

Enante Darout   10/18/2021

9

1  A        No other majors.
2  Q        Okay.  And then you started law school
3  in 2011?
4  A        Correct.
5  Q        Okay.  So what -- what did you do
6  during the gap period between 2009 and starting law
7  school in 2011?
8  A        I worked.
9  Q        Okay.  Who'd you work for?  What'd you
10 do?
11 A        I was a group facilitator at YCS, a
12 group home organization in New Jersey.
13 Q        Okay.  And you went to Cooley Law
14 School --
15 A        I did.
16 Q        -- and got your J.D., your Juris
17 Doctorate degree, which is a degree that lawyers
18 get?
19 A        Correct.
20 Q        And then you stayed an additional year,
21 2013 to 2014, and got an LL.M. from Cooley;
22 correct?
23 A        Correct.
24 Q        And that is in finance and corporate
25 law?

10

1  A        Correct.
2  Q        Okay.  Is Cooley a good law school?
3  A        I think that opinion is subjective or
4  objective, depending on who you ask.
5  Q        Do you think Cooley Law School is a
6  good law school?
7  A        I got a really good education from that
8  law school.
9  Q        Okay.  Are you aware of bad press that
10 Cooley's gotten about its rank quality?
11 A        Once I graduated I did not pay
12 attention to any press that came out regarding the
13 school.
14 Q        Do you know why there's so much bad
15 press about Cooley?
16 A        No, I do not.
17 Q        Do you know whether it's true that less
18 than half of their graduates pass the bar exam the
19 first time?
20 A        I'm sorry; ask that -- I'm sorry; can
21 you repeat that?
22 Q        Sure.  Do you know why -- do you know
23 whether it's true that less than half of its
24 graduating classes pass the bar for the first time?
25 A        Do I know why is the question?  I'm

11

1  sorry.
2  Q        No.  Do you know whether that's true?
3  A        I can't say for certain whether that's
4  true or not.  I passed the first time.
5  Q        Good.  So you were -- you were living
6  in New Jersey when you applied to law school?
7  A        I was.
8  Q        Okay.  There are lots of law schools
9  that surround New Jersey, Connecticut, very good
10 law schools.  Tell me why you chose Cooley.
11 A        Cooley was one of the few schools that
12 I applied to, and so that was one of the schools
13 that accepted me, and --
14 Q        And that's in -- go ahead.
15 A        I'm sorry?
16 Q        No, go ahead.  I'm sorry; I cut you
17 off.
18 A        And so I attended.
19 Q        Okay.  And it's in Lansing, Michigan?
20 A        It is.
21 Q        What was it about Cooley that attracted
22 you to apply?
23 A        I don't know if there's any one thing
24 that attracted me to apply.  At that time I was
25 applying to a few schools, and so that was just one

12

1  of the schools that I applied to.
2  Q        What other schools did you apply to?
3  A        If I remember correctly -- mind you
4  this was years ago.
5  Q        Sure.
6  A        -- there was a school in Florida,
7  Florida Coastal I believe.  I might have that
8  wrong.  I can't recall.  I can't recall the other
9  schools.
10 Q        Okay.
11 A        But I know that there were a few.
12 Q        Okay.  Did you get in -- into any?
13 Were you accepted in any other schools?
14 A        I believe I may have been to -- I can't
15 recall.  I can't recall, to be honest.  It was so
16 long ago.
17 Q        Thank you.  That's fine.  You are a
18 licensed attorney in Pennsylvania and New Jersey?
19 A        In New Jersey currently.
20 Q        Okay.  And I saw that you were
21 administratively suspended in Pennsylvania.  Can
22 you tell that story?
23 A        It was essentially for nonpayment.  It
24 was difficult as a younger -- younger person to
25 handle both fees, and so I -- I was -- because I

**Enante Darout   10/18/2021**

13

1  lived in New Jersey I -- I essentially paid for the
2  New Jersey fees and continue on with those CLE
3  courses.
4  Q        So Pennsylvania and New Jersey are
5  really close together; right?
6  A        They are.
7  Q        Were you -- did you apply to both
8  states because you didn't know exactly where you'd
9  be working?
10  A        Precisely.
11  Q        And that way you had -- you were more
12  -- basically more marketable to more employers?
13  A        I believe so.
14  Q        Okay.  But once you got your job you
15  didn't need -- with Travelers, you didn't need
16  both, so you kind of let the Pennsylvania go?
17  A        Precisely.
18  Q        Okay.  What about Connecticut?  Have
19  you ever been licensed to practice in -- law in
20  Connecticut?
21  A        I'm authorized as house counsel -- in-
22  house -- house counsel I believe the title is
23  called in Connecticut.  So I am not licensed in
24  Connecticut, but I do have that authorized house
25  counsel designation.

14

1  Q        What does that mean?  Can you explain
2  that to the jury?
3  A        Essentially what it means is that I'm
4  authorized to practice in-house for Travelers in
5  the state of Connecticut.
6  Q        Okay.  And that is a designation that
7  is given by the Connecticut Bar Association?
8  A        Correct.
9  Q        Okay.  How about Kentucky?  Have you
10  ever had or applied for a Kentucky license to
11  practice law?
12  A        No.
13  Q        For lawyers -- does each state kind of
14  regulate the lawyers in those states?
15  A        Yes.
16  Q        Have you ever attended any CLE,
17  continuing legal education, or seminars under -- on
18  Kentucky law?
19  A        No.
20  Q        Ever taken any classes or any kind of
21  formal education of -- of whatever nature
22  concerning Kentucky law?
23  A        No.
24  Q        I want to ask you a few questions about
25  your preparation for today's deposition.  Is that

15

1  okay?
2  A        Sure.
3  Q        What did you do to prepare for today's
4  deposition?
5  A        I reviewed the opinion that I drafted,
6  the letter that was prepared by you, and some other
7  materials.
8  Q        What were the other materials?  Can you
9  be as specific as -- as possible?
10  A        The policy, the referral, and some of
11  the cases I believe that were noted in each, both
12  the letter and my opinion.
13  Q        Which cases did you refresh yourself
14  of?
15  A        The Hodgewick -- I'm sorry; the
16  Hodgkiss-Warrick case I believe.
17  Q        Right.
18  A        The -- the International case, the
19  Asher case, the LaFrange case, the LaCrosse case,
20  the Thaxton case.  Those are the ones that come to
21  mind.
22  Q        Okay.  Any other re -- any other
23  resources, written material, that you reviewed in
24  preparation for your deposition?
25  A        Sure.  I reviewed the -- some of the

16

1  Kentucky statutes you stated in your letter as well
2  as my opinion as well as the Connecticut statutes,
3  some of the Connecticut statutes referenced in the
4  opinions.
5  Q        Okay.  Anything else?
6  A        I don't believe so.
7  Q        How much time did you spend preparing
8  for this deposition today?
9  A        Not very long.
10  Q        So 30 minutes, three days?
11  A        Oh, I'm sorry.  Maybe two or three
12  days.
13  Q        Okay.  Did you meet with or discuss the
14  case with anyone prior to your deposition?
15  A        With Attorney Stephen Keller.
16  Q        Okay.  Anyone else?
17  A        No.
18  Q        Did you review any of the claim
19  material that Travelers has about this case?
20  A        As in --
21  Q        Claim notes?
22  A        Oh, okay; I'm sorry.  Claim notes -- I
23  did not review the claim notes.
24  Q        Okay.
25  A        I did not review the claim file.

Enante Darout   10/18/2021

17

1  Q      Okay.  Other than Judge Hood's opinion
2  on the coverage issue did you review any pleadings?
3  A      I did not review any of the pleadings,
4  nor did I review the -- what you just mentioned
5  written by -- by the judge.
6  Q      So you did not review Judge Hood's
7  opinion?
8  A      I was not provided with Judge Hood's
9  opinion.
10 Q      Have you read Judge Hood's opinion?
11 A      No, I -- I have not.
12 Q      Out of curiosity?
13 A      No, I have not.
14 Q      Besides Mr. Keller, what about e-mails?
15 Did you e-mail with anyone or -- or communicate in
16 writing with anyone about the case in preparation
17 for your deposition?
18 A      No.
19 Q      Do you keep as part of your job --
20 attorneys keep time records oftentimes.  Do you
21 keep any kind of time records of your time when
22 you're working at Travelers, you know, working on a
23 particular matter versus another matter?
24 A      No, we don't keep -- I don't keep time.
25 Q      Okay.  Has that always been the case

18

1  during your time at Travelers?  You've never --
2  because you've switched positions as I understand
3  it.  Have you ever had to keep your time?
4  A      No.  It was not mandatory for me to
5  keep my time.
6  Q      You ever given your deposition before?
7  A      No.
8  Q      Okay.  Ever been a party to a lawsuit?
9  A      Yes.
10 Q      I don't want to get in too much; I want
11 to respect your privacy.  Can you tell me what it
12 was about basically?
13 A      It -- it was years ago.  It was about a
14 credit card.
15 Q      Okay.
16 A      Yeah.
17 Q      That's good.  Yeah, that's fine.
18 Anything else besides the credit card case?
19 A      No.
20 Q      Okay.  After graduating law school did
21 you find a job?
22 A      Eventually.
23 Q      Okay.  How long was it between the time
24 you graduated and your first legal job?
25 A      I graduated in 2014.  I started with

19

1  Travelers March of 2015.
2  Q      Okay.  What'd you do during that time
3  period?
4  A      I worked for --
5  Q      Did you have other employment?
6  A      Temporarily I worked for Enterprise.
7  Q      Okay.  And then you found a job at
8  Travelers March of 2015?
9  A      Yes.
10 Q      Okay.  And your first job as I
11 understand it was as a technical specialist,
12 liability?
13 A      Correct; general liability.
14 Q      General liability; okay.  What
15 department were you in?
16 A      General liability.
17 Q      Okay.  So that's --
18 A      In --
19 Q      -- that's kind of the department or
20 group?
21 A      Correct.
22 Q      Okay.  What were your duties in that
23 first position?
24 A      So it -- it really truly dealt with
25 everything that -- you know, that -- that falls

20

1  within the claim-handling spectrum.  You receive
2  first notices of loss, you communicate with the
3  claimant, the insured, you investigate the claim,
4  you -- if the matter is in suit you facilitate or
5  work with the attorney that has been assigned to
6  handle the matter, and you work with them until the
7  -- to the end of the case, however that case is
8  disposed, and you essentially investigate the claim
9  throughout.  You review medical records, you,
10 again, communicate with various parties that may
11 have been involved to essentially get their
12 assessment of the -- of the incident, and like I
13 said, you -- you essentially work through the case
14 until -- or the matter until it's resolved, whether
15 it be --
16 Q      Okay.
17 A      -- through trial or through settlement.
18 Q      Were there -- were there -- were they
19 auto cases or other kinds of cases?
20 A      They were general liability cases,
21 slips-and-falls, I did work on a couple of
22 homeowner cases, so for the most part, you know, it
23 was commercial general liability.  So you got a lot
24 of trips-and-falls, slips-and-falls, and things of
25 that nature.

**Enante Darout   10/18/2021**

21

1  Q       So business -- businesses that -- that
2  had insurance would -- would get lawsuits over
3  slip-and-falls and other injuries, and people would
4  sue the business?
5  A       Correct.  And also too, like I
6  mentioned, I did handle homeowner cases some.
7  Q       Okay.  So like your tree falls on some
8  -- you know, somebody's car or whatever?
9  A       Dog bites.  Yes.
10  Q       Dog bites, yeah.  Okay, okay, okay.
11  But at this point you weren't really dealing with
12  auto cases?
13  A       Correct.
14  Q       Okay.  So it sounds like you were --
15  you started as kind of a -- a claim professional or
16  we sometimes call them adjustors?
17  A       Correct.
18  Q       Is that fair?  You were basically kind
19  of an adjustor?
20  A       Correct.
21  Q       Although you were an attorney.  Did you
22  need to be an attorney to be an adjustor, or was it
23  a kind of a training thing?
24  A       I did not need to be an attorney to be
25  an adjustor, but I was.

22

1  Q       Right.  And so why did you start as an
2  adjustor?
3  A       As opposed to an attorney?
4  Q       Right.
5  A       I guess that's the question?
6  Q       Exactly.
7  A       I see.  Okay.
8  Q       Why didn't you leapfrog over and just
9  start as counsel?  Can you tell that story?
10  A       Well, essentially after moving from
11  Michigan, where I went to law school, to New Jersey
12  I applied to various places, and again, I saw that
13  one of the aspects of the claim-handling or claim-
14  adjusting process is to work through litigation,
15  and I thought that I can apply my degree to that
16  portion of -- of the job role and responsibility.
17  Q       I see.  Were you contemplating when you
18  took that job that you would move up and into more
19  of a lawyer kind of role?
20  A       When I took that job in 2015 that
21  wasn't in my immediate -- I guess my -- my
22  immediate thought process.  It wasn't in my
23  purview.  It was simply doing the -- the -- the
24  adjusting, and that was my thought process or my
25  mind set at the time of hiring.

23

1  Q       Gotcha.  So as an adjustor, part of
2  your job was not writing coverage letter --
3  coverage opinion letters; correct?
4  A       Coverage opinion letters?  No, not
5  coverage opinion letters.
6  Q       Okay.  You wrote letters probably to
7  insureds and --
8  A       Reserving my -- the rights and --
9  Q       Right.
10  A       -- coverage denials and things of that
11  -- that nature.
12  Q       Right.  Okay.  Your supervisor was
13  Peter Sanborn?
14  A       No.  He's my current supervisor.
15  Q       Okay.  Who was your supervisor back
16  then?
17  A       Albert Green I believe.
18  Q       Green like the color or with an E on
19  it?
20  A       Green like the color, uh-huh.
21  (Affirmative)
22  Q       Okay.  And you worked in that capacity
23  until roughly June of 2018?
24  A       Correct.
25  Q       Okay.  So I want to figure out how --

24

1  how it works in terms of getting assignments.  I
2  work at a private law firm.  The older attorneys
3  will usually send assignments to the younger
4  attorneys, and we do.  How was it that you received
5  your assignments as a technical specialist?  With
6  -- with whom did you interact within the Travelers
7  organization?  Can you kind of tell that story?
8  A       As a technical specialist, the
9  assignments were simply given to you.  There
10  weren't -- I mean, and after your review -- after
11  your review of the case or whatever documents or
12  materials you're provided, that discussion is had
13  with the manager to determine whether you kept the
14  case or whether the case was -- or whether the
15  claim -- I should say claim, not case -- whether
16  you kept the claim --
17  Q       Uh-huh.  (Affirmative)
18  A       -- or that the claim should be
19  elevated.
20  Q       Okay.  So is that a unit manager that
21  you'd work with?
22  A       Correct.
23  Q       Okay.  Is that person considered your
24  supervisor, or is that someone else?
25  A       That is -- that would be my supervisor.

**Enante Darout   10/18/2021**

---

25

1  Q        Okay.
2  A        That was my supervisor.
3  Q        Okay.  And so Mr. Green was your unit
4  manager at that time?
5  A        In 2015, yes.
6  Q        Okay.  Did -- did your unit manager
7  become someone else?
8  A        Over time, yes.
9  Q        Okay.  What other unit managers have
10  you had?
11  A        Elizabeth Heebner.
12  Q        Can you spell her last name?
13  A        H-e-e-b-n-e-r.
14  Q        Anyone else?
15  A        No.
16  Q        So how did you get your assignments?
17  Did someone hand you a piece of paper, did you get
18  an e-mail, was it an internal communication within
19  a Travelers communication system?
20  A        The latter.
21  Q        Okay.  So an internal communication
22  system within Travelers?  What is that system
23  called?
24  A        Claim Platform.
25  Q        And it's only accessible by Travelers

---

26

1  employees?
2  A        Correct.  I believe so.
3  Q        Okay.
4  A        I -- I believe so.
5  Q        Does it function like e-mail?  Are
6  there electronic messages that go between people?
7  A        In Claim Platform?  I -- I believe
8  there can be notes.  I believe unit managers can
9  insert notes if necessary so that it can alert the
10  claim professional of whatever that they need to be
11  alerted about.  But in terms of like an instant
12  messaging feature, something like that, I don't
13  believe there is one.  I could be -- I could be
14  wrong, but I don't believe there is one.
15  Q        I see.  So -- so through the -- the
16  Claim Platform you would get a new assignment from
17  someone?
18  A        Correct.
19  Q        Would you get assignments from your
20  unit manager, or would you get assignments from
21  other people?
22  A        I believe it was -- and I don't want to
23  -- I don't want to guess here, so I don't want to
24  say the wrong thing.  So I -- I cannot say for
25  certain how that works.

---

27

1  Q        You don't remember how you got your
2  assignments?
3  A        I do remember that it was a popup.  I
4  don't know who assign -- in terms of whether it
5  came from a unit manager or whether it came from a
6  notice-of-loss department, you know, it could be
7  either one, but I'm uncertain as to how they would
8  come.  I know that they came through the Claim
9  Platform program, but how they were uploaded I
10  can't say for sure.
11  Q        Could you see the Claim Platform
12  program on your phone?
13  A        No.  No.
14  Q        Was it only accessible if you were in
15  the Travelers office where you were designated?
16  A        For me at least it was.
17  Q        Okay.  Are the notes, the information
18  that you insert in the Claim Platform on a
19  particular case, is that information preserved by
20  Travelers?
21  A        I believe so.
22  Q        Can it -- can it be accessed by the
23  appropriate people, do you know, unit man --
24  A        The appropriate --
25  Q        -- unit managers --

---

28

1  A        The appropriate --
2  Q        -- for example?
3  A        The appropriate people, I believe so.
4  Q        Okay.
5  A        The unit manager would be one of them I
6  believe.
7  Q        Okay.  And back in 2015 did you also
8  use e-mail to communicate with third parties
9  outside of Travelers?
10  A        I would.
11  Q        Okay.  Is that e-mail, would it be
12  available on your phone, or was it also only
13  accessible if you were in the office?
14  A        For me it was only accessible in the
15  office at that time.
16  Q        Okay.  Yeah, and we're talking about --
17  still about working as a technical specialist.
18  A        Right.
19  Q        Did your job as a technical specialist
20  involve analyzing the law and giving legal advice?
21  A        No.
22  Q        So after a few years, looks like about
23  three years roughly, you moved into another
24  position --
25  A        Correct.

---

**Enante Darout   10/18/2021**

29

1  Q        -- with Travelers?
2  A        Correct.
3  Q        What was that position?
4  A        In June of 2018 I started a secondment,
5  or a talent share program, where I reported to a --
6  to a claim legal liability in -- in Hartford.  That
7  was about six to seven months that I did that.
8  Q        You called it a secondment?
9  A        Well, they called it secondment.
10 Q        Secondment?
11 A        Correct.
12 Q        So like second ment?
13 A        Right.
14 Q        What is -- what is that?
15 A        A secondment is -- is essentially --
16 how I interpret it to be because, quite frankly, it
17 was the first time I've heard of that term too, I
18 equate it to a talent share where it would allow me
19 to take on a -- a new role and essentially
20 experience that -- that new role and everything
21 that -- that it entailed, so --
22 Q        Okay.  And your title was associate
23 counsel?
24 A        Correct.
25 Q        And your department was claim legal?

30

1  A        Claim legal liability.
2  Q        Claim legal liability?
3  A        Correct.
4  Q        So this -- would it -- would you call
5  it like an internship?
6  A        It is similar in -- in many ways to --
7  Q        I mean, it was paid obviously.
8  A        -- to an internship.
9  Q        Or maybe a clerkship?  Was it like a
10 clerkship --
11 A        I wouldn't call it --
12 Q        -- in private practice?
13 A        I wouldn't call it a clerkship.
14 Q        No?  Okay.  Okay.  So you were -- you
15 were hired and moved to kind of learn this new --
16 new job essentially?
17 A        It was an opportunity to -- to
18 experience a -- a new role.
19 Q        New role?  Okay.  Okay.  And unlike the
20 technical specialist, was this new role more of a
21 lawyer, attorney, position?
22 A        Correct.
23 Q        And did you provide legal advice, deal
24 with coverage issues?
25 A        I did.

31

1  Q        Okay.  Write coverage opinion letters?
2  A        I did.
3  Q        Were you required to have a legal
4  degree for this position?
5  A        Yes.
6  Q        So you were using your -- your law
7  degree?
8  A        Correct.
9  Q        Okay.  Who was your supervisor in -- in
10 this secondment role?
11 A        Katie Pak was her -- Katie Roh was her
12 married name, but she was Katie Pak at the time.
13 Q        Roh, R-o-h?
14 A        You got it.
15 Q        So same kind of question about how you
16 got your assignments.  Did that change?
17 A        It did.
18 Q        And -- and how?  Tell me the story of
19 that process, how you got your assignments and how
20 you communicated, et cetera.
21 A        And so those assignments were given to
22 me by an assigning attorney, so they wouldn't
23 necessarily come from Katie.  And I would work with
24 the assigned -- well, the attorney who assigned the
25 matter to me to draft, issue, and render the

32

1  opinion.
2  Q        Were the assigning attorneys all in the
3  same physical office as you were, or were they
4  scattered throughout?
5  A        They were scattered throughout the U.S.
6  Q        Okay.  How did they choose you?
7  A        I'm not exactly sure how they chose me.
8  I mean, I wasn't part of that process.
9  Q        Okay.  So they would not send their
10 request to Katie Roh and ask Katie Roh to -- to
11 find someone to do this particular task?  You would
12 -- you would get your assignment directly from
13 attorneys probably that you didn't personally know;
14 is that correct?
15 A        I would get the -- I would get my
16 assignments through -- through the assigning
17 attorney.  Whether they had a conversation with
18 Katie or not I can't say.  I do not know.  But the
19 assigning attorney -- the attorney assigning the
20 matter would simply reach out to me.
21 Q        How would they reach out to you?
22 A        Either via e-mail or phone call,
23 sometimes both.
24 Q        Okay.  So this was the standard e-mail
25 that we're familiar with, not the internal Claim

Enante Darout   10/18/2021

33

```
1   Platform?
2   A        Correct.
3   Q        Okay.  And is there a roster of people
4   like you that -- that -- I mean, how did they come
5   to find you?
6   A        I -- I -- I think or I believe I was
7   the -- the only associate counsel in -- in the
8   liability group at the time, and so it wasn't hard
9   to find me.
10  Q        Yeah.  Okay.  So if you needed -- let's
11  say you got a assignment to do a coverage opinion
12  on some issue.  You would get an e-mail and/or a
13  phone call or maybe both from your assigning
14  attorney?
15  A        Correct.
16  Q        And you-all could talk about what they
17  needed from you and et cetera, and then you'd be on
18  your own basically to figure it out and produce
19  some kind of work product.  Is that -- is that
20  fair?
21  A        They -- yes.  They would -- we would
22  discuss the -- the referral.  At that point if I
23  had any questions I would -- I would ask.  And then
24  I would be off to do my own research, to draft, and
25  then I would circle back with the assigned --
```

34

```
1   assigning attorney to discuss what I -- what I --
2   what I concluded.  And if there were changes or
3   edits that needed to be made because of my grammar
4   or some sort, or if they wanted to review the cases
5   that I pulled, they would -- we would -- we would
6   do that at the time, and then we would issue the
7   opinion.
8   Q        Okay.  And would -- would all the
9   materials that you needed to do a particular job,
10  write a particular letter let's say, would all of
11  those be provided by the assigning attorney, or
12  could you independently -- let's say the matter
13  involved a car wreck, and Travelers had claim
14  notes, they had materials regarding that traffic --
15  that car wreck, maybe a police report.  Could you
16  independently find those materials, or did they all
17  have to come from the assigning attorney?
18  A        I could independently find those
19  materials.
20  Q        Okay.  So you probably had a claim
21  number, and with that claim number you -- you had
22  authority to look at the -- the records about that
23  particular matter?
24  A        I could.
25  Q        Yeah; okay.  What kinds of things would
```

35

```
1   you typically -- for a coverage question, what
2   kinds of things typically would you review?
3   A        Usually it would be the claim notes,
4   the claim file, file cabinet.  That's where the
5   documents are housed.  I would jump on Westlaw to
6   determine -- or to do my -- to do my legal
7   research, and any other resources that I -- that I
8   could find to help provide some guidance in
9   whatever issue that I'm researching.
10  Q        Okay.
11  A        So I wasn't limited to simply what was
12  provided to -- to me.
13  Q        Gotcha.  Okay.  Were there any other
14  outside resources that you would utilize typically
15  other than -- than Westlaw?
16  A        No.
17  Q        Okay.  Yeah.
18  A        Maybe if -- if there was something that
19  I could find on Google Scholar I would absolutely
20  use that, but, I mean --
21  Q        You weren't limited in what you could
22  take a look at to help you?
23  A        Correct.
24  Q        Okay.  I'm not saying you should've
25  been.  I'm just trying to figure out your typical
```

36

```
1   kind of process.
2   A        I mean, oftentimes the -- the materials
3   would be presented to me that I would need to
4   review --
5   Q        Right.
6   A        -- but I wasn't limited.
7   Q        Right.  So this secondment kind of
8   position, it lasted until when?  Started June of
9   '18.
10  A        January?
11  Q        I have February of '19.
12  A        February.
13  Q        Does that sound right?
14  A        Yep.
15  Q        Okay.  And then what happened then?
16  Where -- where'd you go?
17  A        Then I became -- I applied to the claim
18  legal property unit, and I became associate counsel
19  with claim legal property.
20  Q        Okay.  And then you -- in April '20 you
21  moved into an associate counsel, corporate legal
22  services, position?
23  A        Correct.  Corporate legal.  Yes, that's
24  correct.  That's correct.
25  Q        And that's where you are today?
```

Enante Darout   10/18/2021



37

```
 1  A       Correct.
 2  Q       Okay.  So let's go back to the
 3  secondment job.  Did that job involve -- unlike the
 4  technical specialist, did that job involve
 5  analyzing the law and giving legal advice?
 6  A       I'm sorry; can you repeat the question?
 7  Q       Sure.
 8  A       I missed it.
 9  Q       Sure.  The secondment position, the
10  talent share position, did that involve analyzing
11  the law and giving legal advice?
12  A       It did.
13  Q       Because you said when you were in the
14  adjustor position you didn't really -- that wasn't
15  part of your duties, but -- but it was with -- with
16  the second position?
17  A       Correct.
18  Q       Okay.
19  A       Actually, to clarify -- just a
20  clarifying point.
21  Q       Yeah, go ahead.
22  A       We reviewed law as -- as an adjustor.
23  However, we did not render advice.  There were case
24  law that we were -- that we were well-versed in
25  because simply the impact that they may have, so
```

38

```
 1  there were cases that we just knew, but we never --
 2  at that point never rendered legal -- legal opinion
 3  as a claims adjustor.  Sorry.
 4  Q       Gotcha.  I understand.  Thank you for
 5  the clarification.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Enante Darout   10/18/2021



Enante Darout   10/18/2021



Enante Darout  10/18/2021

13 (Pages 49 to 52)



**49**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**50**

1
2
3
4
5
6
7
8
9
10
11
12
13
14 Q     Was this the first one, 26?
15 A     I be -- I'm sorry?
16 Q     Excuse me.  Go ahead.
17 A     I believe it --
18 Q     Twenty-eight.  Twenty-eight.
19 A     I believe it -- it was -- I believe it
20 was.
21 Q     Okay.  How many before the Woods
22 letter, Exhibit 28, how many of your coverage
23 letters involved Kentucky law?
24 A     Can't say many.
25 Q     Can you remember any?

**51**

1 A     No, I can't remember any.
2 Q     Have you ever written a coverage
3 opinion letter involving Kentucky law besides
4 Woods?
5 A     I can't recall.
6 Q     Prior to the November 28th, Exhibit 28,
7 had you ever given anyone advice based upon -- as
8 an attorney based upon Kentucky law?
9 A     I can't recall.  I don't believe so,
10 but I can't -- can't recall for certain.
11 Q     So I want to go back.  This is the
12 product, the work product, dated November 28th,
13 Exhibit 28.  That -- that was the product of your
14 work on Woods?
15 A     Correct.
16 Q     Okay.  I want to go back before that
17 and kind of go through real quickly a little bit of
18 history.
19         By the way, Ms. Darout, if you need to
20 take a break at any time, just let us know and --
21 and anybody else, and we'll take a break; okay?
22 A     Okay.
23 Q     Are you good to go?
24 A     Yes.
25 Q     Okay.  I want to first look at Woods --

**52**

1 the Woods Exhibit 16.  I shared that folder.
2 Hopefully you got it.  So there's a separate folder
3 called, Woods Exhibits, and let's go to 16.  Excuse
4 me.  Yes, that's right.
5         So we sent a collection of materials to
6 Travelers early in September of '18 with all the
7 medical bills and -- and pictures and so forth and
8 made a demand for the policy limits.  And this was
9 the response by Paul Galanski.  This is Exhibit 16
10 in the Woods deposition.  It's an e-mail dated
11 October 5th, 2018.  Have you seen this before,
12 Ms. Darout?
13 A     No, I have not.
14 Q     Okay.  So he's writing to confirm a
15 settlement offer in the amount of $39,000, new
16 money, to resolve the pending underinsured motorist
17 bodily injury claim on behalf of your client, Laura
18 Woods.  This offer is inclusive of medical bills,
19 lost wages, out-of-pocket expenses, and/or liens.
20 This figure represents the available $100,000 each
21 person policy limit less credits for payments by
22 the tortfeasor of 50 and MP/PIP that totals 11,000.
23 Our calculation for setoffs equals $61,000, leaving
24 39,000 in available coverage.  Please see the
25 attached policy, payout ledger, and release for

Enante Darout   10/18/2021

53

1    your client's signature.
2          Does that scenario sound familiar to
3    you?
4    A      Yes.
5    Q      And he attaches -- there's where we
6    sent it, sent the information to him on September
7    14th, and so he responded on October 5th and
8    attached the policy and the PIP ledger and a
9    general release. You've not seen any of this
10   material?
11   A      No.
12   Q      Okay. But you don't have any
13   information that it didn't occur, do you?
14   A      No. I don't have any information at
15   all.
16   Q      Okay. So he responds October 5th. And
17   then -- so I want to look at Exhibit 25. This is a
18   new exhibit. So Mr. Galanski says there's a
19   $100,000 limit, but we have to take away the
20   $50,000 that Ms. Woods got from Eaves/USAA, and
21   then you got to take away the $10,000 of sometimes
22   it's called O-P-I-P, out-of-state PIP; right?
23          (Said document is filed with this
24          deposition and marked as Plaintiff's
25          Exhibit No. 25 for purposes of

54

1          identification.)
2    A      Uh-huh. (Affirmative) Yes.
3    Q      You have to say yes. Okay; thanks.
4    And then 1,000 of med pay; right --
5    A      Yes.
6    Q      -- for a $39,000 offer. So is Eaves
7    the fellow who was responsible for the car wreck?
8    Did he -- is he the one that crossed the
9    centerline?
10   A      From my understanding, yes.
11   Q      Okay. Explain what med pay is.
12   A      Med pay from what I understand is how
13   we actually write it in the policy. It's -- it's
14   an amount that based on certain circumstances that
15   would be paid -- that would be paid regardless of
16   fault.
17   Q      Okay. And so it covers medical bills
18   up to 1,000?
19   A      It does cover medical bills up to
20   1,000.
21   Q      Co-pays, prescriptions, that sort of
22   thing?
23   A      Correct.
24   Q      Okay. What about PIP, out --
25   out-of-state PIP? What -- what is that?

55

1    A      I don't understand the -- the question.
2    Q      Is there some -- is there some coverage
3    that's required in Kentucky that was paid?
4    A      From what I understand, Kentucky does
5    have that $10,000 PIP payment max.
6    Q      Okay. And that's required because the
7    loss was in Kentucky?
8    A      Correct.
9    Q      Okay. So we were not satisfied with
10   that, and so we spent the next two or three weeks
11   analyzing the policy and writing a coverage opinion
12   letter that we sent to Mr. Galanski -- I'm on
13   Exhibit 26 now -- we sent to him on October 30th of
14   '18. Do you see that?
15          (Said document is filed with this
16          deposition and marked as Plaintiff's
17          Exhibit No. 26 for purposes of
18          identification.)
19   A      Can you zoom in, please?
20   Q      Sure. Is that any better?
21   A      Yes. Yes. Better, thank you. Yes,
22   October 30th is when it was sent.
23   Q      Dear Mr. Galanski, please see the
24   attached letter regarding the coverage/setoff
25   issue. So the issue is Ms. Woods thinks you can't

56

1    offset by any of these items, and Travelers thinks
2    that they can; right?
3    A      Yes.
4    Q      And it comes down to a question of
5    whether Kentucky or Connecticut law applies to this
6    particular loss; correct?
7    A      Correct.
8    Q      Okay. And so have you seen this,
9    Exhibit 26?
10   A      No, I have not.
11   Q      So attached is a 15-page letter that we
12   wrote. Have you seen that?
13   A      I have.
14   Q      Okay. Fifteen pages; correct?
15   A      Correct.
16   Q      And then you did your thing and came up
17   with a letter dated November 28th of 2018, which is
18   Exhibit 28; correct?
19   A      Correct.
20   Q      Okay. That was not shared with us at
21   the time, but Mr. -- it was communicated to us.
22   Let me see if I can find it. Woods Exhibit 19. So
23   we got Exhibit 19, which is Woods Bates 2356, from
24   Matt Parsons. And so -- so your letter was
25   November 28th, and on December 6th he wrote to us

**Enante Darout   10/18/2021**

---

**57**

1  and said, we have completed our review and believe
2  Connecticut law would govern and we're able to take
3  the offsets on the matter.  The offer stands at the
4  remaining applicable UIM limits of 39,000.  Please
5  advise.
6       Have you seen that?
7  A       No.
8  Q       Okay.  And the rest is history, as they
9  say.  Tell me -- so that's the background to your
10  getting this assignment to write this letter.  Tell
11  me how you got the assignment.  How did you -- how
12  did you receive it?  Go ahead.
13  A       I believe it was sent via e-mail.
14  Q       From -- go ahead.
15  A       I believe it was sent via e-mail by
16  Patricia -- Patricia Allen.
17  Q       Who is she?
18  A       She was the one who supervised this
19  assignment.
20  Q       And she is with what department?
21  A       Claim legal auto.
22  Q       Okay.  Okay.  So you believe that
23  Patricia Allen sent you a e-mail or communication?
24  A       I believe so.  Either it was an e-mail
25  communication or perhaps she spoke to me and then

---

**58**

1  it was forwarded to me, but I do remember that I
2  had a communication with her prior to actually
3  getting my hands on the assignment, prior to
4  receiving it.
5  Q       Okay.  And what did the assignment say
6  if it was -- if it was in writing, or what did she
7  say?
8  A       I can't recall as I don't have that
9  e-mail.  If it was an e-mail I know I don't have
10  it.
11  Q       Have you -- have you looked for it?
12  A       I'm sorry?
13  Q       Have you looked for the e-mail?
14  A       No, because I know that at least
15  Travelers back then had a two-year retention policy
16  on e-mails, so when -- when I -- when I learned of
17  this deposition, that -- that -- that was long
18  gone.
19  Q       What is their retention policy?
20  A       On e-mails I believe it's two years
21  they hold it.
22  Q       And they automatically then delete
23  it --
24  A       They --
25  Q       -- or archive it somewhere?

---

**59**

1  A       I -- I don't know.
2  Q       Okay.
3  A       I don't know what happens to it after
4  that.
5  Q       So you think you got an e-mail from
6  Ms. Allen?
7  A       If not an e-mail then it was a
8  communication, it was a direct conversation.  I'm
9  not exactly sure.
10  Q       Do you-all work in the same building or
11  is she in a different location?
12  A       We were in the same building at that
13  time.
14  Q       Okay.  So who was sort of your
15  supervisor or boss on this -- on this assignment?
16  A       Patricia Allen.
17  Q       It wasn't Katie Roh?
18  A       She is the supervising attorney of the
19  entire secondment program, but Patricia Allen was
20  the one who assigned this matter to me.  As I
21  mentioned before, I work with the attorney who
22  assigns the case or assigns the referral to me.
23  Q       So if you have a question you go to the
24  assigning attorney?
25  A       Precisely.

---

**60**

1  Q       Okay.  Do you know why Patricia Allen
2  selected you?
3  A       I do not know why.
4  Q       Do you know why she did not retain
5  coverage counsel in Kentucky to do this?
6  A       I do not know why.
7  Q       Travelers has outside counsel, like
8  Mr. Keller, Mr. Maloney, who represent it in
9  coverage matters in Kentucky and elsewhere;
10  correct?
11  A       I'm sorry?  Stephen Keller?
12  Q       Travelers has panel counsel that handle
13  defense and coverage matters for it in probably 50
14  states but including Kentucky; correct?
15  A       I believe so, yes.
16  Q       Okay.  I'm just curious why Travelers,
17  Patricia Allen, chose you as opposed to somebody
18  who is licensed in Kentucky.  Do you -- do you
19  know?
20  A       I'm sure it had something to do with
21  the fact that she was confident in the work product
22  that I have provided before.
23  Q       Have you worked for -- for her before?
24  A       No, not for her specifically before,
25  no.  But I'm sure that -- you know, that I -- my --

---

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Enante Darout  10/18/2021

---

61

1   my work and my reputation as being a competent
2   attorney, being able to research items and come to
3   sound conclusions, could've been part of it. I did
4   good work, and so maybe that had something to do
5   with it.
6   Q        Had you done other coverage letters for
7   claim legal auto?
8   A        I have.
9   Q        Up to that time?
10  A        I have.
11  Q        Okay. But not for Ms. Allen?
12  A        No, not for Ms. Allen.
13  Q        Is it less expensive for Travelers to
14  ask in-house staff to write legal opinion letters
15  rather than hiring outside counsel in Kentucky?
16  A        Perhaps. I don't know. I don't know
17  what the costs are.
18  Q        You don't see the bills from outside
19  counsel, defense counsel?
20  A        I haven't seen a bill while during a
21  secondment for outside coverage for -- for a
22  coverage opinion, no.
23  Q        Did you -- did you see attorney bills
24  when you were in your adjustor position?
25  A        Yes.

---

62

1   Q        Because you were kind of managing
2   litigation?
3   A        Precisely.
4   Q        Okay. If -- if Travelers reduces its
5   expenses by -- by letting in-house people do
6   coverage letters, does Travelers' profits increase?
7        MR. KELLER: Objection --
8   A        I wouldn't know --
9        REPORTER: I'm sorry? I didn't get
10  that.
11       MR. KELLER: Sorry. I just said
12  objection to the form, but go ahead.
13  Q        Let me rephrase. If Travelers reduces
14  its expenses by not hiring qualified counsel in
15  Kentucky to address Kentucky law issues, does
16  Travelers see an increase in profits?
17  A        I would not know anything about that
18  profit margin.
19  Q        So you don't know whether if Travelers
20  spends less it makes more?
21  A        If Travelers --
22  Q        Don't you have a master's in corporate
23  finance?
24  A        I'm sorry?
25  Q        Don't you have an LL.M. in finance?

---

63

1   A        I have a LL.M. in corporate law and
2   finance.
3   Q        Finance?
4   A        So you're asking me what again?
5   Q        Well, I asked you if it was less
6   expensive for Travelers to ask in-house staff to
7   write legal opinions rather than outside counsel in
8   Kentucky.
9   A        Well, obviously if there's not a cost
10  associated then there would be some savings, but I
11  don't think that that speaks to the competency of
12  the attorney, whether in-house or outside counsel,
13  in handling the matter.
14  Q        I'm just talking about the financial.
15  A        And I think I responded to your
16  question.
17  Q        So the answer is yes, they -- it is
18  less expensive. And then my next question was, if
19  Travelers saves on expenses, does its profit go up?
20  A        I don't necessarily think those two are
21  -- are they tie all the way 100 percent because
22  there are factors aside from that that would go
23  into allocating or calculating profits, but --
24  Q        Okay. I'm going to show you Exhibit
25  27, Ms. Darout. Do you see that, Exhibit 27?

---

64

1            (Said document is filed with this
2            deposition and marked as Plaintiff's
3            Exhibit No. 27 for purposes of
4            identification.)
5   A        Yes.
6   Q        Okay. What is that?
7   A        That is the referral for this -- for
8   this matter.
9   Q        Okay. Well, it looks to be an e-mail;
10  is that true?
11  A        Yes, it is in e-mail form, but -- but
12  that is the request for legal advice, the referral
13  as we call it.
14  Q        Okay. That's a referral. So that's --
15  this is one of the ways you get an assignment?
16  A        One of the ways.
17  Q        Okay. Do you always get a formal
18  request for advice kind of document for each
19  assignment?
20  A        No.
21  Q        Okay. Sometimes it's less formal?
22  A        Yes.
23  Q        Okay. So this is asking for -- it's
24  got a claim number, and it's October 31, '18. And
25  it says, claimant, Laura Woods. So have you --

Enante Darout  10/18/2021

65

1  have you seen this before?
2  A     I have.
3  Q     Okay.  And it goes through some of the
4  -- what the issue, and it says the claim adjustor's
5  Matt Parsons and his unit manager is Chris Pencak
6  is it, P-e-n-c-a-k?
7  A     Correct.
8  Q     Do you know Chris?
9  A     I do not.
10  Q     Okay.  Do you know Matt?
11  A     I do not.  I know he's the
12  professional, the claim professional on this
13  matter, but I don't know him.
14  Q     Okay.  So the e-mail says it was sent
15  from Matt Parsons to Chris Pencak, cc Matt Parsons,
16  October 31, '18; is that correct?
17  A     Correct.
18  Q     So how did it get to you?
19  A     I don't know how this went from Matt
20  and Chris to the claim legal auto department.  All
21  I know is that it was either sent to me via e-mail
22  -- well, it was sent to me via e-mail I believe.
23  I'm not sure if it was because I had that
24  conversation with Pat and then Matt forwarded the
25  referral to me, or whether it was -- I don't

66

1  remember the chain of -- of -- or the order in
2  which it got to me in terms of Pat's involvement.
3  Q     Okay.  Well, I want a copy of that
4  e-mail.
5  A     I -- I don't know if I -- that's what
6  I'm saying.  I don't know if I have it because,
7  again, when this all arose that was I don't know
8  how long ago, so, I mean --
9  Q     You can --
10  A     -- I would --
11  Q     You can address that with Mr. Keller.
12  I've been asking for this e-mail.  I want this
13  e-mail.  I want you to find it, archive, whatever,
14  find it.
15  A     As I said, I believe that's how it
16  happened.  Again, I cannot be certain.
17  Q     Well, I'm going down here to the bottom
18  where it says, other participants --
19  A     Uh-huh.  (Affirmative)
20  Q     -- and you're not listed.  So somebody
21  printed it, walked it down the hall, whatever,
22  whatever, it's two or three years old, it's not
23  forever.  I want the e-mail where you got your
24  assignment.  So you can talk to Mr. Keller about
25  that after we're -- after we're done.

67

1           Attached files to this, looks like the
2  insurance policy, Newberry policy, is attached as a
3  PDF.  Do you agree?
4  A     Correct.  I do agree.
5  Q     And then Kentucky offset language
6  letter, I assume that's my letter.
7  A     I believe you're right.
8  Q     Okay.  Were there any other materials
9  that Matt or Mr. Pencak or Ms. Allen supplied to
10  you for this assignment?
11  A     No.
12  Q     Did you independently do some research
13  for this assignment?
14  A     I cannot recall.  I know my, like I
15  said, normal course of -- oh, no.  I'm sorry.  My
16  entire shelf just fell.
17  Q     Oh, that's okay.
18  A     I'll pick that up later.
19          I know the normal course for me is that
20  when I receive a claim referral or a referral
21  assignment such as this, I would review claim
22  review notes and I -- perhaps if necessary based on
23  the issue I would review the claim file.  I cannot
24  recall, though, my steps here.
25          MR. STOLTZ:  Can we take a short

68

1  ten-minute break?
2          MR. KELLER:  Sure.
3          MR. STOLTZ:  That be okay?  We're
4  making good progress.  I don't think
5  it's going to last too, too long.
6          VIDEOGRAPHER:  Okay.  The time is
7  11:08, and we're off the record.
8          (A brief break is taken.)
9          VIDEOGRAPHER:  We're now back on
10  the video record.  The time is 11:21.
11  Q     Ms. Darout, we were talking about what
12  you reviewed in -- that's part of this assignment.
13  But I wanted to go back and ask a couple more
14  questions about the assignment itself, why you, the
15  question of why you.  Do you know why Travelers or
16  Ms. Allen didn't select someone internal with
17  Travelers but licensed in Kentucky?
18  A     Do I know why?
19  Q     Yes.
20  A     No, I don't know why, why they made
21  their decision.
22  Q     Does Travelers have Kentucky employees?
23  A     I believe so, but I'm -- I'm not -- I'm
24  not certain, no.  I don't know.  I'm not certain.
25  Q     Do you know if they have anybody in

**Enante Darout  10/18/2021**

69

1  claim legal that has a Kentucky license?
2  A       I do not know that.
3  Q       Were there other people who were
4  interning with you besides just you?  Were you the
5  only one you said?
6  A       I was the only associate counsel, yes.
7  Q       Okay.  Okay.  And this is kind of
8  related.  Why not someone with some coverage
9  opinion experience and at least a review by someone
10 with a Kentucky law background?  I guess you don't
11 know why that either.
12 A       I can't answer that question; correct.
13 Q       Okay.  So let's go back to materials
14 reviewed.  We -- we've got the Newberry insurance
15 policy and my letter, the 15-page letter, and you
16 said you didn't really remember or do you remember
17 anything else that you reviewed as part of this
18 assignment?
19 A       The letter, the referral, the policy.
20 Those were the --
21 Q       I mean besides -- besides the case law
22 stuff.
23 A       Oh, okay.  Okay.  Yeah, those were the
24 three items I remember reviewing.
25 Q       So the -- you said the claim file or

70

1  the claim notes?
2  A       Excuse me.  Normally in practice, back
3  then at least, when I received an assignment I -- I
4  would review the claim file and the claim -- look
5  for the claim file cabinet and the claim notes,
6  depending on what issue I'm -- I'm trying to -- to
7  review or trying to figure out.
8  Q       Okay.  Explain to the jury in as simple
9  terms as you can --
10 A       Uh-huh.  (Affirmative)
11 Q       -- what's the difference between the
12 claim file and the claim notes?
13 A       The claim notes are the actual notes
14 that the claim professional can put in.  When I say
15 claim file I'm usually referring to the claim file
16 cabinet, and that is where the documents can be
17 stored as it relates to that particular claim.
18 Q       Okay.  So the claim notes are part of
19 and located in the claim cabinet?
20 A       No.  The claim file notes are not
21 located in the claim cabinet.  The claim --
22 Q       Okay.  Where --
23 A       The claim file cabinet is, again, the
24 -- where all the documents and -- and -- well,
25 yeah, documents can be stored relating to that

71

1  claim.  The claim notes is -- is exactly that,
2  where a claim professional can input claim -- their
3  notes into the -- into the -- into the claim, and
4  that can be, you know, notes about --
5  Q       Okay.
6  A       Yeah.
7  Q       So if it's an auto wreck you might have
8  in the claim cabinet, file cabinet, you might have
9  photographs, you might have a police report, you
10 might have a witness statement --
11 A       Precisely.
12 Q       -- that kind of stuff?
13 A       Precisely.
14 Q       Okay.  But the claim notes are the
15 claims -- or the notes that the adjustor makes, you
16 know, maybe about telephone conversations that he
17 or she has?
18 A       Precisely.
19 Q       Okay.  Okay.
20 A       Precisely.
21 Q       So which do you think you reviewed in
22 this assignment?
23 A       I can't recall whether I reviewed one
24 or both or neither or -- because the -- the issue
25 was simply spelled out in the referral, and that

72

1  simply dealt with which state would govern the --
2  this choice of law issue.
3  Q       Okay.  And so that's Exhibit 27 you're
4  talking about or whatever e-mail that you may or
5  may not have that forwarded this thing to you?
6  A       In the referral document, yes.
7  Q       Right.  Would -- if -- if you received
8  the assignment from Patricia Allen, would she have
9  added something to this e-mail, maybe some -- maybe
10 Chris Pencak forwards the e-mail to Ms. Allen,
11 Ms. Allen forwards the e-mail to you, would she
12 have written anything in addition?
13 A       I don't recall.  I don't know if she
14 would or wouldn't have.  I don't think anything was
15 written, but I don't -- I don't know.  I can't
16 recall.
17 Q       Okay.  I'm just trying to get the
18 universe of stuff that you looked at.
19 A       Understand.
20 Q       Anything else that you remember
21 specifically that you reviewed other than the case
22 law and the statutes?
23 A       No.
24 Q       Okay.  Let's pull up your letter, which
25 is 28.  So the first question I've got is, it looks

Enante Darout  10/18/2021

---

73

1  to me like these -- this is -- this page, Exhibit
2  28, this is Travelers 213 to 216, we're on 213
3  right now.  Can you see that?
4  A      Yes.
5  Q         It looks to me like there are two
6  documents here on this page.  It looks like there
7  is a privileged and confidential letter that starts
8  out, Matt, that's in a particular font and size,
9  and then above it is -- indicates that it was
10 communicated via e-mail with a different font in a
11 different size.  And the interesting thing about
12 this -- and I'm getting to a question -- is this
13 kind of trails off down like that, the top part.
14 Was there some other narrative, words, as part of
15 this e-mail that were excluded?  In other words,
16 was this kind of put on a copier and the e-mail
17 writing omitted?
18 A      No.
19 Q         Okay.  Because when I look at it, it's
20 kind of odd.  Usually when I send an e-mail there's
21 an attachment and you see an icon for the
22 attachment.  But when I print the e-mail it doesn't
23 print the attachment in this way, and if it does,
24 it's all aligned.  This kind of drops off.  Do you
25 recall writing an e-mail to Matt Parsons and

---

74

1  attaching this letter as an attachment?
2  A      No.
3  Q         How did you communicate it to
4  Mr. Parsons?
5  A        It was written in that e-mail, right in
6  the --
7  Q         So you wrote -- you wrote the text into
8  the e-mail?
9  A        Correct.
10 Q         Okay.  And it's -- your letter is four
11 pages; right?
12 A      Yeah, I believe so.
13 Q         Okay.  And as part of your work --
14 okay.  So you got this assignment on Novem -- on --
15 let's see.  I don't want to misquote dates.
16 Exhibit 27 was dated October 31, and this is dated
17 November 28, so that's 28 days.  Do you know if you
18 got the assignment on Halloween of 2018 or if it
19 took a few days?
20 A      I don't remember.
21 Q         Okay.  Okay.  Anyway, that's 28 days;
22 right?
23 A      Uh-huh.  (Affirmative)  Yes.
24 Q         And this was the only product of your
25 -- of your work on this assignment; correct?

---

75

1  A      Correct.
2  Q         You didn't do a supplemental or
3  anything, a revised?
4  A      I don't believe so.
5  Q         Explain to me in as -- and the jury in
6  as much detail as possible, what did you do to
7  produce this letter?
8  A      I read the referral, I reviewed the
9  policy, I read your letter, and I performed some
10 research of my own, and I remember drafting it.
11 And in a normal course I send it over to the
12 assigning attorney to review, and then once the
13 product is finalized it's sent over to Matt.
14 Q         Okay.  And I -- I note here that you
15 refer to Matt not as Mr. Parsons but Matt.
16 A      Uh-huh.  (Affirmative)
17 Q         Were you acquainted with Mr. Parsons?
18 A      No.
19 Q         You also end it with it says, best,
20 Enante.
21 A      Right.
22 Q         Or Enante; sorry.
23 A      Uh-huh.  (Affirmative)  Yes.
24 Q         It -- it sounds a little informal and
25 friendly.  You say -- had you met Mr. Parsons

---

76

1  before?  Had you talked to him before this
2  occasion?
3  A      No.
4  Q         Okay.  Do you remember talking to him
5  by telephone about the assignment at any time?
6  A        I may have.  Usually I call the claim
7  professional before issuing the -- the opinion.
8  Sometimes I will call right after I send it -- send
9  the opinion over.  But I -- I do speak with the
10 claim professional at the time the opinion is -- is
11 rendered.
12 Q         You don't have the e-mail that
13 represents I guess the assignment.  Tell me in your
14 own words, what was your assignment?
15 A        My assignment was to determine which
16 state law governs this -- this setoff issue.
17 Q         Okay.  The reason I ask is you put in
18 your letter here -- can you see my red underlining?
19 A      No.  There you go.  Yep.
20 Q         Because you recite what Mr. Parsons'
21 position is, that the Connecticut written policy
22 should prevail -- I think you mean the Connecticut
23 law should apply -- due to the significant
24 relationship Connecticut has with this loss.  That
25 was you describing Mr. Parsons' position; correct?

---

**Enante Darout  10/18/2021**

---

77

```
 1  A        Correct.
 2  Q        Which was Travelers' position; correct?
 3  A        Correct.
 4  Q        And then claimant's counsel believes
 5  the UIM limit of 100 should be tendered, while it's
 6  your position that $39,000 should be tendered;
 7  correct?
 8  A        Correct.
 9  Q        Okay.  And then above that, should
10  prevails, allowing -- that's a typo; correct?
11  A        Seems to be, yes.
12  Q        And then you say, the claimant -- as
13  the claimant has received $61,000, which has been
14  paid by or on behalf of Eaves.  Is that true?
15  A        It was an inadvertent misstatement.
16  Q        What would the correct statement be?
17  A        That 50,000 was paid by the -- or on
18  behalf of Eaves, the tortfeasor, and then the
19  subsequent -- there's a 10,000 PIP and a thousand-
20  dollar med pay.
21  Q        Those were not paid by or on behalf of
22  Eaves; correct?
23  A        Correct.
24  Q        Those are no-fault benefits.
25  A        Correct.
```

---

78

```
 1  Q        Correct?
 2  A        Correct.
 3  Q        What does no-fault benefits mean to the
 4  jury?
 5  A        Exactly what you stated, that because
 6  there's no -- there's no fault associated or tacked
 7  with it, that these monies are -- are simply
 8  granted because of several, you know, various
 9  reasons, one of them being that -- the thousand
10  being that they're medical payments that -- that
11  would need to be made, and the 10,000 would be
12  because of the location of the accident, and that's
13  what the Kentucky law prescribes in -- for -- as
14  far as PIP is concerned.
15  Q        So Ms. Woods had more than $11,000 of
16  medical bills and other lo -- they call them
17  special damages.  She had more than -- more than
18  that 11, so she was eligible to get the ten plus
19  the one of essentially no-fault benefits under the
20  Travelers policy; is that correct?
21  A        Correct.
22  Q        Okay.  That's just -- that 61 is just a
23  typo basically?
24  A        It was a misstatement, yes.
25  Q        Okay.
```

---

79

```
 1  A        An inadvertent misstatement.
 2  Q        Okay.  No problem.  So -- so then the
 3  next part of the -- of your letter you go into a
 4  factual background, and you talk about Mr. Eaves
 5  traveling on Military Pike and some of the details
 6  of what happened.  Do you know where this came
 7  from?
 8  A        It had to have come from the claim
 9  notes or the claim file cabinet.
10  Q        Okay.  Okay.  And then -- then you go
11  into and you type part of the policy language; is
12  that correct --
13  A        Correct.
14  Q        -- that you feel is kind of pertinent?
15  A        Correct.
16  Q        Okay.  And that comes from the un- and
17  underinsured motorist coverage, D1 under the
18  policy; correct?
19  A        Correct.
20  Q        And there's this language under limits
21  of liability, liability, the UIM hundred is limited
22  by amounts paid by or on behalf of persons or
23  organizations who may be legally responsible?
24  A        Uh-huh.  (Affirmative)  Yes.
25  Q        Right.  Again, that's referring to in
```

---

80

```
 1  this particular case the $50,000 that Mr. Eaves'
 2  insurance company paid; correct?
 3  A        Correct.
 4  Q        That does not include no-fault
 5  benefits; correct?
 6  A        Correct.  However, I believe that there
 7  is statute in Connecticut that addresses direct
 8  indemnity payments, which although not directly
 9  stated by the policy, I think we can read that in
10  with subsections that you've highlighted in the
11  letter but also section B as well of the policy.
12  Q        Okay.  Well, we're going to walk
13  through that policy --
14  A        Uh-huh.  (Affirmative)
15  Q        -- in more detail --
16  A        Sure.
17  Q        -- shortly, and we can talk more about
18  that.
19          So the first part of your -- sort of
20  the nonfactual part, the analysis part of your
21  letter, the first question that you raise is, is
22  there a conflict of laws?  Are the laws in
23  Connecticut and Kentucky different so that a choice
24  needs to be made?  Is that right?
25  A        Correct.
```

---

Enante Darout   10/18/2021

---

81

```
 1  Q       And you go through a little bit of
 2  Connecticut and some Kentucky, and you recite some
 3  language from the UIM statute in Kentucky, and you
 4  sort of conclude there seems to be a disconnect.
 5  So I think that means that you -- you see a
 6  difference in the laws; is that -- is that fair?
 7  A       Yes.
 8  Q       Okay.  You say one allows for a
 9  reduction to -- to the extent -- while one allows
10  for a reduction to the extent damages are paid on
11  behalf of the responsible party, the other would
12  call for the UIM to compensate the insured to be
13  compensated but for the fact that the tortfeasor
14  was underinsured.  I don't understand the second
15  part of that.  It looks like there's maybe a typo
16  of compensate and compensated.  Can you explain to
17  me what you're trying to say here?
18  A       I'm just reading it again.
19  Q       I think the first part is Connecticut,
20  damages minus payments, less payments?
21  A       I'm sorry; if you could just hold on
22  for a second while I read it.
23  Q       Yeah.  Go ahead.
24  A       Okay.  Now what was the question?
25  Q       What are you saying?
```

---

82

```
 1  A       That -- and you are correct in that the
 2  first part is trying to assert that -- what
 3  Connecticut -- what Connecticut's position is in
 4  that the -- you can reduce it by the amount of
 5  damages paid on behalf of the responsible party,
 6  and the second portion is it's calling out what
 7  Kentucky does.
 8  Q       The other, so -- so the up to
 9  responsible party, that -- you're talking about
10  Connecticut there?
11  A       Correct.
12  Q       So the other, that's Kentucky; right?
13  A       Uh-huh.  (Affirmative)
14  Q       Would call for the UIM to compensate
15  the insured to be compensated but for the fact that
16  the tortfeasor was underinsured.  I don't -- can
17  you -- I don't understand that.  It doesn't make
18  sense to me.  Can you explain it?  I mean, they're
19  both underinsured.  UIM is not implicated unless
20  the tortfeasor doesn't have enough insurance.
21  That's why they call it underinsured.
22  A       Uh-huh.  (Affirmative)
23  Q       The person that ran into Laura Woods
24  was underinsured.  He only had 50, and she had
25  catastrophic damages.  The other would call for the
```

---

83

```
 1  UIM to compensate the insured to be compensated but
 2  for the fact that the tortfeasor was underinsured.
 3  A       And your question is, is exactly what
 4  am I trying to say there?
 5  Q       Yeah.  What are you trying to say
 6  there?
 7  A       I think what I was trying to say there,
 8  and it obviously comes off the way that you're -- I
 9  understand the way that you're receiving it.  But
10  essentially it was supposed to call out that --
11  that Kentucky essentially processes it in -- in a
12  -- in a different way in that, you know, it bases
13  the -- the amount off of the -- sorry; things are
14  just falling all over the place -- based on the
15  total damages as opposed to subtracting it from --
16  from the -- what we know in Connecticut, from the
17  policy limits.
18  Q       So Kentucky is damages less limits;
19  Connecticut is what, limits minus --
20  A       Right.  According --
21  Q       -- payments?
22  A       According to -- yes, limits minus
23  payments, yes.
24  Q       Okay.  So Kentucky is -- let's say that
25  again.  Let's say that again.  Connecticut --
```

---

84

```
 1  A       Kentucky is --
 2  Q       Go ahead.
 3  A       Kentucky is damages less limits --
 4  Q       Right.
 5  A       -- and Connecticut is limits less the
 6  tortfeasor's liability apportionment.
 7  Q       Okay.  So either way we've got a
 8  conflict there; correct?
 9  A       Correct.
10  Q       So we need to do the choice-of-law
11  analysis; is that right?
12  A       Uh-huh.  (Affirmative)  Correct.
13  Q       And we have to do this why?
14  A       Because there is a conflict.
15  Q       Right.  Because the loss is in
16  Kentucky, and federal courts sitting in Kentucky
17  apply Kentucky law on conflicts; right?
18  A       I believe that there is an analysis
19  that needs to be made in terms of which state's law
20  governs, that the most significant relationship
21  test is taken into account when determining --
22  well, not taken into account.  It is what we --
23  what they review.  It is a weight of -- it is a --
24  it's factored based on -- well, it's weighted based
25  on the factors that is allotted in I think the
```

---

Enante Darout   10/18/2021

85

1  restatement that I think both of our letters cited,
2  and that they come to a conclusion.
3  Q      Right.  But that's -- the Kentucky test
4  is the one you use because we got a federal court
5  sitting in Kentucky?
6  A      Right.  Right.  So then you have the --
7  right.  So --
8  Q      That's the Erie -- that's the Erie
9  doctrine; right?
10  A     Right.
11  Q     Erie; right?
12  A     Uh-huh.  (Affirmative)
13  Q     Remember that from law school?
14  A     I do remember that from law school.
15  Q     Okay.
16  A     Thank you for the reminder.
17  Q     Uh-huh.  (Affirmative)  So you're
18  applying a test.  And the Kentucky test is two-
19  part; right?  The first part is the most
20  significant relationship?
21  A     Right.  Exactly what I just stated.
22  Q     Right.
23  A     Yep.  Uh-huh.  (Affirmative)
24  Q     So -- and the second part is the public
25  policy exception; is that fair?

86

1  A     Yes.
2  Q     Okay.  So you start off on the most
3  significant relationship test, and you conclude
4  that Connecticut has the most significant
5  relationship to the transaction in this particular
6  case; correct?
7  A     Correct.
8  Q     Okay.  So then we go to -- the next
9  question is whether the public policy prohibits the
10  public -- the policy provision at issue.  So this
11  second part is not part of the Connecticut analysis
12  of conflicts of law; correct?
13  A     Correct.
14  Q     This is a thing that's kind of unique
15  to Kentucky.  Well, there may be other states, but
16  -- but it's a -- this is a Kentucky overlay; right?
17  A     Correct.
18  Q     You got to pass both tests; right?
19  A     Uh-huh.  (Affirmative)  Yes.
20  Q     Okay.  And so how do you address the
21  public policy provision part of the test in your
22  letter?
23  A     Essentially I reviewed the cases that
24  are cited in the letter, I found that the cases,
25  based on the facts that they were provided, saw

87

1  that the other state, not Kentucky, had the most
2  significant contacts, and that essentially public
3  policy wasn't taken into consideration at that
4  point --
5  Q      Okay.
6  A      in -- in -- in those cases.
7  Q      Okay.  So you've got about -- got about
8  half a page here, well, maybe a whole page, of
9  discussion of these two cases.  One's called
10  LaCrosse, and the other one is called --
11  A     Thaxton.
12  Q     -- Thaxton, uh-huh.  (Affirmative)
13  A     Uh-huh.  (Affirmative)
14  Q     And LaCrosse dealt with Illinois law,
15  Illinois, and Thaxton involved Ohio; right?  Am I
16  remembering these correctly?
17  A     Yes.
18  Q     Okay.  And so the question was, was it
19  Kentucky or Illinois or Kentucky or Ohio?
20  A     Yes.
21  Q     And you addressed -- you addressed --
22  you cited these two cases for the proposition that
23  Kentucky courts will -- will -- will find that the
24  other state's law applies, in one case Illinois and
25  one case Ohio.

88

1  A     Correct.
2  Q     Correct?
3  A     Correct.
4  Q     But they don't have anything analogous
5  to the facts of our case, do they?
6         MR. KELLER:  Objection to the form,
7         but go ahead.
8  Q     Tell me the facts of LaCrosse.
9  A     I think I just stated it right -- I
10  mean, essentially right there.  It was a named
11  insured that resided in Illinois, and they were
12  driving --
13  Q     Okay.  Stop right there.  Stop right
14  there.
15  A     Uh-huh.  (Affirmative)
16  Q     So the -- the plaintiff, the victim in
17  that case, lived in Illinois; right?
18  A     The named insured, yes, was --
19  Q     The injured party.  The guy that was
20  hurt, he -- yeah, and -- and also the named insured
21  because --
22  A     Correct.
23  Q     -- he had underinsured.
24  A     Correct.
25  Q     He lived in Illinois.  Well, in our

Enante Darout  10/18/2021

89

1  case she lived in Kentucky.  That's the whole point
2  of the public policy exception, isn't it?
3  A      Well, in our case the named insured was
4  a resident of -- of Connecticut, if I remember that
5  correctly.  Based on the policy language that we
6  have, Dawson and I think Paula Newberry, the named
7  insureds, were residents of Connecticut.
8  Q      So I've got LaCrosse up.  You recognize
9  that as LaCrosse?
10  A      I do.
11  Q      And they start out with the factual and
12  procedural background.  It says Mr. LaCrosse was
13  involved in a motor vehicle accident that took
14  place in Murray, Kentucky.  LaCrosse was an
15  Illinois resident.  See that?
16  A      Yes.
17  Q      And up there it says, well, he --
18  crushed spine, $500,000 in damages, big -- now that
19  part is kind of like Laura Woods; right?  But he
20  was an Illinois resident.  Again, on page three of
21  the opinion, and this is Exhibit 33, the Court
22  makes a point of saying again here LaCrosse resides
23  in Illinois.
24              (Said document is filed with this
25              deposition and marked as Plaintiff's

90

1              Exhibit No. 33 for purposes of
2              identification.)
3  A      Correct.
4  Q      Yeah.  And then -- and then there's a
5  discussion here where the Court towards the end
6  says, all that remains is a nonresident victim and
7  an accident that occurred in Kentucky.
8  Accordingly, no reason exists to interfere with the
9  law as set forth in Illinois for its citizens --
10  apparently they had a similar law of Connecticut of
11  setoff UIM -- when the UIM setoff involved would
12  not be harmful to the people of Kentucky.  Thus the
13  trial court correctly used offsets to reduce UIM
14  liability.
15              So they found that because the victim
16  was not a resident of Kentucky that the offsets
17  applied and the guy got less money.  How -- how is
18  this case like the Woods case?
19  A      Well, like I said, the named insureds,
20  Dawson and Newberry, were residents of Kentucky.
21  Q      No, no.  They were residents of
22  Connecticut.
23  A      I'm sorry; of Connecticut.  I -- I
24  misstated.  Yes.  Dawson Newberry and Paula I
25  believe her name is are residents of Connecticut.

91

1  And I think that our facts differ in that in that
2  -- well, in that case there.  I think the -- the
3  analysis that we have to do is -- is -- is one that
4  is fact-specific.  It varies in that, you know,
5  there are different facts in different cases.  And
6  in that one LaCrosse, yes, is the -- is the named
7  insured from what I understand.  He's the one
8  seeking UIM benefits, and he's the one that resided
9  in a different state.  He's the one that resided in
10  -- in Illinois if I -- if I remember correctly, as
11  opposed to in our case Dawson and Paula, who are
12  the named insureds, resided in Connecticut.  So
13  that is part and parcel as to why I thought those
14  were -- were analogous.  Both named insureds were
15  not residents of Kentucky.
16  Q      Well, the named insureds, that --
17  that's part of the significant relationship
18  analysis.  That's part of the first part.
19  A      Uh-huh. (Affirmative)
20  Q      The named insured is not part of the
21  second part.  In fact, the Court -- I've got -- can
22  you see this that I've got up here, the yellow, all
23  that remains?
24  A      Yes.
25  Q      The Court seems to be focusing on the

92

1  victim, who the plaintiff is.  And the plaintiff
2  was a nonresident -- was a resident of Illinois.
3  And for that reason the UIM setoff involved would
4  not be harmful to the people of Kentucky because
5  this guy lived in Illinois.
6              So I don't see the factual analogy
7  because if -- if you use the Court's reasoning
8  here, Laura Woods is a resident of Kentucky, so it
9  is harmful to her to have Connecticut law apply
10  because she gets less money.  So I -- I'm still --
11  I still don't see what -- why you cited this as
12  support that the public policy exclusion would not
13  be applicable to Laura Woods.
14  A      I think I -- I explained it.  My
15  reasoning and rationale were because the named
16  insureds were not residents of Kentucky; they were
17  residents of -- of Connecticut.  The policy stated
18  the -- I mean, the policy stated that the vehicle,
19  the Tacoma, was -- was in -- in Connecticut, and I
20  believe that it was their belief, that it was
21  Standard Fire's belief, that the -- that the car,
22  the car at issue, was housed, garaged, at the time
23  of contracting, at the time of execution of the
24  policy.  And so I think that while you're focusing
25  on Laura Woods being the -- the victim, I, again,

Enante Darout  10/18/2021

93

1 was focusing on the fact that, you know, this is a
2 fact-specific analysis, and our facts say that
3 Laura Woods was not an insured on the policy.
4 Q      Yeah, except --
5 A      Well, not a named insured on the
6 policy. Forgive my --
7 Q      Right. There's no question about that.
8 A      Uh-huh. (Affirmative)
9 Q      But as far as the victim, the injured
10 party, that seems to be what the LaCrosse court is
11 focused on.
12        Well, let's look at Thaxton. This is
13 Exhibit 34. This is the other case that you cite --
14 A      Uh-huh. (Affirmative)
15 Q      -- as support for your conclusion that
16 the public policy exclusion would not apply in this
17 case. And you say that the Thaxtons were residents
18 of Ohio. Is that your reading of this?
19        (Said document is filed with this
20        deposition and marked as Plaintiff's
21        Exhibit No. 34 for purposes of
22        identification.)
23 A      Yes.
24 Q      Okay. Well, is this what I'm pulling up
25 here, is this the Thaxton case that you're talking

94

1 about?
2 A      Yes. That they had -- that they had --
3 they had contacts in Ohio. I think -- I think there
4 was -- and I may be blending my cases, so forgive me
5 for that. I think this is one where they -- they
6 attempted to change their residency to Connecticut.
7 So forgive me, again, if I'm misstating or if I'm
8 confusing my cases, so --
9 Q      I don't think Connecticut was involved.
10 A      I'm sorry. I continue to say
11 Connecticut and I don't mean to say Connecticut.
12 Q      That's okay.
13 A      I mean to say Kentucky; I apologize.
14 Q      That's okay. So this is an unpublished
15 opinion of the Court of Appeals, which is -- do you
16 know if the Court of Appeals in Kentucky is the
17 highest court or the intermediate court?
18 A      I -- I believe that they are the
19 intermediate court, but I could be mistaken.
20 Q      Okay. Well, you're right. So the Court
21 says the Thaxtons claim to have moved to Ohio. You
22 see that?
23 A      Uh-huh. (Affirmative) Right.
24 Q      This is the Court of Appeals reviewing
25 the trial court's opinion, and the trial court

95

1 concluded that Ohio law should apply --
2 A      Correct.
3 Q      -- in this particular case?
4 A      Correct.
5 Q      And the Court of Appeals is reciting
6 some things that -- and then they say again, the
7 Thaxtons claim to have moved to -- to Kentucky. And
8 then on the next page they note that the Thaxtons
9 initially filed their complaint alleging that they
10 were residents of Ohio. Again, where they were
11 residents appears to be the issue in the case, and
12 the Court doesn't seem to be buying that because all
13 their contacts and all their -- their cars are
14 registered in Ohio and their licenses are Ohio. And
15 apparently they realized that Kentucky law was more
16 favorable to their claim, this offset, so they were
17 trying to kind of modify -- after they filed their
18 complaint they tried to modify it and -- and
19 establish Kentucky residence, but the Court doesn't
20 seem to be buying it. Thaxtons' alleged Kentucky
21 residency. Do you see that?
22 A      Yes.
23 Q      And then -- and then it says at the very
24 end, Ohio law should control absent some compelling
25 reason to the contrary. No such reason's been

96

1 presented. Apart from Thaxton providing Allstate
2 with a Kentucky P.O. box mailing address, all
3 actions relating to negotiating, contracting, and
4 performing the insurance transaction occurred in and
5 concerned Ohio.
6        So in Thaxton the Court concluded that
7 they were residents of Ohio, not Kentucky, and so
8 they couldn't take advantage of the public policy
9 exception, again, because they're not residents of
10 Kentucky. How does this case help your position?
11 A      Because, again, the named insureds were
12 not residents of Kentucky. And similar to what
13 we've -- what you've just highlighted, the -- the
14 negotiating, the contracting, the performing of the
15 insurance transaction, all occurred in Connecticut.
16 Q      But all that stuff has to do with the
17 first part of this -- of the test, not the second
18 part. Don't you agree?
19 A      I think the second part of the test is
20 to determine whether the public policy exception
21 applies. And in my opinion the -- the public policy
22 exceptions did not apply because, again, this is
23 fact-specific, Dawson and Paula were residents of
24 Connecticut.
25 Q      Yeah, but what about the victim? The

**Enante Darout   10/18/2021**

97

1  public policy is designed to protect the victim.
2  A        Yeah.  And I think that this is a unique
3  issue because, again, you know, this -- this -- at
4  our issue we have a non -- a person who is not a
5  named insured on the policy that is driving the
6  vehicle that apparently -- that got into the car
7  accident.  Forgive me; I didn't mean to say
8  apparently, but that got into -- was a victim of the
9  car accident, and nowhere on the policy is she noted
10  as a named insured.  Nowhere on the policy did they
11  say that the car would be housed in -- in Kentucky.
12  And so, again, these -- these two cases are both in
13  my opinion listed there or shown there to show that
14  there are various factors that are taken into
15  consideration when determining whether -- whether,
16  one, they're the most significant test -- that the
17  most significant relationship test should apply, and
18  two, whether public policy is an issue that should
19  even be discussed.
20  Q        Okay.  Well, I'm back to your letter,
21  and obviously you think the public policy exclusion
22  should be discussed because you say so in your
23  letter, the next question is, and you cite the two
24  cases, LaCrosse and Thaxton, and you would agree
25  with me, would you not, that in both of those cases

98

1  the victim was a non-Kentucky resident; correct?
2  A        It's not whether they should be
3  discussed; it's whether they should be applied.  And
4  yes, Laura Woods is a Kentucky resident.
5  Q        No, no, no, no, no.  That's not what I
6  said.  Listen to my question.
7  A        Uh-huh.  (Affirmative)
8  Q        In LaCrosse the injured party resided in
9  Illinois; correct?
10  A        Yes.  The named party, who is also the
11  injured party --
12  Q        Okay.  That's it.  That's it.  That's
13  it.
14  A        -- is located in Illinois.
15  Q        Injured party was in Illinois.  In
16  Thaxton the injured party tried to say they lived in
17  Kentucky, but the Court didn't buy it and said they
18  lived in Ohio; correct?
19  A        The named insured, who is also the
20  injured party, yes.
21  Q        No, no, no, no.  I'm not asking about
22  the named insured.
23  A        But that -- but that's part and parcel
24  of my -- of my --
25  Q        Listen to my question, Ms. Darout.

99

1  A        Okay.
2  Q        In Thaxton the -- the injured party, the
3  Court did not buy that they lived in Kentucky;
4  correct?
5           MR. KELLER:  I'll object to the
6           form, but go ahead.
7  A        No --
8  Q        In Thaxton --
9  A        Uh-huh.  (Affirmative)
10  Q        -- the Court found that the plaintiffs
11  were residents of Ohio, not Kentucky, and therefore
12  the public policy exclusion did not protect them; is
13  that --
14           MR. KELLER:  Same objection, but go
15           ahead.
16  Q        -- is that true?
17  A        I will say that the plaintiff, who
18  happened to be the named insureds and the victims of
19  the incident, were found to be residents of Ohio --
20  Q        Ohio.  Okay.  So --
21  A        -- in Thaxton.
22  Q        Okay.  In fact, you even say -- you even
23  -- you even quote that in your letter, oddly enough.
24  Can you read this?
25  A        Uh-huh.  (Affirmative)  Apart from

100

1  Thaxton providing Allstate with a Kentucky post
2  office box mailing box [sic], all actions related to
3  negotiating, contracting, and performing the
4  insurance transaction occurred in and concerned
5  Ohio.
6  Q        Okay.  And then you have a conclusion.
7  A        Right.
8  Q        Where's the -- where's the analysis?
9  A        Analysis?
10  Q        Of why the public policy exception
11  doesn't apply.  You -- you talk about the two cases.
12  A        Uh-huh.  (Affirmative)  Yes.
13  Q        You quote from the second one.  Where's
14  the -- how do you get to it's my opinion the public
15  policy exclusion would not apply?  How do you get
16  there?
17  A        I think we just talked about how I got
18  there.
19  Q        Well, tell me again because I'm not
20  clear.  There's nothing -- you don't write anything
21  in here after that to get to your conclusion.  How
22  do you get to your conclusion?
23  A        Okay.  And so I don't believe the public
24  policy applies in this case here because we don't
25  get there.  I think the most significant -- the most

**Enante Darout  10/18/2021**

---

101

1   significant relationship test discusses the factors
2   that we discussed; right?
3       Q       Yeah.
4       A       The contract, the negotiation, the
5   drafting --
6       Q       That part --
7       A       -- the execution.
8       Q       That part, yes.
9       A       Correct.  Right?  And the named insureds
10  aren't Connecticut residents, and so the named
11  insureds in my opinion wouldn't receive -- at least
12  in this case, they would -- Laura would not receive
13  the benefit of the public policy because, again, the
14  named insureds, who the policy was drafted for, were
15  not Connecticut residents.  The car, the trans --
16  the car in and of itself was not one that was
17  supposed to -- was not one that was stated to be in
18  Kentucky.  Again, the -- the contract itself, all
19  transactions or all actions related to the
20  transaction occurred in Connecticut.  And so in my
21  opinion, you know, Laura Woods, unfortunately,
22  wouldn't receive the benefit of -- of getting the
23  public policy exception.
24      Q       Okay.  So I think you're saying it's
25  really just one test, the significant relationship,

---

102

1   and the public policy is kind of the same analysis
2   with a big focus on the named insured?
3       A       What I'm saying is that the public
4   policy exception would not apply here because Dawson
5   and Paula are both Kentucky -- I'm sorry -- are both
6   Connecticut residents.  The car --
7       Q       And they're the named insureds.
8       A       And they're the named insureds.  The car
9   in question was supposed -- was -- when Standard
10  Fire drafted the policy, I'm sure they believed that
11  the car was going to be a -- in a Kentucky -- I'm
12  sorry -- in Connecticut.
13      Q       Garaged -- garaged in Connecticut.
14      A       Garaged.  Well, I think I said that in
15  the letter, garaged in Connecticut.  I believe that
16  all transactions relating to this policy occurred,
17  arose, happened in -- in Connecticut.
18      Q       Issued in Connecticut, premiums paid in
19  Connecticut; right?
20      A       All of that; correct.
21      Q       Okay.  All that.
22      A       So that is --
23      Q       So and that is -- that is also your
24  analysis on the public policy exception?  In other
25  words, it's really just one test; is that -- is that

---

103

1   your understanding?
2               MR. KELLER:  Objection, but go
3   ahead.
4       A       I mean, I don't know how many times
5   we're going to try to slice this, but -- but --
6       Q       I'm just trying to understand how you
7   got to the conclusion in your letter --
8       A       Uh-huh.  (Affirmative)
9       Q       -- that the public policy exclusion
10  would not apply --
11      A       Okay.
12      Q       -- when the two cases that you cite --
13      A       Uh-huh.  (Affirmative)
14      Q       -- have non-Kentucky residents involved.
15  So that doesn't help -- that doesn't -- the whole
16  issue is that the injured party, the plaintiff, is a
17  resident of Kentucky, and Kentucky's laws are
18  designed to protect Kentucky citizens.
19      A       Correct.  So on both cases the named
20  insureds were also the ones seeking the benefit of
21  the UIM coverage; correct?
22      Q       That's right.
23      A       Okay.  And so in both cases because it
24  was the named --
25      Q       But not in Laura Woods.

---

104

1       A       Right.  But again, this is a fact-
2   specific factor-weighted analysis; right --
3       Q       Well, that's why I'm saying --
4       A       -- when you get into that.
5       Q       -- these tests are factually
6   distinguishable from Laura Woods.  Would you not
7   agree with that?
8       A       No.  I'm saying that we have to take
9   the facts into consideration in coming to an opinion
10  or a conclusion; right?  You got to take the -- it's
11  a fact-find -- it's a fact -- you got to weigh all
12  of the facts essentially when you're coming to a
13  conclusion.  It's not necessarily a blanket
14  statement you can issue and think that they could
15  all fall within that purview.  No, it's -- it's a
16  weighted test.  You got to weight it.
17      Q       Right.  But where -- where is the
18  discussion about Laura Woods about -- I don't -- I
19  don't see any discussion about named insureds and
20  garaged and paying pre --
21      A       Again --
22      Q       I'm just trying to get from point A to
23  point B --
24      A       Sure.
25      Q       -- and I'm not following it.

---

**Enante Darout   10/18/2021**

105

1  A        Again, so as I draft -- well, when I've
2  concluded the drafting of my opinion I have a phone
3  call.  It's either before -- right before the
4  opinion is submitted or, again, right after the
5  opinion is sent over to -- to -- to I guess in this
6  case Matt.  And so I'm almost positive that a
7  conversation would have happened, and that would've
8  been included, which may have been the reason why it
9  was omitted from -- from this letter here.
10  Q        Okay.  What was that conversation?  Tell
11  me what that was.
12  A        Can I say what it was word for word?
13  No.  But essentially I --
14  Q        I'm not asking you to do that.
15  A        -- I would go through it --
16  Q        Go ahead.
17  A        -- I would go through -- I would go
18  through the case, I would go through my -- my
19  findings, the analysis there, I'd review some of the
20  cases that I talk about, and then I would talk with
21  him as to how I got to the conclusion, why I got
22  there, which is probably why it's -- it's not in the
23  letter right there.
24  Q        So you think your analysis was
25  transmitted to him by telephone, and so you didn't

106

1  bother to type it up here?
2  A        Again, that's my only conclusion because
3  I would have normally stated all of that, I would've
4  gone through it, you know, with him.
5  Q        Because you would agree there's
6  something missing here; right?
7  A        I don't agree that there's something
8  missing.
9  Q        You don't.
10  A        I mean, in your view there could've
11  been, right.
12  Q        Okay.
13  A        In your view there could've been.
14  Q        Okay.  Fair enough.
15  A        But in -- I mean, in my opinion I think,
16  you know, I've -- I related that -- that information
17  to him.
18  Q        Some projects I get I can finish in 30
19  minutes.  Some projects I get I work on for weeks.
20  Do you know how long you spent working on this
21  letter?
22  A        Probably a couple of weeks.  Two -- two
23  weeks maybe, perhaps.
24  Q        So -- okay; two weeks.  Let's see.  Have
25  you -- have you lost my screen?

107

1  A        Yes.  You're no longer sharing.
2  Q        Okay; let me try that again.  Sorry.  Am
3  I back?
4  A        Yes.
5  Q        I'm trying to pull up a slide that says,
6  28 days.  You see that?
7  A        Yes.
8  Q        Exhibit 29, that's just a little slide.
9  So Matt Parsons e-mails to Chris -- e-mail to Chris
10  Pencak was October 31.  I think you said it may have
11  been a few days before you -- it came -- it got to
12  you, and your letter's dated November 28th.  So
13  that's 28 days.  Do you remember -- so question is,
14  how long did you spend on this project?
15          (Said document is filed with this
16          deposition and marked as Plaintiff's
17          Exhibit No. 29 for purposes of
18          identification.)
19  A        Like I said, maybe a couple of -- I'm
20  going to say maybe two -- two weeks.
21  Q        Okay.  Did you ever consider rejecting
22  the assignment?  Did you ever consider maybe talking
23  with Ms. Allen and said, you know, I don't really
24  have much experience with Kentucky, particularly
25  UIM; maybe you should find somebody who has either

108

1  experience or is licensed in Kentucky?
2  A        No, I didn't have that conversation.
3  Q        Did you on a regular basis write opinion
4  letters that dealt with other state laws?
5  A        Yes.
6  Q        Okay.  So that was not out of your
7  routine?
8  A        No.
9  Q        Okay.  And again, you don't have any
10  time records of your time spent working on this
11  assignment?
12  A        No.
13  Q        Did you transmit a draft to Ms. Allen or
14  Mr. Parsons for their kind of review before you put
15  it in final form?
16  A        Not -- I wouldn't have sent it to Matt.
17  I don't send it to the professional -- claim
18  professional before it's final.  But I would have
19  sent it to the assigning attorney to -- to review.
20  Q        Okay.  So one of the key things you
21  reviewed was the policy itself?
22  A        Correct.
23  Q        Let's go to that, Exhibit 30.  This is
24  not the whole policy; it's excerpts.  And I have
25  some things highlighted that are pertinent I think

Enante Darout 10/18/2021

109

1  to our discussion. So is this Exhibit 30 the -- the
2  policy that applied to this particular claim?
3          (Said document is filed with this
4          deposition and marked as Plaintiff's
5          Exhibit No. 30 for purposes of
6          identification.)
7  A       Yes. I see the named insured; I see the
8  effective dates, yes.
9  Q       Accident I think was in December of '16,
10  so this would've been within the period; correct?
11  A       Correct. I'm sorry; I didn't know that
12  was a question.
13  Q       Okay. There's a '98 Toyota Tacoma.
14  That's Ms. Woods' -- that's the Newberrys' truck?
15  A       Yes.
16  Q       Okay. And it's got coverages, limits of
17  liability, and payment section. And it provides
18  medical payments, what -- what I've been calling med
19  pay, is $1,000 per person; correct?
20  A       Yes.
21  Q       And coverage D1, which is in this case
22  underinsured motorist coverage, of 100?
23  A       Yes.
24  Q       Okay. And Travelers has a family of --
25  of companies and subsidiaries, for want of a better

110

1  word, that actually are the issuer of the policy,
2  and I think in this case it's Standard Fire
3  Insurance Company. Do you see -- do you see that?
4  A       Yes.
5  Q       Okay. That's why Standard Fire is the
6  -- is the defendant in this case; correct?
7  A       Correct.
8  Q       Okay. Okay. And then we're on GP --
9  let's see -- page GP-1. This is the general
10  provisions. These thing -- these provisions apply
11  to all the different coverages; correct?
12  A       Correct.
13  Q       Okay. And it is -- it's a Connecticut
14  policy, and that means that people that live in
15  Connecticut, if they buy a policy, this is the
16  policy that's marketed there; correct?
17  A       Correct.
18  Q       And states have different insurance
19  laws, so -- so a lot of insurance policies will be
20  tailored to particular states; is that -- is that
21  right?
22  A       Right.
23  Q       Okay. And it says, general provisions
24  section, unless otherwise stated, the provisions in
25  this section apply to all coverage sections and

111

1  endorsements of this policy; right?
2  A       Right.
3  Q       And then there's an agreement. And it
4  says, in return for payment of premium and subject
5  to all the terms of this policy, we will provide the
6  coverages you have selected. These are shown by
7  premium entries in the declarations. The
8  declarations is a part of this policy.
9          Now is the declarations the first part
10  -- the first couple pages that are unique to the --
11  to the Newberrys?
12  A       Yes. I mean, it's written for them,
13  yes.
14  Q       Okay. So this is the -- this is the
15  customized first couple of pages, two, three, four,
16  three pages, is for their particular situation, and
17  then the rest is kind of the form part; is that
18  fair?
19  A       Yes.
20  Q       Okay. Then there's a section in the
21  general provisions about duties after a loss, and
22  there's a section on GP-3 which talks about
23  additional duties for reparation benefits coverage.
24  And it says, a person seeking reparation benefit
25  coverage must, and it's got A, B, C there. Is that

112

1  -- is that referring to PIP, O-P-I-P? In other
2  words, if you're getting basic reparation benefits,
3  which is another word for PIP, in your particular
4  locale, you've got to show us medical records, show
5  about your inability to work, you've got to provide
6  proof, before we have to pay the $11,000, or 10 in
7  this case?
8  A       I believe so.
9  Q       I think that's what that is.
10  A       Yeah. I'm sorry; I have to kind of go
11  in to see it.
12  Q       Says if we pay you PIP, you've got to
13  first show us that you actually incurred expense?
14  A       Yes.
15  Q       Medical records, billing records, et
16  cetera.
17  A       Sorry. Yeah. I had to get closer to
18  the screen. It was kind of small.
19  Q       Okay. Does that help?
20  A       Very much so. Thank you.
21  Q       Okay. And then we go there's a general
22  conditions, and when we go to the next page we've
23  got a section called, our right to recover payment.
24  If we make a payment under this policy and the
25  person to or for whom payment was made has a right

---

113

1 to recover damages from another, we are subrogated
2 to that right.  That person must do, one, whatever
3 is necessary to enable us to exercise our rights;
4 two, nothing after loss to prejudice them.  And then
5 it's got, however, our rights in this paragraph A,
6 two, do not apply under un- and underinsured
7 motorist coverage.  Right?
8 A        Correct.
9 Q        So they don't have a right of
10 subrogation for UIM; correct, under this policy?
11 A        Correct.
12 Q        Policy period and territory:  This
13 policy applies only to accidents and losses which
14 occur during the policy period shown in the
15 declarations and within the policy territory.  The
16 policy territory is the United States of America,
17 its territories or possessions, Puerto Rico, and
18 Canada.  I guess you could take the car to Puerto
19 Rico and drive it around?  Is that what that says?
20 A        Yes, it's what it says.
21 Q        So if the -- if the Toyota Tacoma is
22 taken out of state and an accident occurs, it's
23 covered?
24 A        Potentially.
25 Q        Okay.  Depending on other terms?

---

114

1 A        Precisely.
2 Q        Okay.  But that's what that's getting
3 at; the policy territory is you can take your car
4 anywhere in the country, and Travelers got you
5 covered?
6 A        Potentially, yeah.
7 Q        Okay.  Okay.  Okay.  The next coverage
8 section is liability.  Liability coverage section,
9 A, bodily injury; B, property damage.  I don't think
10 this applies in this case of Laura Woods because I
11 think this applies when -- when a third party is
12 injured by an insured and the third party is making
13 a claim against the insured.  Is that right?
14 A        Yes, you're correct.
15 Q        Okay.  So I'm going to skip this
16 coverage A and B liability.  So it's a few pages,
17 three pages.  Except I want to -- I want to focus on
18 this even though it's not a part of our loss.  There
19 is a section in here under liability that says, out-
20 of-state coverage.  If an auto accident to this --
21 to which this policy applies occurs in any state or
22 province other than the one in which your covered
23 auto is principally garaged, we will interpret your
24 policy for that accident as follows:  If the state
25 or province has a financial responsibility or

---

115

1 similar law specifying limits of liability for
2 bodily injury or property damage higher than the
3 limit shown in the declarations, this policy will
4 provide the higher specified limits.  Two, a
5 compulsory insurance or similar law requiring a
6 nonresident to maintain insurance whenever the
7 nonresident uses the vehicle in that state or
8 province, this policy will provide at least the
9 required minimum amounts and types of coverage.
10        Now I think that kind of goes to why
11 Travelers paid the PIP in Kentucky, because Kentucky
12 requires -- Travelers does business in Kentucky, and
13 Kentucky requires all drivers to have a minimum of
14 10,000 of PIP.  Does that kind of go into that
15 concept or not, or do you know?
16 A        I'm just reading it again.
17 Q        Can you see it?
18 A        Actually if you could make it a bit
19 bigger that'd be helpful.  Thank you.
20        I think the reason for the PIP being
21 provide -- provided kind of speaks I think more
22 mainly in the -- in the UIM coverage.  This -- while
23 I understand or see your point, this is still housed
24 under that liability section.
25 Q        First of all, Connecticut doesn't have

---

116

1 PIP; right?  So --
2 A        No, it does not have PIP.  You're
3 correct.
4 Q        So this policy doesn't have -- it
5 doesn't provide PIP expressly within that?
6 A        Not expressly, no, but I think that the
7 wording of the UIM provisions, you could kind of
8 read that in, or at least my interpreting was that
9 it included that there.
10 Q        Okay.
11 A        So --
12 Q        Okay.  Okay.  I gotcha.  Let's move on.
13        Next section is coverage C, medical
14 payments.  So this is the med pay.
15 A        Right.
16 Q        Correct?
17 A        Correct.
18 Q        Okay.  Now let's see what it does.
19 Insuring agreement:  We will pay the usual and
20 customary charge for reasonable expenses incurred
21 for necessary medical and funeral services if
22 somebody passes away because of bodily injury, one,
23 caused by an accident, and two, sustained by an
24 insured.  And then it's got, insured as used in this
25 coverage section means, two, any other person while

---

Enante Darout   10/18/2021

117

1   occupying your covered auto.
2          So because Ms. Woods was occupying the
3   auto and incurred medical expense, she was eligible,
4   not a named insured but as a -- as an insured, to
5   receive the -- the med pay 1,000; is that --
6   A      Right.
7   Q      -- correct?
8   A      Correct.
9   Q      Okay.  And there's nothing in here --
10  are you aware of anything in here that conditions
11  payment on not being at fault for the accident?
12  A      I am not aware of anything in there that
13  -- in this -- in this coverage C about fault.
14  Q      I don't think there is.
15  A      Right.
16  Q      So for example, if Ms. Woods had crossed
17  the centerline and hit Mr. Eaves head on, in other
18  words, if she had been the fault of the -- if she
19  had been at fault, if she was responsible for the
20  collision, she still would've been eligible -- and
21  hurt, she still would've been eligible for this
22  payment?  Doesn't matter whether she was at fault or
23  someone else was at fault; correct?
24  A      Correct.
25  Q      Okay.  And it's a thousand dollars under

118

1   this policy; right?
2   A      Yes, it is.
3   Q      Okay.  So then we get to coverage D1,
4   which is un- and underinsured motorist bodily injury
5   coverage, which is what we're talking about in this
6   case; right?
7   A      Yes.
8   Q      Okay.  The insuring agreement says, we
9   will pay compensatory damages which an insured is
10  legally entitled to recover from the owner or
11  operator of an uninsured or underinsured motor
12  vehicle because of bodily injury, one, sustained by
13  an insured, and two, caused by an accident.  The
14  owner or operator's liability for these damages must
15  arise out of the ownership, maintenance, or use of
16  the underinsured motor vehicle.
17         So that all -- that all jibes with
18  Laura's situation; correct?
19  A      Correct.
20  Q      Okay.  And then it -- it says, we will
21  pay under this coverage only after the limits of
22  liability under any applicable bodily injury or
23  liability bonds or policies have been exhausted by
24  payments of judgments or settlements.
25         So in other words, Laura wasn't eligible

119

1   for underinsured until she had exhausted the limits
2   of Mr. Eaves' policy?
3   A      Correct.
4   Q      His liability policy?
5   A      Right.  The 50,000; correct.
6   Q      Has -- has to be exhausted before one
7   nickel of underinsured is -- is -- is -- before
8   Laura was eligible for $1 of underinsured?
9   A      Correct.
10  Q      If she had settled his claim for 49,000
11  or $49,999, her underinsured -- your -- Travelers'
12  underinsured obligation to pay would be zero; right?
13  A      It would have kicked -- it would have
14  been triggered; right.
15  Q      Right.  Okay.  Insured as this coverage
16  section means, two, this is B and then two, any
17  other person occupying your covered auto.
18         So that applies to Laura Woods; right,
19  because she was occupying the Toyota Tacoma?
20  A      Correct.
21  Q      Okay.  Okay.  And then let's look at
22  what -- then they define what a underinsured motor
23  vehicle means.  It's a land motor -- land motor
24  vehicle or trailer of any type for which the sum of
25  the limits of liability under all bodily injury

120

1   liability bonds or policies applicable at the time
2   of the accident is less than the limit of liability
3   for this coverage under the policy.
4          That's kind of like what we were talking
5   about before.  UIM has to be more than the
6   underlying -- the limit of liability.  And the
7   underinsured motor vehicle is Mr. Eaves' vehicle;
8   right?
9   A      Right.
10  Q      By definition, it doesn't have enough
11  insurance it's underinsured; right?
12         Okay.  And then there's some exclusions;
13  correct?
14  A      Yes.
15  Q      And go down to Exhibit [sic] E.  I'm on
16  page UIM-2.  Let me see if I can blow this up.
17  Says, we will not pay -- E says, we will not pay
18  compensatory damages to the extent that the amounts
19  are or were available to an insured under any bodily
20  injury liability bonds or policies applicable to the
21  underinsured motor vehicle.
22         So underlying liability is paid first,
23  and only if your damages exceed that is this
24  triggered; correct?
25  A      Correct.

Enante Darout  10/18/2021

121

1  Q      So that's kind of another way of saying
2  it. And then it's got a limits of liability
3  section. And limit C says, the limit of liability
4  will be reduced by all sums, one, paid to the
5  insureds because of the bodily injury by or on
6  behalf of persons or organizations who may be
7  legally responsible.
8          So again this says Travelers gets a
9  credit for the amount paid by or on behalf of
10  persons responsible, such as Eaves in this case;
11  correct?
12  A      Correct.
13  Q      And then limit letter E says, we will
14  not make a duplicate payment under this coverage for
15  any element of loss for which payment has been made,
16  again, by or on behalf of persons or organizations
17  who may be legally responsible.
18          Kind of another way of saying the same
19  similar thing; correct?
20  A      Correct.
21  Q      So these two, C and E, they don't
22  provide -- med pay and PIP are not made by or paid
23  on behalf of persons legally responsible; right?
24  A      I'm sorry; say that one more time.
25  Q      Med pay and O-P-I-P, med pay and PIP,

122

1  are not excluded by these limitations; right? These
2  don't provide a -- a credit for no-fault, do they?
3  A      Cor -- cor -- correct. They -- those
4  partic -- those particular sections, no, do not.
5  Q      They're -- they're getting at -- at --
6  at coverage that was afforded to Mr. Eaves --
7  A      Right. Right.
8  Q      -- in our -- in our situation?
9  A      Right. But -- but I do think that that
10  section D should also kind of be taken into -- into
11  consideration here, that no one will be entitled to
12  receive duplicate payments for the same elements of
13  loss under this policy or under this coverage. So I
14  think you got to also take that as well.
15  Q      Okay.
16  A      So while it's not directly or expressly
17  stated, I think --
18  Q      In certain circumstances that might
19  limit a payment?
20  A      In certain circumstances.
21  Q      Yeah; okay. But not in Laura Woods'
22  situation because her damages were so great there
23  was no duplication; correct?
24          MR. KELLER: Object to the form, but
25  go ahead.

123

1  A      I think also too if you read that as --
2  I think it's -- I think it's -- I think it's the
3  Connecticut statute 38a. I can't recall the exact
4  number, but there is a section in there that talks
5  about direct indemnity payment, so while, again,
6  it's not expressly stated, I think -- I think
7  there's room or it could be argued that -- that it
8  could be included.
9  Q      Okay. But, I mean, Travelers paid the
10  hundred, so they conceded that it didn't apply in
11  Laura Woods' case; correct?
12          MR. KELLER: Object to the form, but
13  go ahead.
14  A      I'm sorry; they -- they paid the hundred
15  so what?
16  Q      If they -- they paid the full hundred.
17  A      They did pay the full hundred.
18  Q      So they conceded that in Laura's case
19  this limitation didn't apply.
20  A      I wasn't involved in that determination.
21  Q      Well, if Traveler -- let's say it this
22  way: If Travelers paid Laura the full hundred
23  without deducting, then this wasn't a limitation on
24  her claim or payment.
25  A      Again, that --

124

1          MR. KELLER: Object to the form.
2          THE WITNESS: I'm -- I'm sorry.
3          MR. KELLER: Go ahead.
4  A      Again, I wasn't involved in that; right?
5  My -- my scope and my involvement was limited to
6  issuing the -- the opinion.
7  Q      I'm talking about a hypothetical. Let's
8  talk in hypothetical.
9  A      I can't do hypotheticals. I mean,
10  hypotheticals are -- are exactly that,
11  hypotheticals.
12  Q      Well, let me try. A person is injured
13  in Kentucky, and Travelers pays the full hundred,
14  although they also receive $11,000 in no-fault
15  benefits. Did this limitation apply?
16          MR. KELLER: Object to the form, but
17  go ahead.
18  A      I mean, again, it's -- it's a
19  hypothetical, like we talk about what took place,
20  and again, I wasn't involved in the determination at
21  that point.
22  Q      But you're a lawyer. We talk about
23  hypotheticals all the time, don't we?
24  A      Well, I mean, in this case I'm a
25  deponent, and in this case we're talking about the

**Enante Darout   10/18/2021**

---

125

1   facts that occurred here in Laura Woods' case.
2   Q        You're the deponent.  That's why I'm
3   asking you the question.
4   A        Right.  But I'm telling you that I --
5   that would be simply speculating on this
6   hypothetical, and, I mean, the facts are what it
7   was.  And again, I wasn't involved in that portion
8   of the determination.
9   Q        Okay.  Let me check my notes real quick.
10  Sorry.
11           Let's go back to coverage section D1,
12  which is un- and underinsured coverage.  Is there
13  anywhere in this coverage -- and you're familiar
14  with Travelers policies, insurance policy forms;
15  right?
16  A        Yes.
17  Q        You've read a bunch of them?
18  A        I have.
19  Q        Okay.  Both as an adjustor and as
20  associate counsel?
21  A        Correct.
22  Q        Is there anywhere in the UIM section or
23  in the general conditions section that requires an
24  insured to provide a release before full benefits
25  are payable?

---

126

1            MR. KELLER:  Object to the form, but
2            go ahead.
3   A        I -- I mean, I can't recall that off the
4   top of my head.  That's a very specific question.  I
5   can't recall that off the top of my head.
6   Q        Okay.  Well, let's -- do you need a few
7   minutes to review this policy?  Because I don't --
8   A        If you want to -- if you want to point
9   me to a specific section.
10  Q        No.  I said, is there anything in here
11  that requires an insured to provide a release before
12  full benefits are paid?  I don't --
13  A        I don't --
14  Q        -- think there --
15  A        I don't believe so.
16  Q        I don't think there is.
17  A        Well, that's -- I don't -- I don't
18  believe so.  I mean, I can't recall off the top of
19  my head if -- if this one had it or not, but I don't
20  believe in general we have what's -- at least in
21  this type of policy I don't believe.
22  Q        In a UIM -- in the UIM context?
23  A        Right.
24  Q        Okay.  Is there anywhere in the policy
25  -- in this policy that permits offsets for med pay

---

127

1   or O-P-I-P?
2   A        Expressly, no, but I think we had the
3   conversation that I think some of that could be --
4   at least I interpret it to mean that -- that there
5   are some sections that would allow for such a thing.
6   Q        Sort of an incorporated -- incorporation
7   by reference or location of the loss kind of
8   concept?
9   A        Correct.
10           MR. KELLER:  Object to the form, but
11           go ahead.
12  Q        As part of your -- what you looked at to
13  -- in this particular case, your assignment, was one
14  of the materials that you looked at the uninsured
15  motorist worksheet for this matter?
16  A        No.
17  Q        You didn't look at that?
18  A        No.
19  Q        Why not?
20  A        Because, again, the call or the question
21  at least for me was which state would govern, which
22  -- and -- and there -- I didn't take that UIM
23  worksheet into consideration because that wasn't the
24  -- in my opinion that wasn't the call or the
25  question I had to understand or figure out or opine

---

128

1   as to which state would govern, and that didn't fall
2   within the purview of my -- of my review.
3   Q        I'm going to pull up Exhibit 39.  Can
4   you see that?
5            (Said document is filed with this
6            deposition and marked as Plaintiff's
7            Exhibit No. 39 for purposes of
8            identification.)
9   A        Yes.
10  Q        This is the uninsured -- well, under --
11  under -- underinsured motorist worksheet.
12  A        Underinsured or uninsured?
13  Q        Says un, doesn't it?
14  A        Yes.
15  Q        I think it's used in the under context
16  as well, isn't it?
17  A        You tell me.  I'm not sure.
18  Q        Well, it says Laura Woods, doesn't it?
19  A        I believe so.
20  Q        And it says the claim number.  That's
21  the claim number you're familiar with; right?
22  A        It is.
23  Q        And it's got Galanski on there.  Dawson
24  Newberry is the named insured.  Does this look like
25  a uninsured motorist worksheet that was done on this

---

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

Enante Darout   10/18/2021

129

1  case?
2  A       For this case it looks like it, yes.
3  Q       Okay.  Looks like the report date is
4  October 5th of '18; is that correct?
5  A       Yes, that's what's listed.
6  Q       So if you had looked for this, was this
7  something that you could've looked at and you had
8  access to if you felt like it was pertinent?
9  A       If it was in the claim file or the claim
10 cabinet, yes.
11 Q       Well, Travelers produced it.  It's
12 Travelers 1396.  So I assume it was in the cabinet.
13 A       Okay.
14 Q       Is that where these things are kept?
15 A       I would assume so, yes, somewhere in the
16 file.
17 Q       Okay.  To me it just has a lot of
18 background information about the claim, and, you
19 know, it's kind of interesting to kind of sum -- it
20 pulls everything together in a -- in a nice summary.
21 Would you agree, or do you know?
22 A       I don't know what the rest of this
23 document looks like, so --
24 Q       Well --
25 A       -- I'll have to take your word for it.

130

1  Yeah, I mean, it --
2  Q       It's got stuff on -- it's got the policy
3  details, it's got vehicle details, financial
4  incurred, I guess that's what Travelers has paid
5  out, it's got accident information, liability
6  analysis --
7  A       Okay.  Yep.  Yep.  I remember --
8  Q       -- injury information.
9  A       -- seeing something similar when I was a
10 general liability adjustor.
11 Q       Okay.
12 A       Okay.  Yeah.
13 Q       And damages evaluation.  A lot of
14 interesting stuff.
15 A       Okay.
16 Q       But this is not something that you --
17 you looked at to kind of get up to snuff, get up to
18 speed, on what the claim was about?
19 A       No.
20 Q       Okay.  Did you ever consult these
21 worksheets when doing coverage opinion letters?
22 A       No.
23 Q       How come?
24 A       Because it had nothing to do with my
25 analysis.  If there were issues in the claim or if

131

1  there were claim notes that I would have needed to
2  review, I would've went to the notes portion itself,
3  not to the BIW, or the bodily injury worksheet as we
4  -- as it's called, as it's sometimes referred to.
5  Q       Is there something different than this?
6  A       No.  It's sometimes referred to as the
7  BIW.
8  Q       Oh, okay.
9  A       Uh-huh.  (Affirmative)
10 Q       Okay.
11 A       So I wouldn't have --
12 A       There are other -- there are other
13 resource -- there are other things within the -- the
14 claim file cabinet that are more helpful to you?
15 A       More helpful than this?
16 Q       Yes.
17 A       Yeah, sure, yeah.
18 Q       Okay.
19 A       The claim -- the claim notes in
20 particular.
21 Q       Okay.  Gotcha.  I'm going to pull up
22 again the coverage letter that we did in response to
23 Mr. Galanski's $39,000 offer, and this is -- was
24 something you reviewed and looked at when you were
25 working on this assignment?

132

1  A       Yes.
2  Q       Okay.  And it's 15 pages, and it kind of
3  goes through -- we don't really talk about the
4  policy, but -- language, but -- I mean, we don't --
5  we don't recite the language in here.  But it talks
6  about UIM benefits and the most significant
7  relationship test, and it goes on for about two
8  pages on that, and then we get to the public policy
9  exception on page four.
10 A       Yes.
11 Q       You see all that?
12 A       Uh-huh.  (Affirmative)  Yes.
13 Q       There's a statutory analysis section and
14 then several hypotheticals and then a case law
15 analysis that is four or five pages, and then it
16 goes through the PIP med pay, so a lot of
17 information here, but not very much of it is
18 mentioned in your letter, and I was just wondering
19 if -- what your response to this pretty lengthy and
20 detailed analysis was, if any.  It looks to me like
21 you just disregarded it, but I'm sure that's not the
22 case.  Can you tell me the story of how you -- how
23 you -- you didn't distinguish any of the cases that
24 -- that we cite.  So I'm just kind of wondering what
25 your thought process was.

Enante Darout   10/18/2021

34  (Pages 133 to 136)

---

133

1  A       Sure.  I read through your letter, I
2  reviewed the -- some of the authorities there, I --
3  I essentially then wrote my -- my opinion.
4  Q       Did you read Philadelphia versus Morris?
5  A       I believe I did.
6  Q       Do you know what that case is about?
7  A       I mean, there -- there's a lot of cases
8  in there.  Not off the -- not off the top of my
9  head.  If I were to go back and perhaps just reading
10 a blurb maybe will --
11 Q       Yeah.
12 A       -- trigger.
13 Q       Because I think that's a pretty
14 important case.  That's the one about workers' comp
15 benefits offset.
16 A       Workers' comp benefit offsets.  I mean,
17 would that even apply here?
18 Q       Well, I think it was analogous, which is
19 why we discussed it.
20 A       But, I mean, it's workers' comp.
21 Q       And it went through the amendment of the
22 UIM statute in 1988.
23 A       Okay.  Right.  I --
24 Q       Do you remember --
25 A       -- I do remember that where it removed

---

134

1  the to-the-extent language?  Is that the one?
2  A       Yeah.  It added the three sections, the
3  three, four, and five in the UIM statute.
4  Q       Right, right, right.
5  Q       Changed it to the broad, and they went
6  through that whole history.
7  A       Correct.
8  Q       There isn't any mention of that case at
9  all in your letter, and I think it's a pretty
10 important case.  I'm wondering --
11 A       Well, I think --
12 Q       I'm wondering why you omitted it.
13 A       I -- I think while I understand what
14 you're saying, I mean, it still, if I remember
15 correctly, revolved a workers' comp issue --
16 Q       Yeah, and what --
17 A       -- if I remember correctly.
18 Q       Right.  We -- we couldn't find a case,
19 you know, exactly on all fours --
20 A       Right.
21 Q       -- but -- trying to find it in the
22 letter.  There it is on page nine.
23 A       Right.  It removed the to-the-extent
24 language.  Yep.
25 Q       Yeah.

---

135

1  A       I remember reading that.
2  Q       It changed it to --
3  A       Uh-huh.  (Affirmative)
4  Q       It changed it to the damages less limits
5  instead of the paid less limits.
6  A       Okay.
7  Q       But there's no -- you know, we go on,
8  talks about the broad and narrow view and that -- it
9  talks about the public policy, but there's -- yeah,
10 I guess you didn't -- you didn't feel like it was a
11 -- significant enough to mention in your letter?
12 You thought your case --
13 A       I don't know if it --
14 Q       Okay.
15 A       I don't -- I wouldn't call it it wasn't
16 significant enough.
17 Q       Okay.
18 A       I understood the reason why you placed
19 it there, but it --
20 Q       Because the Court said -- the Court said
21 you can't offset by workers' comp.
22 A       Right.  You can't offset --
23 Q       And so you were trying to argue, you
24 know, similarly, you can't offset for these other
25 things.

---

136

1  A       But again, you know, this, again, was
2  with regards to workers' comp.  I mean, that's
3  definitely a fact that is different from the facts
4  that we have with this Laura Woods case.  And also
5  too, you know --
6  Q       What about this history of --
7  A       -- the question of --
8  Q       -- the amendment of the statute?  What
9  about this history in -- it was amended in '88, and
10 then in '98 they added this section -- let's see --
11 this part about adding three, four, and five to the
12 UIM statute.  In fact, let's -- let's pull up that
13 UIM statute.
14 A       Sure.
15 Q       This is the Kentucky statute.  So in '98
16 they added three, four, and five, and I think five
17 is particularly germane, but it ends with, nothing
18 in this section, including any payment or credit
19 under this subsection, nothing reduces or affects
20 the total amount of uninsured -- of underinsured
21 motorist coverage payable to the injured party.
22 That seems pretty important to me.  Why
23 -- why didn't you address that in your letter or try
24 to distinguish it?  Because all the cases seem to
25 focus on -- on this statute.

---

Enante Darout  10/18/2021

137

1  A       Yeah.  And I think you get there if you
2  decide that Kentucky is the governing state law
3  here.  And it's not to say, again, that your -- your
4  case research wasn't thorough and well-written.  It
5  absolutely was.  I was of the opinion that
6  Connecticut state law applied.
7          And so like I said, I read the case.  I
8  understood that the language was changed in the
9  statute.  I understand that there is that sentence
10  there that you underlined, but I think you get there
11  once you determine that Kentucky is the governing
12  state law, and I didn't get there.  My conclusion
13  stated otherwise.
14  Q       Let's go to Exhibit 32.  So Exhibit 32
15  is a kind of a chart of cases.  These are state and
16  federal conflicts of law authorities is a
17  restatement, but the rest are cases.  This is what
18  we -- we cited in our letter, you cited in your
19  letter, and then the Court, Judge Hood, ultimately
20  thought were germane in his opinion which found that
21  Kentucky law applied.  So in the -- in the Gess
22  Mattingly, the GMA letter, we've got Hodgkiss-
23  Warrick, Restatement, Stonewall, Asher, Riggs, et
24  cetera.  And so the red cases are cases that are
25  cited by more than one of us.  So the black cases

138

1  were only cited by the -- by the particular person
2  who authored the letter or opinion.
3          So Hodgkiss-Warrick is a pretty
4  important case.  All three of us cited that one.
5  Restatement, which is where this -- kind of this
6  comes from, the conflicts-of-law test cited by Woods
7  and by Hood, you didn't look at that in your letter.
8  Philadelphia versus --
9          (Said document is filed with this
10          deposition and marked as Plaintiff's
11          Exhibit No. 32 for purposes of
12          identification.)
13  A       I'm sorry.  What was it that I didn't
14  look at in the letter?
15  Q       The re -- oh, no, the Restatement.  Is
16  that in your letter?
17  A       It is.
18  Q       Okay.  So that's a typo.  So the
19  Restatement 188, yeah, that's right.  That's a typo.
20  So that should be there.
21  A       Uh-huh.  (Affirmative)
22  Q       But for example, LaCrosse and Thaxton
23  were not cited by us or Judge Hood.  And so your
24  letter was the shortest and the leanest.  But I'm
25  just wondering if there are any of these cases that

139

1  you remember that -- either in the letter we wrote
2  or Judge Hood's letter or opinion that you remember
3  that you felt weren't applicable, that you could
4  distinguish, et cetera.  Any -- anything that you're
5  like, oh, that case doesn't apply because of this or
6  that?
7  A       Sure.  So again, I did not read Hood's
8  opinion.  So can't speak to the cases that I have
9  not read in your opinion that are cited there.  I'm
10  trying to think.
11  Q       Did the -- did -- did some of the cases
12  in my letter you just -- you didn't bother to read?
13  A       Yes, because I understood them to be
14  true.  Didn't read Riggs, and I think -- I think it
15  was Watts that I didn't -- Wallace that I didn't
16  read.
17  Q       Okay.  Well, there's no mention of I
18  would say most of the cases that -- that we cited.
19  And so you -- you took a different approach,
20  obviously.  But sitting here today do you remember
21  if any of these cases in your view were inapplicable
22  or unpersuasive or anything like that?
23  A       Well, I'm trying to think through.
24  Q       Coots is a big case in Kentucky on UIM,
25  which is why it's there.  It's a older case.

140

1  A       I'm just trying to remember the -- the
2  facts behind each case and I could tell you why I
3  thought that they were -- they were different.
4  Q       Do you remember the facts of any of them
5  where you can tell me --
6  A       I think --
7  Q       Go ahead.
8  A       -- International was the Louisiana and
9  Ohio.  They took into the consideration the -- the
10  factors that -- that we've talked about, the
11  contracting, the negotiating, the performance of --
12  the place of performance.  I know Asher said that
13  the -- the named insured no longer had an interest
14  because I think he was dismissed from the case or
15  something of -- of that sort.
16  Q       Okay.
17  A       And I remember being, well, I don't know
18  how that is -- that is on point because, I mean, in
19  this case the -- the named insured has an interest;
20  the policy's drafted and written to him.  The car is
21  registered in I believe in -- in his or Paula's
22  name.  It was our belief that the car was garaged,
23  it was -- it was there in -- in Connecticut, and,
24  you know, just for the various factors that we
25  talked about before I thought it was a

Enante Darout  10/18/2021

141

1  distinguishable case.
2  Q       Anything else? Any other cases that you
3  remember?
4  A       Yeah, yeah. There was the LaFrange case
5  that dealt with two Kentucky residents. They
6  rejected the limits-less-paid approach I believe. I
7  know that they were struck, they were severely
8  injured, the driver's name was Richardson. The
9  driver had the policy limit of -- okay, I remember
10  now. I think LaFrange was the case that was before
11  all of the UIM statutes were modified, if I remember
12  correctly because they -- LaFrange had a -- Greg
13  Richardson had a $25,000 policy, and I think the UIM
14  policy was $25,000, so it was kind of a net zero
15  gain, and I think that was the reason why they went
16  through modifying the UIM. That may have been one
17  of the cases that required them to -- where they had
18  to take a look at the -- the UIM statute. Am I --
19  am I right about that one, LaFrange?
20  Q       I think so.
21  A       Okay.
22  Q       They kind -- they kind of run together
23  for me as well.
24  A       Tell me about it. I know. I know.
25  Q       Anything else you remember that sort of

142

1  sticks out as like, you know, this case, you know,
2  doesn't help them at all or this case doesn't seem
3  applicable?
4  A       I remember with -- I remember with Asher
5  one of the reasons why I thought that it wasn't
6  applicable was because, again, the Court said that
7  Asher no longer had an interest in the case because
8  he was dismissed from the suit, and I didn't really
9  think that was on point with what we were talking
10  about.
11         I know with National Union Fire
12  Insurance, one of the things that you called out
13  there was that choice-of-law analy -- the choice-of-
14  law provision wasn't stated in the -- it was I think
15  stated in the policy. But my thought was, well,
16  that was only a -- a factor that -- that bolstered
17  the -- the -- the most significant relationship test
18  that -- that the Court had issued. It was one of
19  the things that just bolstered it. But again, it
20  was just a factor, and I know that our policy is
21  silent on that in terms of a choice-of-law
22  provision. But again, its absence or its presence
23  is merely a factor to -- to consider. It's not the
24  end-all/be-all, you know. And so I know that I
25  reviewed a good portion of your cases. I may not be

143

1  stating them all well, but -- but I did.
2  Q       Okay. I'm curious why you haven't --
3  why you never read Judge Hood's opinion.
4  A       It was never provided to me. Quite
5  frankly, my -- my --
6  Q       It's a published -- it's a published
7  decision on Westlaw. Your name is in there.
8  A       Oh, is it?
9  Q       Yeah.
10  A       Again, I -- once my involvement was
11  concluded, I -- that was --
12  Q       Close the file.
13  A       -- that was my -- well, that was my --
14  Q       Move on.
15  A       Well, that was my -- well, that was my
16  -- the extent of my involvement.
17  Q       Okay. Did you speak to -- before the
18  deposition stuff, did you speak to Parsons or --
19  after you sent your letter about the letter or
20  anything?
21  A       No. No. After I submitted my -- my
22  opinion to -- to -- to Matt, I had no further
23  conversations with him.
24  Q       Okay. Have you been involved in the
25  litigation strategy, planning, anything of that

144

1  nature? Have you been privy to those
2  communications?
3  A       No. Not at all, no.
4  Q       So you've not advised Travelers about
5  what to do in this particular case? That's been
6  somebody else's job?
7  A       Outside of my opinion, no, I had no
8  involvement.
9  Q       Okay. And again, was the -- was the
10  letter -- you said you spent about two weeks on it.
11  Were you working on other things at the same time,
12  other -- I've got various files. I don't work on
13  one thing; I work on several things. Is that your
14  -- your experience also, or were you --
15  A       Yeah. Yes.
16  Q       -- doing this one thing for two weeks?
17  A       No. No. I was working on other things
18  as I was working on this.
19  Q       I gotcha. So when you say two weeks,
20  that's not the total amount of time. That's kind of
21  what I'm getting at. You didn't -- you wrote it --
22  A       The amount of hours?
23  Q       You wrote it over a two-week period.
24  You didn't spend 80 -- 80 hours writing it; correct?
25  A       No. No, I did not spend 80 hours. At

**Enante Darout   10/18/2021**

145

1   least I don't believe I spent 80 hours writing it.
2   Q        But --
3   A        But it was over a course of two weeks
4   that I got it.
5   Q        Over a course of -- yeah, because you
6   had 28 days between, so that makes sense.  Do you
7   know about how much time you spent on this
8   assignment?
9   A        No.  I have no way to accurately tell
10   you how long, how many hours I dedicated to this.
11   Q        Five, 20 hours?  Can you give me your
12   best estimate?
13   A        Twenty, 25 hours perhaps --
14   Q        Okay.
15   A        -- because of all the reading that I had
16   to do.
17   Q        Yeah.  It's a lot of cases; right?
18   A        Uh-huh. (Affirmative) Yes.
19   Q        And again, nobody really reviewed --
20   well, did you send it to Parsons to review?  I can't
21   remember if -- if anybody reviewed it --
22   A        No.
23   Q        -- before the final.  Okay.
24   A        I did not send it to Parsons.
25   Q        Oh, you sent it to Ms. Allen?

146

1   A        Yes.
2   Q        Okay.
3   A        I would have sent it to Ms. Allen.
4   Q        Okay.  And then she forwarded it on?
5   A        No.  I was -- I was the one that sent it
6   to Matt.
7   Q        You -- you -- right, right, because the
8   e-mail says from you.
9   A        Precisely.
10   Q        Okay.  Okay.  Did you copy Ms. Allen --
11   A        I believe I did.
12   Q        -- or did you-all have any --
13   A        I think it's on the letter.
14   Q        Okay.  Okay.  When you use Westlaw, do
15   you print cases and underline them?
16   A        Oh, yes.
17   Q        Yeah, me too.  So you -- for this
18   assignment you sort of created some paper; right?
19   A        I believe so.  I -- I have a tendency to
20   print out cases or statutes or whatever to -- I need
21   the hard paper in my hand --
22   Q        Sure.
23   A        -- to really understand it, so yes, yes.
24   Q        I'm exactly the same way.  I've got to
25   highlight and underline and star.  What do you do

147

1   with that material once your coverage letter is
2   complete?  What was your habit?
3   A        I -- I would typically just disregard --
4   discard the -- sorry -- discard the -- the
5   documents.
6   Q        Just throw them in the trash or in the
7   shredder?
8   A        The shredder the cases, right.
9   Q        In this particular case did you keep
10   anything?
11   A        No.
12   Q        Okay.  Do you have any kind of
13   electronic file that is somewhere within Travelers'
14   control that would have -- sorry; there's some
15   ambulance -- that would -- that would contain, you
16   know, some of your notes or anything?
17   A        Not that I held onto.
18   Q        Okay.
19   A        Whether it's archived I can't -- I don't
20   know.  I did not hold onto anything.  I don't think
21   I saved anything on my Desktop or anything like
22   that.
23   Q        Who would know about that?
24   A        I don't -- I can't tell.  I -- I don't
25   know.

148

1   Q        Okay.
2   A        I don't know.  I don't know how that
3   process works.
4   Q        What do you do -- what do you do with
5   the insurance policy and, you know, the claim file
6   materials that you might get and print out?  What do
7   you do with all that stuff?
8   A        I usually discard them --
9   Q        Okay.
10   A        -- after the policy -- after the opinion
11   is drafted.
12        Sorry; these cases are now coming back
13   to me.  Just like I'm just -- because I know that I
14   read through them, so --
15   Q        Yeah.  I've dreamed about them.
16   A        I'm sure.
17   Q        Yeah.  Did you at any time feel like
18   pressure or that you needed to come to a conclusion
19   that was consistent with Mr. Parsons' view --
20   A        Not at all.
21   Q        -- to be kind of a team player?
22   A        Not at all.
23   Q        Were you ever concerned maybe in the
24   back of your mind that you might receive some kind
25   of negative performance reviews if you disagreed

**Enante Darout   10/18/2021**

---

149

1  with, you know, the initial company position on
2  these offsets?
3  A      Not at all.
4  Q      Did you receive compensation or extra
5  bonuses for making coverage determine --
6  determinations that were favorable to Travelers?
7  A      Not at all.
8  Q      Your compensation has nothing to do with
9  -- well, let me -- how is your bonus calculated?
10 A      I don't -- I don't know how it's
11 calculated.
12 Q      Do you get a bonus annually?
13 A      Yes.
14 Q      Do you know what factors are used to
15 determine it?
16 A      No.
17 Q      Is -- is -- is the claim payout, the
18 amount that's paid out on claims, does it factor
19 into the -- the formula for -- for a particular
20 unit?  Is your-all's -- the unit that you're in, is
21 there some kind of performance-based --
22 A      I don't believe --
23 Q      -- criteria that --
24 A      I don't -- I don't believe so, no.
25 Q      Okay.

---

150

1  A      No, not at all.
2  Q      Do you think you received better
3  performance evaluations for making coverage
4  determinations in Travelers' favor?
5  A      Not at all, no.
6  Q      In the 50-plus coverage letters that you
7  did in this time period, did you ever reach the
8  conclusion that was less favorable to -- in other
9  words, found that there was full coverage or found
10 that there should be a payment when the initial
11 evaluation was there shouldn't be?
12 A      Yes.
13 Q      So you arguably wrote coverage letters
14 that were unfavorable to Travelers?
15 A      Yes, I guess if you want to put it that
16 way.  I -- I -- I've drafted --
17 Q      Use your words.
18 A      I've drafted opinions that would either
19 -- based on the coverage issue, of course, and the
20 facts surrounding it would either confirm or provide
21 coverage or remove that coverage or exclude that
22 coverage.
23 Q      What about a -- how many -- did you ever
24 write a coverage letter that was different from the
25 view expressed by the assigning -- by who the

---

151

1  assignment came from?  In this case --
2  A      Many times, yeah.
3  Q      In this case Parsons felt like
4  Connecticut law applied, 39,000.  You concluded the
5  same thing.  Did you ever disagree with the initial
6  -- the adjustor's view?
7  A      Yes, I have.
8  Q      How often?
9  A      In the -- in the -- I don't know -- 100,
10 50 -- between 50 and a hundred or so that I've
11 drafted, it's -- it's really hard to put a number to
12 it.
13 Q      Just do your best.
14 A      I mean, our professionals are --
15 Q      Well, you're --
16 A      -- are oftentimes spot on.
17 Q      Right.
18 A      You know, sometimes they're not, so
19 maybe --
20 Q      Right.  You talk about being a team, and
21 I'm wondering if -- you know, nobody likes being
22 told they're wrong, and so that's hard just as human
23 nature.  But, you know, sometimes you -- you have to
24 give that bad news.
25 A      Well, I mean, our profession, we give

---

152

1  bad news pretty often.  So regardless of what --
2  what I would -- giving bad news, I'm using air
3  quotes, or -- or not agreeing with the
4  professional's analysis isn't foreign to me.  It's
5  -- it's -- it's -- I've done it often.  And -- but
6  to put a number to it, it's difficult for me to do.
7  Q      Okay.  Fair enough.  Did you provide any
8  materials to counsel in this case?  Like we asked
9  for e-mails, for example.  Were you asked to provide
10 any kind of documentation, whether electronic or
11 paper, that you ended up producing to Mr. Keller or
12 Mr. Maloney?
13 A      I was not asked.
14 Q      You were not asked?  Somebody else?
15 A      I don't believe -- I could be wrong.  I
16 can't remember.  I might've been asked to provide
17 whatever I have.
18 Q      Were you asked to do a search of your e-
19 mails for anything relating to Woods?
20 A      I -- I could have been.  I cannot
21 recall.
22 Q      You don't remember?
23 A      I do not remember.
24 Q      Could -- today could you search your e-
25 mails and pull up Woods if it said Woods or the

---

**Enante Darout  10/18/2021**

153

1  claim number?  Could you do that?
2  A       If it was within the last two years,
3  then -- then -- then yes.  If it goes beyond that I
4  -- I don't know.
5  Q       So December '18 goes beyond that,
6  doesn't it?
7  A       Precisely.
8  Q       Yeah.  Did anybody ever tell you to
9  preserve any e-mails relating to this case because a
10  lawsuit had been filed?
11  A       I'd have to -- I mean, I don't -- I
12  don't recall.  If they did, I would've absolutely
13  done so.  So I don't -- I do not recall.
14  Q       Is there a procedure for doing that?
15  How would you -- how would you go about preserving
16  -- let's say you handled a matter in 2020 and it
17  results in litigation, and so -- and you were
18  involved somehow, and so you're asked to preserve
19  any e-mails relating to this case.  What's the
20  procedure for doing that?  How would you go about
21  doing it?
22  A       Usually they issue a hold, and -- they
23  meaning the company.  I don't know who in the
24  company issues that hold, but someone issues a hold.
25  And the -- the documents that have been uploaded to

154

1  the claim file, that -- that is preserved.  The
2  notes are preserved.  And they ask that any -- any
3  e-mails exchanged should have also been uploaded
4  into the file cabinet.  And so that's why those --
5  those e-mails would be -- those e-mails would be
6  preserved there.
7  Q       The reason I ask is --
8  A       Yep.
9  Q       -- it's really odd to me, and maybe I'm
10  just -- we've gotten zero internal e-mails.  The
11  claim notes or the claim file references a lot of e-
12  mails between Travelers and my office and Travelers
13  and third parties, but we got no internal Travelers
14  e-mails about this.  Well, that's not true.  We've
15  gotten -- we've gotten some from Mr. Keller and
16  Ms. Allen and that sort of thing, but back in --
17  back in November, December 2018, October, this
18  Exhibit 27 is really the only thing we've gotten
19  internal, internally, with just Travelers people.
20  And I wonder if you know, was a hold put on the
21  Woods claim file cabinet because of this litigation;
22  do you know?
23  A       No, I don't know.  If it -- if it -- if
24  it was I wouldn't have been privy to that because I
25  wasn't handling the claim file.

155

1  Q       Who -- who -- how's -- who does that; do
2  you know?
3  A       Who issues the hold?
4  Q       Yeah.  Who issues the hold?
5  A       I -- I don't know that.
6  Q       Okay.  Have you ever seen one of these?
7  Is there some kind of a -- do you get a message?  Is
8  there something put on the file cabinet that says --
9  A       It's -- I don't know what is -- what is
10  seen on a -- on a -- on the Claim Platform, but I do
11  know that you would get some type of a
12  communication, whether it's a pop-up -- I think it's
13  an e-mail, but I -- I mean, I haven't seen one of
14  those in quite some time, so I can't -- I can't
15  recall, and I don't want to --
16  Q       Yeah.
17  A       -- lead you down the wrong path.
18  Q       So it could be an e-mail, it could be
19  some kind of warning in the -- in the file cabinet?
20  A       Correct.
21  Q       Okay.  But you haven't seen it very
22  often?
23  A       Right.
24  Q       You know it happens, but you haven't
25  seen it?

156

1  A       Correct.
2  Q       Okay.  Did you ever forward your -- some
3  of your work e-mails to a personal account so you
4  would have kind of a backup?
5  A       No.
6  Q       Did you ever do that?
7  A       No.
8  Q       Okay.  So we wouldn't -- from a -- you
9  wouldn't have any Woods-related stuff under another
10  e-mail address?
11  A       Absolutely not.
12  Q       Okay.  Let's see.  So Travelers fought
13  about -- over your deposition in the litigation for
14  over a year, multiple motions, responses, pleadings,
15  preliminary ruling in the magistrate judge, final
16  ruling in the magistrate judge, appeal to the
17  district judge, all over whether you would appear
18  for your deposition.  It took over a year to get an
19  order from Judge Hood ordering you to appear,
20  ordering Travelers to make you available.  Do you
21  know anything about that?
22       MR. KELLER:  Object.  Object to the
23  form.
24  Q       I mean, that's all on Westlaw too.
25  A       Again, once my -- once my involvement

Enante Darout   10/18/2021

---

157

1  ended, that was the extent.  I was aware that there
2  were -- and I don't know the extent of it, quite
3  frankly -- that there were still things going on.  I
4  didn't know the details of all of it.  But again,
5  once my involvement ended, that was pretty much --
6  that was pretty much it for me.
7  Q        I'm just curious why.  What's the big
8  hubbub about you testifying?  I don't get it.  Do
9  you know why they were so resistant to producing you
10 for deposition?
11 A        I do not know.
12 Q        You should read the opinions.
13          Do you know of any evidence that you'd
14 seen that would suggest Laura Woods lived with her
15 parents or used the Toyota Tacoma on a regular
16 basis?
17 A        There was no evidence suggesting that
18 Laura Woods lived with her parents.  Is that -- that
19 was the first part of the question?
20 Q        Yeah.
21 A        Now can you repeat the second part?
22 When you clump the questions up like that it's hard
23 for me to answer each.
24 Q        Sorry.  Okay, yeah.  First part was
25 lived with her parents.  Second part, used the

---

158

1  Toyota Tacoma on a regular basis.
2  A        Yes.
3  Q        Do you know of any evidence that she
4  used the Toyota Tacoma on a regular basis?
5  A        No, I don't know of any evidence that
6  suggested that.
7  Q        Because this was a Kentucky loss, would
8  you agree that Kentucky's Unfair Claims Settlement
9  Practices Act applies to Travelers' conduct?
10 A        I would --
11          MR. KELLER: Object to form, but go
12 ahead.  Go ahead.
13 A        What does the Kentucky claims -- I'm
14 probably saying it wrong, but what does it say?
15 Q        I'll show you.  Unfair Claims Settlement
16 Practices Act, Exhibit 37, it prohibits certain
17 conduct by an insurance company.  It's KRS 304.12-
18 230, and a copy is Exhibit 37.
19          (Said document is filed with this
20          deposition and marked as Plaintiff's
21          Exhibit No. 37 for purposes of
22          identification.)
23 A        Okay.
24 Q        Do you know whether this applies to
25 Traveler on a Kentucky loss?

---

159

1  A        It could.
2  Q        Okay.  Misrepresenting facts or the
3  insurance policy provisions, failing to acknowledge
4  and act reasonably promptly on communications, et
5  cetera, et cetera.  If Travelers misrepresented
6  pertinent facts or insurance policy provisions
7  relating to coverages, would that be a violation of
8  this act?
9          MR. KELLER: Objection to the form.
10         Go ahead.
11 A        If they did, sure.
12 Q        Six is not attempting in good faith to
13 effectuate prompt, fair, and equitable settlements
14 of claims in which liability has become reasonably
15 clear.  If Travelers did that, would it be in
16 violation of this act?
17         MR. KELLER: Same -- same objection.
18         Go ahead.
19 A        If Travelers did exactly what six says,
20 then yes.
21 Q        How about seven?  If they compelled
22 insureds to institute litigation to recover amounts
23 due under an insurance policy by offering
24 substantially less than the amounts ultimately
25 recovered in actions brought by such insureds, if

---

160

1  Travelers did that, would they be in violation of
2  the act?
3  A        If they did --
4          MR. KELLER: Same objection.
5  A        If they did, yes.
6  Q        Seven; okay, yeah.
7          I'm going to look at the complaint now,
8  and it's in one of the Woods exhibits.  It is one of
9  the Woods exhibits.  Exhibit 20 from the Woods
10 deposition is the complaint.  Have you ever seen
11 this before, Ms. Darout?
12 A        No.
13 Q        Okay.  This was filed in state court
14 here in Kentucky in Fayette County, Fayette Circuit
15 Court, and then it was removed to federal court by
16 -- by Standard Fire.  So that's why -- that's why it
17 says circuit court.  And you've seen complaints
18 before; right?
19 A        I have.
20 Q        Yeah.  So we start off with the parties
21 and so forth.  Let's go down to paragraph 18.
22 Eighteen says, the PIP -- PIP benefits paid or
23 payable under the Kentucky Motor Vehicle Reparations
24 Act, KRS Chapter 304.39, the MVRA, are no-fault
25 benefits.  They are paid regardless of who is

---

Enante Darout   10/18/2021

161

1  responsible for the subject motor vehicle collision.
2       Would you agree with that?
3  A    Yes.
4  Q    Paragraph 19:  The med pay benefits paid
5  or payable under the capital P policy, and that's
6  the -- that's the Newberry policy, are paid without
7  regard to liability.  They are paid regardless of
8  who is responsible for the subject motor vehicle
9  collision.
10      Is that true?
11 A    Yes.
12 Q    Number 20:  No express condition,
13 exclusion, term, or language in the policy permits
14 the setoff, paren, or reimbursement, close paren, of
15 PIP and med pay benefits paid or payable under the
16 policy from the limits of the UIM benefits available
17 under the policy.
18      MR. KELLER:  Objection to form.  Go
19 ahead.
20 Q    Is that true?
21 A    I think we talked about this before.
22 And while it may not be expressly stated, I think
23 you could interpret it as -- as being allowed for.
24 Q    Contemplated.  Contemplated maybe?
25      MR. KELLER:  Object to form.  Go

162

1  ahead.
2  A    I -- I -- I will stick with it can be
3  interpretated as such.
4  Q    Okay.  Interpreted?
5  A    Interpreted.  I said -- you said
6  contemplated.  I'm sorry; I'm all over the place.
7  I'm so sorry.
8  Q    That's okay.  You're doing great.
9  A    Yes.  Yeah.  Yes.
10 Q    Do you need a -- you need a break?
11 We're going to -- we have a little bit more to go
12 and we can push on.
13 A    Nope.
14 Q    Okay.
15 A    Let's -- let's keep going.
16 Q    Okay.  Twenty-one:  PIP and med pay
17 benefits were paid or payable by Travelers to Woods
18 or to her medical providers as a result of the
19 subject collision.  Is that true?
20 A    You said 21?
21 Q    Twenty-one.
22 A    Yes.
23 Q    Okay.  And then 22, scoot down a little,
24 PIP and med pay benefits were not paid or payable to
25 Woods or to her medical providers, quote, by or on

163

1  behalf of persons or organizations who may be
2  legally responsible, close quote, within the meaning
3  of paragraph C1 on page UIM-2 of the policy.
4       MR. KELLER:  Objection to the form.
5       Go ahead.
6  Q    Is that true?
7  A    The PIP and med -- correct.
8  Q    Correct?
9  A    Yeah.  I'm sorry.  Can you not hear me?
10 Q    Sorry.  Yeah.  I had a little -- I lost
11 you there for a second.  Thank you.  Okay.
12      And then finally, 23:  PIP and med pay
13 -- med pay benefits were not paid or payable to
14 Woods or her medical providers, quote, by or on
15 behalf of persons or organizations who may be
16 legally responsible, close quote, within the meaning
17 of the policy.
18      MR. KELLER:  Objection to form.  Go
19 ahead.
20 Q    Is that true?
21 A    Just reading it one more time.  Number
22 23; right?
23 Q    Yeah.  Go ahead.
24 A    Correct.  But again, I -- I think as we
25 spoke before, that they could be read in.

164

1       I apologize; those are my dogs.
2  Q    Oh, that's okay.  I can barely hear
3  them.
4  A    Someone must be here.
5  Q    How do you think Laura Woods feels about
6  how Travelers has treated her?
7       MR. KELLER:  Objection; calls for
8  speculation.  Go ahead if you know.
9  A    I don't know.
10 Q    Do you have anything you'd like to say
11 to her?  Because this may be your only opportunity.
12 A    I'm sorry that she was involved in an
13 accident.  I hope that she is recovering, and I hope
14 that she continues to recover, and I -- I truly do
15 wish her the -- the best.
16      MR. STOLTZ:  Thank you.  Can we take
17 a short break, five minutes?
18      MR. KELLER:  That's fine with me.
19 Are you done, Steve, or are you not
20 sure?
21      MR. STOLTZ:  I -- I want to -- I
22 want to look over my notes, and I want
23 to talk to Stefan.
24      MR. KELLER:  Sure.  That's fine.
25      MR. STOLTZ:  Well, let's take ten.

Enante Darout   10/18/2021

---

165

1        VIDEOGRAPHER: Okay. The time is
2  1:32 --
3        MR. STOLTZ: Because I may -- I may
4  be done.
5        MR. KELLER: Okay.
6        VIDEOGRAPHER: -- and we're off the
7  record.
8        (A brief break is taken.)
9        VIDEOGRAPHER: We're now back on
10  video record. The time is 1:44.
11        MR. STOLTZ: Thank you.
12  Q        Ms. Darout, we were talking about Exhibit
13  37, which is the Unfair Claims Settlement Practices
14  Act in Kentucky. Are you familiar with unfair claim
15  settlement practices laws in different states?
16  A        No. It'd be one of those -- because I'm
17  sure it might vary from state to state, depending on
18  the state I'd have to do a bit of research.
19  Q        You know that these laws exist in
20  various states?
21  A        I do. I do.
22  Q        Okay. And before today had you ever
23  read the Kentucky statute?
24  A        No.
25  Q        Okay. And I know you've read the UIM

---

166

1  statute because you had to to -- to do your opinion;
2  right?
3  A        Yes. Yes; that is correct.
4        MR. STOLTZ: So that's Exhibit 36.
5        (Said document is filed with this
6        deposition and marked as Plaintiff's
7        Exhibit No. 36 for purposes of
8        identification.)
9  Q        There's one we haven't talked about,
10  which is the PIP statute, 304.39-250, Exhibit 35.
11  It says -- it's entitled, Deduction and setoff, and
12  it's within the Motor Vehicle Reparations Act. It
13  says, except as otherwise provided in this subtitle,
14  basic reparation benefits shall be paid without
15  deduction or setoff.
16        Had -- had -- were you familiar with
17  this statute, Ms. Darout, before today?
18        (Said document is filed with this
19        deposition and marked as Plaintiff's
20        Exhibit No. 35 for purposes of
21        identification.)
22  A        Yeah, I believe you might've mentioned
23  it in your letter.
24  Q        Okay. Okay.
25  A        So yes.

---

167

1  Q        So you've seen that before?
2  A        I have.
3  Q        Okay. You say you haven't read Judge
4  Hood's coverage opinion.
5  A        I have not.
6  Q        Okay. So I'm going to give you some
7  time to do that, and then I'm going to ask you some
8  questions about it, so now you get to read it. So
9  it's 17, 18 pages, double-spaced. It's about nine
10  pages single-spaced. What do you need, 15 minutes,
11  20 minutes?
12  A        I mean, in order for me to truly parse
13  that out and understand what I'm reading, I -- I --
14  I don't know.
15  Q        Okay. Well, let's try -- let's try 20
16  minutes. You have access to the opinion, Exhibit
17  31. We sent you a Dropbox link. It's a PDF. It's
18  31.
19        (Said document is filed with this
20        deposition and marked as Plaintiff's
21        Exhibit No. 31 for purposes of
22        identification.)
23  A        Have to go back to Exhibit 31. Let's
24  see here.
25  Q        I think you'll find it interesting.

---

168

1  There used to be a guy on the radio --
2  A        Exhibit 31?
3  Q        Thirty-one.
4  A        Okay.
5  Q        Is that the memorandum opinion and
6  order?
7  A        Yes.
8  Q        So take -- we'll take 20 minutes and
9  take a look and review this and see what you think.
10  I think you might be curious about it.
11  A        Are there any specific sections in
12  particular or just read the whole?
13  Q        No. It reads pretty well. It's not --
14  it's not full of too many case cites. It reads
15  pretty well. But, you know, this is the conclusion
16  of our litigation over this coverage question, which
17  kind of started with you. And I just kind of want
18  to -- want to ask you a few questions about -- about
19  how it turned out.
20        There's an old -- there's a -- used to
21  be a radio guy on -- on the radio, it was Paul
22  Harvey, and it was before your time I'm sure, but he
23  would have kind of an interesting something, little
24  segment, and then there'd be a commercial break and
25  then he'd say, now the rest of the story. So this

---

169

1  is kind of the rest of the story.
2  A        Okay.
3            MR. STOLTZ:  Let's take -- let's
4  take a break and we'll -- we'll try to
5  get back together at 12 -- 2:10.
6            THE WITNESS:  Okay.
7            MR. KELLER:  Is that going to give
8  you enough time, Enante, 20 minutes?
9            THE WITNESS:  I -- we'll come back
10  in 20 minutes and we'll see where I am.
11            MR. STOLTZ:  Okay.
12            MR. KELLER:  Okay.
13            VIDEOGRAPHER:  It's 1:49 --
14            MR. STOLTZ:  Thank you.
15            VIDEOGRAPHER:  -- and we're off the
16  record.
17            (A brief break is taken.)
18            VIDEOGRAPHER:  We're now back on
19  video record.  The time is 2:11.
20  Q        Okay.  We're back from a break.
21  Ms. Darout, did you have a chance to skim the --
22  Judge Hood's opinion letter or order?
23  A        Yes.
24  Q        Okay.  I'm going to -- if you want to
25  look at the -- the one on your screen, but I'm going

170

1  to scoot down here to page 11 and try to blow that
2  up a little bit.  So the first part of his opinion
3  he goes through the facts and he talks about the
4  first part of the test, which is the significant
5  relationship test.  He agrees that Connecticut has
6  the most significant relationship.
7            And then part B on page 11 he starts
8  talking about the public policy exception, and this
9  is what he says.  He says, notwithstanding the
10  outcome of the most significant relationship test,
11  Woods contends that Kentucky law should apply as a
12  matter of public policy.  It is true that Kentucky
13  courts may refuse to apply the law of another
14  jurisdiction when application of said law will
15  result in enforcement of contractual provisions that
16  contravene Kentucky's public policy, citing Marley.
17  Basically, when engaging in a choice-of-law
18  analysis, Kentucky courts will disregard the outcome
19  of the most significant relationship test.  They'll
20  throw that away when another jurisdiction's law
21  violates a public policy as declared by Kentucky
22  courts or the Kentucky General Assembly.
23            Woods claims that Kentucky's public
24  policy, which disfavors the type of setoff provision
25  like the one found in the Standard Fire policy,

171

1  justifies application of Kentucky law.  On that
2  point Woods is correct.
3            The Kentucky General Assembly has
4  established that setoff provisions, like the one in
5  the Standard Fire policy, violate public policy of
6  the Commonwealth of Kentucky.  The 1988 revision to
7  the UIM statute reflects a broad view of UIM
8  coverage and makes UIM coverage available up to the
9  policy limit of the insured, and they cite the
10  statute -- he does.  As a result, the Kentucky
11  General Assembly has clearly stated that setoff
12  provisions pertaining to UIM benefits violate the
13  public policy of Kentucky.
14            The Kentucky Supreme Court has also
15  recognized that setoff provisions pertaining to UIM
16  benefits violate the public policy of the
17  Commonwealth, stating -- and they go through a quote
18  from Philadelphia versus Morris.  At the end he
19  emphasizes, which is the Court in Philadelphia
20  talking, we now hold that an insurance carrier
21  cannot set off workers' compensation benefits
22  against the policy's face amount of UIM coverage.
23  To do so would be to violate the public policy of
24  this Commonwealth as clearly established [sic] by
25  the legislative revision of the UIM statute, and

172

1  he's citing Morris.
2            Of course, in Morris the Kentucky
3  Supreme Court was dealing with a case that involved
4  setoff based on workers' compensation benefits --
5  it's a difference, as you pointed out, Ms. Darout --
6  not setoff due to money paid under another insurance
7  policy.  Even so, the reason for the setoff is
8  immaterial under Kentucky law.  At bottom, Kentucky
9  law prohibits the setoff or deduction of any
10  previously received benefits from the amount of UIM
11  coverage available under an insurance policy.  As a
12  result, the Kentucky Supreme Court has also clearly
13  explicated that setoff provisions pertaining to UIM
14  coverage violate the public policy of Kentucky.
15            Moreover, another judge of the Eastern
16  District of Kentucky, which is where our case is
17  pending, determined that Kentucky's public policy
18  exception applied in a case with strikingly similar
19  facts, and he cites a case called Schardein.  In
20  Schardein the Court was tasked with determining
21  which jurisdiction's law would apply to interpret an
22  insurance policy that was issued to Indiana to
23  Indiana residents for vehicles that were to be
24  primarily garaged and used in Indiana.  The accident
25  at issue occurred in Kentucky and involved a

Enante Darout  10/18/2021

173

1  Kentucky resident who was not driving one of the
2  vehicles listed under the insurance policy but was
3  covered under the policy as a family member.  The
4  Court acknowledged that the named insureds were
5  Indiana residents and that the policy was issued in
6  Indiana.  Still, the Court held that Kentucky law
7  applied to interpretation of the contract because
8  the injured party was a Kentucky resident and his
9  estate was entitled to the protections of Kentucky
10  law based on the public policy exception.
11        The application of Kentucky law in this
12  case is also bolstered by the fact that the accident
13  giving rise to coverage occurred in Kentucky, and a
14  Kentucky resident is seeking benefits under the
15  Standard Fire policy.  While the residency of the
16  party seeking benefits is not dispositive in the
17  most significant — in the most significant
18  relationship analysis, it is an important factor
19  when considering whether the public policy exception
20  applies.  Kentucky has a significant interest in
21  protecting its residents when they are injured
22  within Kentucky's borders.  As such, the public
23  policy exception should apply under Kentucky law in
24  this case.
25        Standard Fire contends that a blanket

174

1  public policy exception for application of setoff
2  provisions pertaining to UIM benefits is unfair
3  because Woods was a second-class UIM insured who was
4  unknown to the insurer and who played no role in
5  forming the policy at issue.  It is true that Laura
6  Woods was not a named insured or listed as a
7  scheduled driver on the Standard Fire policy.
8  Still, this is not a case where an accident in
9  Kentucky involving a Kentucky resident is completely
10  unknown or unfathomable to the insurer.  Woods was
11  covered under the Standard Fire policy because she
12  was driving one of the covered vehicles, which was
13  owned by her father, and the policy provided
14  coverage which was nationwide in scope.  Ultimately
15  Standard Fire could have foreseen that the named
16  insured would drive his car into Kentucky or loan it
17  to someone driving in Kentucky that might be
18  involved in an accident in Kentucky.  Since an
19  accident in Kentucky involving a Kentucky resident,
20  while perhaps unlikely, was foreseeable to the
21  insurer, it cannot be said that application of
22  Kentucky law is unfair based on these facts.
23        In some instances application of
24  Kentucky's public policy exception may be unfair
25  where an injured party is completely unknown or

175

1  unforeseen under the provisions of the insurance
2  policy, but this is not such a case.  Again, while
3  it was most likely that a covered accident would
4  occur in Connecticut since the vehicles were to be
5  primarily used and garaged in Connecticut, it is
6  certainly possible that an accident would occur in
7  another state.
8        Finally, the Court acknowledges that
9  application of the public policy exception in this
10  case swallows the most significant relationship test
11  analysis, which points in favor of application of --
12  of contract -- of Connecticut law.  Still, while
13  sitting in diversity, this Court is tasked with
14  applying the choice-of-law provisions of the forum
15  state and resolving this threshold issue in the same
16  way as it would likely be resolved by the Kentucky
17  Supreme Court.  Kentucky courts have demonstrated a
18  willingness to disregard the most significant
19  relationship test and use the public policy
20  exception in the choice-of-law analysis when a
21  contractual provision clearly violates the
22  Commonwealth's public policy.  Whether that law is
23  good policy as a general matter is the concern of
24  the Kentucky General Assembly and Kentucky courts
25  but not this federal court sitting in diversity.

176

1        In sum, the Kentucky public policy
2  exception requires the application of Kentucky law
3  to the Standard Fire policy because the Kentucky
4  legislature, Kentucky courts, and federal courts
5  applying Kentucky law in similar circumstances have
6  all recognized that setoff -- that setoff provisions
7  pertaining to UIM benefits in insurance policies
8  violate the public policy of the Commonwealth of
9  Kentucky.
10        Even when viewing the facts in the light
11  most favorable to the defendant, the relevant facts
12  are undisputed.  For instance, it is undisputed that
13  the accident giving rise to coverage in this matter
14  occurred in Kentucky and involved a Kentucky
15  resident who was seriously injured.  Moreover, even
16  though Laura Woods is not a named insured and is not
17  listed as a scheduled driver on the policy, it is
18  further disputed [sic] that Woods is covered under
19  the policy because she was driving a covered vehicle
20  and that the policy provides a coverage territory
21  that is nationwide in scope.  As such, the question
22  of which jurisdiction's law applies to
23  interpretation of the policy is purely a question of
24  law.
25        When engaging in a choice-of-law

Enante Darout   10/18/2021

---

177

1  analysis, Kentucky courts will not apply the law of
2  a foreign jurisdiction when application of that law
3  results in enforcement of a contractual provision
4  that violates the public policy of Kentucky. Here,
5  notwithstanding the outcome of the most significant
6  relationship analysis, the Kentucky legislature and
7  Kentucky courts have recognized that setoff
8  provisions in insurance policies violate the public
9  policy of Kentucky. As a result, Kentucky law
10 applies to interpretation of the contract based on
11 the Kentucky public policy exception.
12        And it goes on. But the question that I
13 have, Ms. Darout, is, do you agree with him?
14 A       While I of course respect his opinion
15 and how he so eloquently prepared and drafted it, my
16 research says otherwise, and I would respectfully
17 disagree.
18 Q       So you say the judge is incorrect?
19 A       I -- I will say that he took a different
20 view than I did.
21 Q       Okay. What in what I just read to you
22 do you disagree without?
23 A       Well, I think that you read a lot.
24 There was a lot there. But one thing that I can
25 just think of in -- in what you were reading is

---

178

1  that, you know, I -- I don't think I said it, and if
2  I did I misstated. I never said that the public
3  policy shouldn't be discussed, that exception
4  shouldn't be discussed. I think what I was trying
5  to say is above -- aside from that -- or in addition
6  to that, rather, I think that there is another
7  analysis that should be had or made once you get to
8  that -- that covered policy exception, you know. Is
9  the person who was injured, the person who -- what
10 are their ties to -- to the transaction; right? And
11 -- and what I was trying to get at is that that also
12 is a -- there are factors to be reviewed I think in
13 determining that -- that connection to -- to the --
14 to the -- to the policy, to the transaction itself.
15 So it's not to say that the -- the analysis -- the
16 analysis should stop at -- at the end of the most
17 significant relationship test. I think you and I
18 both agree that in Kentucky there is an initial step
19 of reviewing the -- the public policy exception.
20 Q       Correct.
21 A       But what I was trying to get at, and
22 perhaps, like I said, I wasn't very clear, is that
23 in addition to I think that there is another step in
24 reviewing the -- the injured party and -- and their
25 connection to the transaction. And I think there

---

179

1  there are a couple of things you have to take into
2  consideration, like the -- you know, was that
3  injured person involved in the purchasing and the
4  negotiating of the contracting of the contract, et
5  cetera, et cetera.
6        So again, I think -- I'm not going to
7  say that he's incorrect. I just think that we took
8  different views on how that should be read.
9  Q       Is there anything else that you disagree
10 with in Judge Hood's opinion?
11       MR. KELLER: Object to the form, but
12 go ahead.
13 A       Again, there -- there was a lot there.
14 I skimmed it, and --
15 Q       Can you point to anything specific with
16 it in front of you that you disagree with, any --
17 any language at all?
18 A       Let's see here. Again, this -- this is
19 in -- in his view. I just simply took a simple -- a
20 different approach, and -- and just having 20
21 minutes to review it, it will be hard for me to call
22 something right now without -- without more, but
23 let me see. I think that the reference to the -- I
24 think it was the Morris case --
25 Q       Let me just tell you something about

---

180

1  Judge Hood --
2  A       Uh-huh. (Affirmative)
3  Q       -- before you answer that question.
4  A       Sure.
5  Q       Judge Hood's been on the bench for about
6  45 years in federal court. He's been a federal
7  judge. He was a law clerk for a federal judge
8  between 1972 and 1976. He was a magistrate judge
9  for 14 years, between 1976 and 1990. He's been a
10 U.S. District judge appointed by I think Bush One in
11 1990. He's been on the bench 31 years. He is a
12 senior judge of the Eastern District of Kentucky.
13       MR. KELLER: Is that a question?
14       MR. STOLTZ: The question is, what
15       does she disagree with of his opinion?
16 Q       What -- what did he get wrong? What --
17 what did he say about Kentucky law that -- that you
18 disagree with specifically?
19 A       Well, I think, like I said, I just
20 mentioned a couple of points that I stated. I think
21 the analysis doesn't --
22 Q       I have no idea what you -- what you said.
23 A       Well, like I -- like I said before --
24 Q       I think what you're saying is you can't
25 point to anything today that you disagree with in

---

**Enante Darout   10/18/2021**

---

181

1 the opinion?
2 A      I -- I think that --
3          MR. KELLER:  Object.
4          THE WITNESS:  I'm sorry.  What was
5      that?
6 Q      Is that fair?
7          MR. KELLER:  Go ahead.
8          REPORTER:  Did you object?  I'm
9      sorry.  Did you object?
10         MR. KELLER:  I just said objection
11     and she can go ahead.
12 A      I think that the opinion that I drafted
13 was a reasonable one.  I think that I performed the
14 -- the research and I drafted the opinion, one --
15 one that is reasonable, but, as Judge Hood has
16 stated, that one can see or one can agree or one can
17 disagree and state that my view of how it should be
18 interpreted is incorrect.  But I stand by what I
19 drafted, what I've written, understanding that those
20 -- there are people that may have -- there are
21 courts that may have different views on what I've
22 drafted.
23 Q      Understand.  Okay.  Now I want to ask
24 you a hypothetical.  You and your good friend go to
25 -- no, go -- go for coffee.  Mary's been your friend

---

182

1 since elementary school.  She is not your best
2 friend, but you're really close, been through a lot
3 together, years and years.  She's got your back,
4 you've had your -- her back.  You follow me?
5 A      Okay.
6 Q      Mary -- so you-all meet for coffee
7 somewhere, and Mary's got to park in a parking
8 garage.  And you get the coffee, you have a good
9 time, she opens her purse, and she says, oh, darn,
10 I don't have any cash.  I need ten bucks to pay my
11 parking, and they only -- the -- the card thing is
12 broken.  They only take cash; I don't have any cash.
13 And she says, Enante, can you loan me ten bucks?
14 I'll pay you back.  And you're like, of course.
15 You're my -- you know, you-all are good friends,
16 been together for -- been friends for many years.
17 She -- she's like -- she covers you like a warm
18 blanket.  When you're with her you just feel good
19 and supported, and -- and you've got a great
20 relationship.  So you're like, fine, of course,
21 whatever you need.  I'll pay you back.
22         Couple months later you meet for lunch.
23 She calls you and says, hey, I got your ten bucks.
24 And you kind of go, ha, ha, ha, and okay.  And you-
25 all agree on a place, and you have a very nice

---

183

1 lunch, and the waitress brings the check or -- or
2 asks -- she asks, one or two checks?  And Mary says,
3 two.  And you kind of go, huh, that's weird, but
4 whatever.  And so she brings the checks.  And Mary
5 says, oh, yeah, here's your ten bucks, and she puts
6 it in your hand and says, thanks.  And then she goes
7 and snatches it right back and says, seven years ago
8 we had lunch and I paid for your lunch, but I didn't
9 offer to do it, so I'm going to take this back and
10 now we're even.  And you kind of look at her
11 dumbfounded like, what?  She put a ten-dollar bill
12 in my hand and then she snatches it right back?
13         And so the question is, has Mary repaid
14 the parking, the $10 parking loan?
15         MR. KELLER:  Objection; relevance.
16     I'm not sure how this has anything to do
17     with the case.  So --
18 Q      You think --
19         MR. KELLER:  Enante, you can answer
20     if you understand what he just said.  I
21     don't.
22 Q      Isn't this what Travelers did to Laura
23 Woods?
24         MR. KELLER:  Object to the form, but
25     go ahead.

---

184

1 A      I really can't --
2 Q      They gave -- they gave her -- they gave
3 her the 10 -- they said they were going to give her
4 the 10,000, and then by offsetting it they took it
5 right back.  The question is, have they paid the
6 parking money back?  Have they paid -- if they take
7 it back as an offset, have they really paid it?
8         MR. KELLER:  Same objection.  Go
9     ahead if you know.
10 A      Steve, I'll be honest.  I can't make
11 heads or tails of the hypothetical, and so I don't
12 know how to answer that question.
13 Q      I put $10 in your hand to repay you for
14 money you loaned me for parking -- Mary for parking.
15 I put it in your hand, and then I snatched it out of
16 your hand.  And the question is, did I pay you back
17 for the parking?
18         MR. KELLER:  Same objection.
19 Q      If I put a ten-dollar bill in your hand
20 and then I come up with some pretext or something to
21 snatch it right back, have I paid it?
22         MR. KELLER:  Same objection, and --
23 Q      Isn't that the same thing that Travelers
24 did to Laura Woods?  They said they would pay the
25 10,000, they paid it, and then they took it right

---

Enante Darout   10/18/2021

185

1   back as a form -- as an offset.
2           MR. KELLER:  Same objection.  Go
3       ahead.
4   Q       Isn't it the same thing?
5           MR. KELLER:  Same objection.
6   A       No.
7   Q       How is it different?
8   A       Well, first and foremost I hardly
9   understand the example, but if in your hypo Mary at
10  some point paid something -- Steve, I'm going to be
11  honest, I can't make heads or tails of it.
12  Q       Let me -- let me tell you the --
13  A       I can't follow.
14  Q       Let me tell you the -- let me tell it to
15  you again.  Okay, you're at coffee with your friend
16  Mary.
17          MR. KELLER:  I think she's already
18      told you she doesn't understand.  So do
19      you want her --
20          MR. STOLTZ:  I'm going to -- I'm
21      going to try it again.
22          MR. KELLER:  Okay.  This -- this'll
23      be the last time, but go ahead.
24  Q       You and Mary go to coffee.  She doesn't
25  have cash for parking.  She asks you if you'll loan

186

1   her ten bucks.  You say, of course I'll loan you ten
2   bucks.  Couple months later -- she says, I'll pay
3   you back.  You're like, yeah, yeah, no problem;
4   happy to do it.  Couple months later you meet for
5   lunch.  Waitress brings two checks.  You're kind of
6   surprised by that.  You figured somebody'd pick it
7   up or whatever.  End of the meal Mary puts in your
8   hand the ten-dollar bill that you loaned to her a
9   couple months ago for parking.  But then she
10  snatches it right back and says, well, I paid for
11  your lunch seven years ago, and so now we're even.
12  And the question is, has Mary paid the parking loan?
13          MR. KELLER:  Same objection.  Go
14      ahead.
15  A       I mean, some people will say no, some
16  people will say yes.  I -- I don't --
17  Q       What do you say?
18  A       I say I hardly think -- I don't know.  I
19  just don't know how this is relevant to -- to the
20  case at hand.
21  Q       Because Travelers did the same thing to
22  Laura Woods, didn't she -- didn't they?
23          MR. KELLER:  Object to the form.
24  A       So Laura loaned Travelers some money and
25  then Travelers -- what?  I'm sorry.

187

1   Q       Mary is Travelers.
2   A       Mary is Travelers.  And then --
3   Q       Mary owes -- Mary owes money to you.
4   You're Laura Woods.
5   A       And I'm Laura?
6   Q       Uh-huh.  (Affirmative)  And they paid
7   the money, the $10, or in Laura's case 10,000, or
8   11,000, and then they take it right back.  Have they
9   paid it?  If they put it in your hands and then take
10  it right back for some other reason, have they
11  discharged the obligation to pay the loan?
12          MR. KELLER:  Object to the form.
13      This has gone on a long time.
14  A       Yeah.
15          MR. KELLER:  Go ahead.
16  A       I don't -- I don't know how to answer
17  that, Steve.
18          MR. STOLTZ:  Okay.  Subject to later
19      objections I move to admit all of the
20      exhibits, 25 to 39, and that's all I
21      have.
22      ------------------------
23          EXAMINATION
24  BY MR. KELLER:
25  Q       Ms. Darout, did you have any sort of

188

1   ulterior motive for rendering the opinion that you
2   prepared in this case?
3   A       No, I did not.
4   Q       Were you rewarded in any way, whether by
5   money or a different position or otherwise, by
6   Travelers because of --
7   A       No.
8   Q       -- the opinion you prepared?
9   A       No.  No, not at all.
10  Q       Does Travelers or Standard Fire -- I'm
11  going to use the two interchangeably.  Does
12  Travelers have a company policy or stance to limit
13  the full amount of UIM benefits payable to insureds?
14  A       Do they have a policy to limit?
15  Q       Yes.
16  A       They don't have -- are you talking an
17  internal policy?
18  Q       Yes.
19  A       No.  No, they don't.
20  ██████████████████████████████
21  ██████████████████████████████
22  ████████████████████████████████████
23  ████████████████████████████████████
24  ████████████████████████████████
25  ██████████████████████████████████████

Enante Darout   10/18/2021

189

1  ▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮
3  Q   Okay.  Did anyone tell you what
4  conclusion to reach when preparing your coverage
5  opinion?
6  A    No.
7        MR. KELLER:  Okay.  That's all I
8  have.  Thank you.
9        MR. STOLTZ:  Ms. Darout, thank you
10  very much.
11       THE WITNESS:  No problem.
12       VIDEOGRAPHER:  Okay.
13       MR. KELLER:  Enante, do you want the
14  opportunity to review the transcript
15  before it's released?  You have that
16  option.
17       THE WITNESS:  Yes.
18       MR. KELLER:  Okay.  So, Madam Court
19  Reporter, if you would like to -- I
20  don't know how you want to do it, Steve.
21  But if you-all want to reach out and
22  then we can provide Enante with the
23  unofficial transcript, and then she can
24  review it and then furnish whatever
25  additions or corrections she sees,

190

1  that's fine.
2        MR. STOLTZ:  That's fine.  I think
3  Ms. Sowards will do that.
4        MR. KELLER:  Okay.
5        VIDEOGRAPHER:  Thank you.  There
6  being no --
7        MR. STOLTZ:  You want -- you want
8  her to send it to you, Stephen?
9        MR. KELLER:  That's fine.
10       MR. STOLTZ:  Okay.
11       VIDEOGRAPHER:  Anybody have anything
12  further?
13       MR. STOLTZ:  Nothing further.
14       MR. KELLER:  No.
15       THE WITNESS:  No.
16       VIDEOGRAPHER:  That being all, the
17  deposition is concluded.  The time is
18  2:40, and we're off the record.
19  -----------------------
20       (DEPOSITION CONCLUDED)
21
22  _____
23
24
25

191

1  STATE OF KENTUCKY )
   COUNTY OF FAYETTE )
2
         I, MARYBETH C. SOWARDS, Certified Court
3  Reporter and Notary Public, State of Kentucky at
   Large, certify that the facts stated in the caption
4  hereto are true; that at the time and place stated
   in said caption the witness named in the caption,
5  after being by me duly sworn, was examined by
6  counsel for the parties; that said testimony was
7  taken down in shorthand by me and later reduced to
8  typewriting under my direction; and the foregoing is
9  a true and complete record of the testimony given by
10 said witness.
11       Said deposition was presented to the
12 witness for reading and signature, as set forth
13 herein.
14       My commission expires:  January 11, 2023.
15       In testimony whereof, I have hereunto set
16 my hand and seal of office on this, the 3rd day of
17 November, 2021.
18
19
20
21       _____
22       MARYBETH C. SOWARDS
         Certified Court Reporter (KY)
23       Certification No. 20041D115
24       Notary Public, State-at-Large
25       Notary ID No. 613817

192

1        CERTIFICATE OF VIDEO SPECIALIST
2
   UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF KY
3
   CLAIMANT(S):    LAURA N. WOODS
4  DEFENDANT(S): THE STANDARD FIRE INSURANCE CO.
   CASE NO.:    5:18-cv-658-JMH
5
6        I, JOHN S. SOWARDS, Certified
   Deposition Video Specialist and Notary Public in
7  and for the State of Kentucky at Large, do hereby
   affirm that I have accurately made the video
8  recording of the deposition of ENANTE DAROUT in the
9  above-captioned matter on Monday, October 18, 2021,
10 beginning at the hour of 9:45 a.m. and ending at
11 the hour of 2:40 p.m.  No alterations, additions,
12 or deletions were made thereto.
13       I further certify that I am a
14 disinterested person and that I am in no way
15 interested in the outcome of said action, being
16 neither financially interested nor a relative or
17 employee of any of the parties or counsel.
18       My commission expires:  March 18, 2024.
19       Date:  November 3, 2021.
20
21
22
23       _____
         JOHN S. SOWARDS
24       NOTARY ID No. KYNP4035
25

193

1            SIGNATURE
2            I, ENANTE DAROUT, do hereby certify
3    that I have read the foregoing deposition given by
4    me on October 18, 2021, and acknowledge it to be
5    true and accurate.
6
7
8
           _____
9            ENANTE DAROUT
10
11
12
        Subscribed and sworn to before me by
13
      ENANTE DAROUT on this, the _____ day of
14
      _____, 2021.
15
16
17        My commission expires: _____
18
19
20
21
22        _____
23            NOTARY PUBLIC
24
25

**A**

a.m 1:16 5:3 192:10
ability 6:22
able 39:25 40:1 57:2 61:2
above-captioned 192:9
above-styled 1:19
absence 142:22
absent 95:24
absolutely 35:19 42:11 137:5 153:12 156:11
accept 47:15 48:14
accepted 11:13 12:13
access 129:8 167:16
accessed 27:22
accessible 25:25 27:14 28:13,14
accident 78:12 89:13 90:7 97:7 97:9 109:9 113:22 114:20 114:24 116:23 117:11 118:13 120:2 130:5 164:13 172:24 173:12 174:8,18 174:19 175:3,6 176:13
accidents 113:13
account 84:21,22 156:3
accurate 193:5
accurately 145:9 192:7
acknowledge 159:3 193:4
acknowledged 173:4
acknowledges

175:8
acquainted 75:17
act 158:9,16 159:4 159:8,16 160:2 160:24 165:14 166:12
action 1:20 192:15
actions 96:3 100:2 101:19 159:25
actual 70:13
added 72:9 134:2 136:10,16
adding 136:11
addition 72:12 178:5,23
additional 9:20 111:23
additions 189:25 192:11
address 7:12,15 42:4 62:15 66:11 86:20 96:2 136:23 156:10
addressed 87:21 87:21
addresses 80:7
adjusting 22:14 22:24
adjustor 21:19,22 21:25 22:2 23:1 37:14,22 38:3 61:24 71:15 125:19 130:10
adjustor's 65:4 151:6
adjustors 21:16
administratively 12:21
admit 187:19
advantage 96:8
advice 3:15 28:20 30:23 37:5,11,23 44:5,14 45:6 51:7 64:12,18
advise 57:5
advised 144:4

affect 6:22
affirm 192:7
**Affirmative** 23:21 24:17 41:17 42:25 54:2 66:19 70:10 74:23 75:16,23 79:24 80:14 82:13,22 84:12 85:12,17 85:23 86:19 87:12,13 88:15 91:19 93:8,14 94:23 98:7 99:9 99:25 100:12 103:8,13 131:9 132:12 135:3 138:21 145:18 180:2 187:6
afforded 122:6
age 40:12
ago 12:4,16 18:13 66:8 183:7 186:9 186:11
agree 47:25 67:3,4 96:18 97:24 104:7 106:5,7 129:21 158:8 161:2 177:13 178:18 181:16 182:25
agreeing 152:3
agreement 111:3 116:19 118:8
agrees 170:5
ahead 11:14,16 37:21 43:17 44:10 46:8 50:16 57:12,14 62:12 81:23 84:2 88:7 99:6,15 103:3 105:16 122:25 123:13 124:3,17 126:2 127:11 140:7 158:12,12 159:10,18 161:19 162:1

163:5,19,23 164:8 179:12 181:7,11 183:25 184:9 185:3,23 186:14 187:15
air 152:2
Albert 23:17
alert 26:9
alerted 26:11
aligned 73:24
alleged 95:20
alleging 95:9
Allen 57:16,23 59:6,16,19 60:1 60:17 61:11,12 67:9 68:16 72:8 72:10,11 107:23 108:13 145:25 146:3,10 154:16
allocating 63:23
allotted 84:25
allow 29:18 127:5
allowed 161:23
allowing 77:10
allows 81:8,9
**Allstate** 4:11 96:1 100:1
alterations 192:11
ambulance 147:15
amended 136:9
amendment 133:21 136:8
**America** 113:16
amount 52:15 54:14 82:4 83:13 121:9 136:20 144:20,22 149:18 171:22 172:10 188:13
amounts 79:22 115:9 120:18 159:22,24
analogous 88:4 91:14 133:18
analogy 92:6

analy 142:13
analysis 80:20 84:11,18 86:11 91:3,18 93:2 100:8,9 102:1,24 104:2 105:19,24 130:6,25 132:13 132:15,20 152:4 170:18 173:18 175:11,20 177:1 177:6 178:7,15 178:16 180:21
analytical 38:19
analyzing 28:20 37:5,10 55:11
and/or 33:12 52:19
annually 149:12
answer 63:17 69:12 157:23 180:3 183:19 184:12 187:16
answers 47:21
anticipate 47:17
anybody 51:21 68:25 145:21 153:8 190:11
anymore 48:25
**Anyway** 74:21
**Apart** 96:1 99:25
apologize 44:9 94:13 164:1
apparently 90:10 95:15 97:6,8
appeal 156:16
**Appeals** 94:15,16 94:24 95:5
appear 156:17,19
**Appearances** 2:1 3:3
appearing 5:6
appears 95:11
applicable 57:4 92:13 118:22 120:1,20 139:3 142:3,6

Enante Darout  10/18/2021

195

application
170:14 171:1
173:11 174:1,21
174:23 175:9,11
176:2 177:2
applied 11:6,12
12:1 14:10 22:12
36:17 90:17 98:3
109:2 137:6,21
151:4 172:18
173:7
applies 56:5 87:24
96:21 100:24
113:13 114:10
114:11,21
119:18 158:9,24
173:20 176:22
177:10
apply 11:22,24
12:2 13:7 22:15
76:23 84:17 92:9
93:16 95:1 96:22
97:17 100:11,15
102:4 103:10
110:10,25 113:6
123:10,19
124:15 133:17
139:5 170:11,13
172:21 173:23
177:1
applying 11:25
85:18 175:14
176:5
appointed 180:10
apportionment
84:6
approach 139:19
141:6 179:20
appropriate 27:23
27:24 28:1,3
42:14,15,18
approximate 1:16
April 36:20 38:25
39:1,5,12,24
40:20
archive 58:25

66:13
archived 147:19
area 42:3 48:18
49:2
arguably 150:13
argue 135:23
argued 123:7
arose 66:7 102:17
Asher 15:19
137:23 140:12
142:4,7
aside 63:22 178:5
asked 63:5 152:8
152:9,13,14,16
152:18 153:18
asking 63:4 64:23
66:12 98:21
105:14 125:3
asks 183:2,2
185:25
aspects 22:13
aspiring 38:16
40:10,13
Assembly 170:22
171:3,11 175:24
assert 82:2
assessment 20:12
40:8
assign 27:4
assigned 20:5
31:24,24 33:25
59:20
assigning 31:22
32:2,16,19,19
33:13 34:1,11,17
59:24 75:12
108:19 150:25
assignment 26:16
32:12 33:11
45:19 49:5 57:10
57:11,19 58:3,5
59:15 64:15,19
66:24 67:10,13
67:21 68:12,14
69:18 70:3 71:22
72:8 74:14,18,25

76:5,13,14,15
107:22 108:11
127:13 131:25
145:8 146:18
151:1
assignments 24:1
24:3,5,9 25:16
26:19,20 27:2
31:16,19,21
32:16 46:25 47:2
47:4,4
assigns 59:22,22
assisted 46:6
assisting 46:11
associate 29:22
33:7 36:18,21
44:4 69:6 125:20
associated 63:10
78:6
Association 14:7
assume 48:3 67:6
129:12,15
assuming 41:25
49:10
Atchison 2:5
attached 3:13
52:25 53:8 55:24
56:11 67:1,2
attaches 53:5
attaching 74:1
attachment 73:21
73:22,23 74:1
attempted 94:6
attempting
159:12
attended 11:18
14:16
attention 10:12
attorney 6:12
12:18 16:15 20:5
21:21,22,24 22:3
30:21 31:22,24
32:17,19,19
33:14 34:1,11,17
38:17 40:11
41:20,22 42:7,12

51:8 59:18,21,24
61:2,23 63:12
75:12 108:19
attorneys 17:20
24:2,4 32:2,13
attracted 11:21,24
authored 138:2
authorities 4:7
133:2 137:16
authority 34:22
authorized 13:21
13:24 14:4
auto 20:19 21:12
41:11 44:14
45:20 48:24
57:21 61:7 65:20
71:7 114:20,23
117:1,3 119:17
automatically
58:22
automobile 4:2
available 28:12
52:20,24 120:19
156:20 161:16
171:8 172:11
aware 10:9 117:10
117:12 157:1

_____
        **B**
_____
B 80:11 104:23
111:25 114:9,16
119:16 170:7
back 23:15 28:7
33:25 37:2 51:11
51:16 58:15 68:9
68:13 69:13 70:2
97:20 107:3
125:11 133:9
148:12,24
154:16,17 165:9
167:23 169:5,9
169:18,20 182:3
182:4,14,21
183:7,9,12 184:5
184:6,7,16,21
185:1 186:3,10

187:8,10
background 7:2
57:9 69:10 79:4
89:12 129:18
backup 156:4
bad 10:9,14
151:24 152:1,2
bar 10:18,24 14:7
barely 164:2
Barnes 2:11
based 42:19 51:7
51:8 54:14 67:22
83:14 84:24,24
86:25 89:5
150:19 172:4
173:10 174:22
177:10
bases 83:12
basic 112:2
166:14
basically 13:12
18:12 21:18
33:18 78:23
170:17
basis 108:3 157:16
158:1,4
Bates 56:23
beginning 192:10
behalf 1:4,14 2:2
2:8 52:17 77:14
77:18,21 79:22
81:11 82:5 121:6
121:9,16,23
163:1,15
belief 92:20,21
140:22
believe 12:7,14
13:13,22 15:11
15:16 16:6 23:17
26:2,4,7,8,13,14
26:22 27:21 28:3
28:6 33:6 39:4
39:15,24 43:3,6
50:17,19,19 51:9
57:1,13,15,22,24
58:20 60:15

65:22 66:15 67:7
68:23 74:12 75:4
80:6 84:18 90:25
92:20 94:18
100:23 102:15
112:8 126:15,18
126:20,21
128:19 133:5
140:21 141:6
145:1 146:11,19
149:22,24
152:15 166:22
**believed** 102:10
**believes** 77:4
**bench** 180:5,11
**benefit** 101:13,22
103:20 111:24
133:16
**benefits** 77:24
78:3,19 80:5
91:8 111:23
112:2 124:15
125:24 126:12
132:6 133:15
160:22,25 161:4
161:15,16
162:17,24
163:13 166:14
171:12,16,21
172:4,10 173:14
173:16 174:2
176:7 188:13
**best** 75:19 145:12
151:13 164:15
182:1
**better** 55:20,21
109:25 150:2
**beyond** 153:3,5
**big** 89:18 102:2
139:24 157:7
**bigger** 115:19
**bill** 61:20 183:11
184:19 186:8
**billing** 112:15
**bills** 52:7,18 54:17
54:19 61:18,23

78:16
**Bing** 2:5 5:19
**bit** 39:10 40:12
41:2 43:23 51:17
81:1 115:18
162:11 165:18
170:2
**bites** 21:9,10
**BIW** 131:3,7
**black** 137:25
**blanket** 104:13
173:25 182:18
**blending** 94:4
**blow** 120:16 170:1
**blurb** 133:10
**bodily** 52:17
114:9 115:2
116:22 118:4,12
118:22 119:25
120:19 121:5
131:3
**bolstered** 142:16
142:19 173:12
**bonds** 118:23
120:1,20
**bonus** 149:9,12
**bonuses** 149:5
**borders** 173:22
**born** 7:3,5
**boss** 59:15
**bother** 106:1
139:12
**bottom** 66:17
172:8
**box** 96:2 100:2,2
**break** 51:20,21
68:1,8 162:10
164:17 165:8
168:24 169:4,17
169:20
**brief** 68:8 165:8
169:17
**brings** 183:1,4
186:5
**broad** 134:5 135:8
171:7

**broken** 182:12
**brought** 159:25
**bucks** 182:10,13
182:23 183:5
186:1,2
**building** 59:10,12
**bunch** 125:17
**Bush** 180:10
**business** 21:1,4
115:12
**businesses** 21:1
**buy** 98:17 99:3
110:15
**buying** 95:12,20

---
**C**
---
**C** 1:14 2:10
111:25 116:13
117:13 121:3,21
191:2,21
**C1** 163:3
**cabinet** 35:4 70:5
70:16,19,21,23
71:8,8 79:9
129:10,12
131:14 154:4,21
155:8,19
**calculated** 149:9
149:11
**calculating** 63:23
**calculation** 52:23
**call** 21:16 30:4,11
30:13 32:22
33:13 64:13 76:6
76:8 78:16 81:12
82:14,21,25
83:10 105:3
127:20,24
135:15 179:21
**called** 13:23 25:23
29:8,9 52:3
53:22 87:9,10
112:23 131:4
142:12 172:19
**calling** 82:6
109:18

**calls** 164:7 182:23
**Canada** 113:18
**capacity** 23:22
**capital** 161:5
**caption** 3:2 191:3
191:5,5
**car** 21:8 34:13,15
54:7 92:21,22
97:6,9,11 101:15
101:16 102:6,8
102:11 113:18
114:3 140:20,22
174:16
**card** 18:14,18
182:11
**carrier** 171:20
**cars** 95:13
**case** 1:2 5:11 7:10
15:16,18,19,19
15:19,20 16:14
16:19 17:16,25
18:18 20:7,7,13
24:11,14,14,15
27:19 37:23
44:24 49:22
59:22 69:21
72:21 80:1 86:6
87:24,25 88:5,17
89:1,3 90:18,18
91:2,11 93:13,17
93:25 95:3,11
96:10 100:24
101:12 105:6,18
109:21 110:2,6
112:7 114:10
118:6 121:10
123:11,18
124:24,25 125:1
127:13 129:1,2
132:14,22 133:6
133:14 134:8,10
134:18 135:12
136:4 137:4,7
138:4 139:5,24
139:25 140:2,14
140:19 141:1,4

141:10 142:1,2,7
144:5 147:9
151:1,3 152:8
153:9,19 168:14
172:3,16,18,19
173:12,24 174:8
175:2,10 179:24
183:17 186:20
187:7 188:2
192:4
**cases** 15:11,13
20:19,19,20,22
21:6,12 34:4
38:1 48:24 86:23
86:24 87:6,9,22
91:5 94:4,8
97:12,24,25
100:11 103:12
103:19,23
105:20 132:23
133:7 136:24
137:15,17,24,24
137:25 138:25
139:8,11,18,21
141:2,17 142:25
145:17 146:15
146:20 147:8
148:12
**cash** 182:10,12,12
185:25
**catastrophic**
82:25
**caused** 116:23
118:13
**cc** 65:15
**centerline** 54:9
117:17
**Central** 1:2,22
**certain** 11:3 26:25
42:8 46:15 51:10
54:14 66:16
68:24,24 122:18
122:20 158:16
**certainly** 175:6
**Certificate** 3:6,6
192:1

Certification
191:23
Certified 1:15
191:2,22 192:6
certify 191:3
192:13 193:2
cetera 31:20 33:17
112:16 137:24
139:4 159:5,5
179:5,5
chain 3:12 66:1
chance 169:21
change 31:16 94:6
changed 134:5
135:2,4 137:8
changes 34:2
Chapter 160:24
charge 116:20
chart 137:15
check 7:22 125:9
183:1
checks 183:2,4
186:5
choice 72:2 80:23
choice-of- 142:13
choice-of-law
84:10 142:13,21
170:17 175:14
175:20 176:25
choose 32:6
chose 11:10 32:7
60:17
Chris 65:5,8,15,20
72:10 107:9,9
circle 33:25
circuit 160:14,17
circumstances
54:14 122:18,20
176:5
cite 93:13 97:23
103:12 132:24
171:9
cited 4:7 85:1
86:24 87:22
92:11 137:18,18
137:25 138:1,4,6

138:23 139:9,18
cites 168:14
172:19
citing 170:16
172:1
citizens 90:9
103:18
Civil 1:19
claim 16:18,21,22
16:23,25 20:3,8
21:15 24:15,15
24:16,18 25:24
26:7,10,16 27:8
27:11,18 29:6,25
30:1,2 32:25
34:13,20,21 35:3
35:4 36:17,19
38:24 39:9,13,15
40:5 41:6,9,11
43:21 44:2,3,14
44:22 45:20
48:13 52:17
57:21 61:7 64:24
65:4,12,20 67:20
67:21,23 69:1,25
70:1,4,4,5,5,12
70:12,13,14,15
70:15,17,18,19
70:20,21,21,23
71:1,1,2,2,3,8,14
76:6,10 79:8,9
94:21 95:7,16
108:17 109:2
114:13 119:10
123:24 128:20
128:21 129:9,9
129:18 130:18
130:25 131:1,14
131:19,19 148:5
149:17 153:1
154:1,11,11,21
154:25 155:10
165:14
claim- 22:13
claim-handling
20:1 22:13

claimant 20:3
64:25 77:12,13
claimant's 77:4
CLAIMANT(S)
192:3
claims 4:15,17
38:3 71:15
149:18 158:8,13
158:15 159:14
165:13 170:23
clarification 38:5
clarify 37:19
clarifying 37:20
classes 10:24
14:20
CLE 13:2 14:16
clear 100:20
159:15 178:22
clearly 171:11,24
172:12 175:21
clerk 180:7
clerkship 30:9,10
30:13
client 47:21 52:17
client's 53:1
clients 46:12
close 13:5 143:12
161:14 163:2,16
182:2
closer 112:17
clump 157:22
Co-pays 54:21
Coastal 12:7
coffee 181:25
182:6,8 185:15
185:24
collection 52:5
collision 117:20
161:1,9 162:19
color 23:18,20
come 15:20 27:8
31:23 33:4 34:17
41:23 47:22 61:2
79:8 85:2 130:23
148:18 169:9
184:20

comes 56:4 79:16
83:8 138:6
coming 104:9,12
148:12
commencing 1:16
comment 43:14
comments 41:15
41:16,18 43:1
commercial 20:23
168:24
commission
191:15 192:18
193:17
Commonwealth
171:6,17,24
176:8
Commonwealth's
175:22
communicate
17:15 20:2,10
28:8 74:3
communicated
31:20 56:21
73:10
communication
25:18,19,21
47:19 57:23,25
58:2 59:8 155:12
communications
144:2 159:4
comp 133:14,16
133:20 134:15
135:21 136:2
companies 109:25
company 1:10 4:9
4:11 5:13,23
80:2 110:3 149:1
153:23,24
158:17 188:12
compelled 159:21
compelling 95:24
compensate 81:12
81:16 82:14 83:1
compensated
81:13,16 82:15
83:1

compensation
149:4,8 171:21
172:4
compensatory
118:9 120:18
competency 63:11
competent 61:1
complaint 95:9,18
160:7,10
complaints
160:17
complete 147:2
191:10
completed 43:7,10
44:6 49:17 57:1
completely 174:9
174:25
compulsory 115:5
conceded 123:10
123:18
concept 115:15
127:8
concern 175:23
concerned 78:14
96:5 100:4
148:23
concerning 14:22
conclude 81:4
86:3
concluded 34:2
95:1 96:6 105:2
143:11 151:4
190:17,20
conclusion 42:19
85:2 93:15 100:6
100:21,22 103:7
104:10,13
105:21 106:2
137:12 148:18
150:8 168:15
189:4
conclusions 61:3
condition 6:21
161:12
conditions 112:22
117:10 125:23

Enante Darout   10/18/2021

**conduct** 158:9,17
**confident** 60:21
**confidential** 73:7
**confirm** 52:14
  150:20
**conflict** 80:22
  84:8,14
**conflicts** 4:6 50:12
  84:17 86:12
  137:16
**conflicts-of-law**
  138:6
**confusing** 94:8
**Connecticut** 7:13
  7:17 11:9 13:18
  13:20,23,24 14:5
  14:7 16:2,3 56:5
  57:2 76:21,22,24
  80:7,23 81:2,19
  82:3,10 83:16,19
  83:25 84:5 86:4
  86:11 89:4,7
  90:10,22,23,25
  91:12 92:9,17,19
  94:6,9,11,11
  96:15,24 101:10
  101:15,20 102:6
  102:12,13,15,17
  102:18,19
  110:13,15
  115:25 123:3
  137:6 140:23
  151:4 170:5
  175:4,5,12
**Connecticut's**
  82:3
**connection** 178:13
  178:25
**consider** 107:21
  107:22 142:23
**consideration**
  87:3 97:15 104:9
  122:11 127:23
  140:9 179:2
**considered** 24:23
**considering**

173:19
**consistent** 148:19
**consult** 130:20
**consummate**
  188:25
**contact** 7:18
**contacts** 87:2 94:3
  95:13
**contain** 147:15
**contemplated**
  161:24,24 162:6
**contemplating**
  22:17
**contends** 170:11
  173:25
**context** 126:22
  128:15
**continue** 13:2
  38:17,19 47:20
  94:10
**continues** 164:14
**continuing** 14:17
**contract** 101:4,18
  173:7 175:12
  177:10 179:4
**contracting** 92:23
  96:3,14 100:3
  140:11 179:4
**contractual**
  170:15 175:21
  177:3
**contrary** 95:25
**contravene**
  170:16
**contributor** 46:5
**control** 95:24
  147:14
**conversation**
  32:17 59:8 65:24
  105:7,10 108:2
  127:3
**conversations**
  71:16 143:23
**Cooley** 9:13,21
  10:2,5,15 11:10
  11:11,21

**Cooley's** 10:10
**Coots** 139:24
**copier** 73:16
**copy** 66:3 146:10
  158:18
**cor** 122:3,3
**corporate** 9:24
  36:21,23 62:22
  63:1
**correct** 6:12,13
  8:18 9:4,19,22
  9:23 10:1 14:8
  19:13,21 21:5,13
  21:17,20 23:3,24
  24:22 26:2,18
  28:25 29:2,11,24
  30:3,22 31:8
  32:14 33:2,15
  35:23 36:23,24
  36:24 37:1,17
  40:21 41:13,14
  43:9 44:21,25
  45:1,2,3,8,15,17
  48:9 49:4 51:15
  54:23 55:8 56:6
  56:7,14,15,18,19
  60:10,14 65:7,16
  65:17 67:4 69:12
  74:9,25 75:1
  76:25 77:1,2,3,7
  77:8,10,16,22,23
  77:25 78:1,2,20
  78:21 79:12,13
  79:15,18,19 80:2
  80:3,5,6,25 82:1
  82:11 84:8,9,12
  86:6,7,12,13,17
  88:1,2,3,22,24
  90:3 95:2,4 98:1
  98:9,18 99:4
  101:9 102:20
  103:19,21
  108:22 109:10
  109:11,19 110:6
  110:7,11,12,16
  110:17 113:8,10

113:11 114:14
  116:3,16,17
  117:7,8,23,24
  118:18,19 119:3
  119:5,9,20
  120:13,24,25
  121:11,12,19,20
  122:3,23 123:11
  125:21 127:9
  129:4 134:7
  144:24 155:20
  156:1 163:7,8,24
  166:3 171:2
  178:20
**corrections**
  189:25
**correctly** 12:3
  87:16 89:5 90:13
  91:10 134:15,17
  141:12
**cost** 63:9
**costs** 61:17
**could've** 61:3
  106:10,13 129:7
**counsel** 5:15
  13:21,22,25 22:9
  29:23 33:7 36:18
  36:21 41:8 44:4
  60:5,7,12 61:15
  61:19,19 62:14
  63:7,12 69:6
  77:4 125:20
  152:8 191:7
  192:17
**counselor** 46:7,17
**country** 114:4
**County** 160:14
  191:1
**couple** 20:21
  41:22 68:13
  106:22 107:19
  111:10,15 179:1
  180:20 182:22
  186:2,4,9
**course** 67:15,19
  75:11 145:3,5

150:19 172:2
  177:14 182:14
  182:20 186:1
**courses** 13:3
**court** 1:1,15,21
  5:10,14,25 85:4
  89:21 90:5,13
  91:21,25 93:10
  94:15,16,17,17
  94:19,20,24,25
  95:5,12,19 96:6
  98:17 99:3,10
  135:20,20
  137:19 142:6,18
  160:13,15,15,17
  171:14,19 172:3
  172:12,20 173:4
  173:6 175:8,13
  175:17,25 180:6
  189:18 191:2,22
  192:2
**court's** 92:7 94:25
**courts** 84:16
  87:23 170:13,18
  170:22 175:17
  175:24 176:4,4
  177:1,7 181:21
**cover** 54:19
**coverage** 4:15
  17:2 23:2,3,4,5
  23:10 30:24 31:1
  33:11 35:1 38:16
  40:11 41:9 44:5
  45:6,13 49:6,7
  49:13 50:22 51:2
  52:24 55:2,11
  60:5,9,13 61:6
  61:21,22 62:6
  69:8 79:17
  103:21 109:21
  109:22 110:25
  111:23,25 113:7
  114:7,8,16,20
  115:9,22 116:13
  116:25 117:13
  118:3,5,21

Enante Darout   10/18/2021

199

119:15 120:3
121:14 122:6,13
125:11,12,13
130:21 131:22
136:21 147:1
149:5 150:3,6,9
150:13,19,21,21
150:22,24 167:4
168:16 171:8,8
171:22 172:11
172:14 173:13
174:14 176:13
176:20 189:4
**coverage/appell...**
44:7
**coverage/setoff**
55:24
**coverages** 109:16
110:11 111:6
159:7
**covered** 113:23
114:5,22 117:1
119:17 173:3
174:11,12 175:3
176:18,19 178:8
**covers** 54:17
182:17
**created** 39:4,12
39:24 40:23 43:7
146:18
**credit** 18:14,18
121:9 122:2
136:18
**credits** 52:21
**crisper** 47:21
**criteria** 149:23
**critical** 38:19
**crossed** 54:8
117:16
**crushed** 89:18
**curiosity** 17:12
**curious** 60:16
143:2 157:7
168:10
**current** 7:13,15
7:23 8:1 23:14

**currently** 12:19
**customary** 116:20
**customized**
111:15
**cut** 11:16

─── **D** ───

**D** 122:10
**D1** 79:17 109:21
118:3 125:11
**damage** 114:9
115:2
**damages** 78:17
81:10,20 82:5,25
83:15,18 84:3
89:18 113:1
118:9,14 120:18
120:23 122:22
130:13 135:4
**darn** 182:9
**Darout** 1:11,13
3:19 4:20 5:8
6:3,9,10 43:8
46:4 51:19 52:12
63:25 68:11
98:25 160:11
165:12 166:17
169:21 172:5
177:13 187:25
189:9 192:8
193:2,9,13
**date** 5:2 44:19
48:4 129:3
192:19
**dated** 3:13,13,15
3:19 4:4 38:25
40:20 43:4 51:12
52:10 56:17
74:16,16 107:12
**dates** 74:15 109:8
**Dawson** 89:6
90:20,24 91:11
96:23 102:4
128:23
**day** 191:17 193:13
**days** 3:24 16:10

16:12 74:17,19
74:21 107:6,11
107:13 145:6
**deal** 30:23
**dealing** 21:11
172:3
**dealt** 19:24 72:1
87:14 108:4
141:5
**Dear** 55:23
**December** 43:5,8
43:16,25 44:19
45:4 56:25 109:9
153:5 154:17
**decide** 137:2
**decision** 68:21
143:7
**declarations**
111:7,8,9 113:15
115:3
**declared** 170:21
**dedicated** 145:10
**deducting** 123:23
**deduction** 4:13
166:11,15 172:9
**deeper** 47:14
48:14
**defendant** 1:11
2:8 5:13,22
110:6 176:11
**DEFENDANT(S)**
192:4
**defense** 60:13
61:19
**define** 119:22
**definitely** 136:3
**definition** 120:10
**degree** 9:17,17
22:15 31:4,7
**delete** 58:22
**deletions** 192:12
**demand** 52:8
**demonstrated**
175:17
**denials** 23:10
**department** 19:15

19:19 27:6 29:25
57:20 65:20
**depending** 10:4
70:6 113:25
165:17
**deponent** 124:25
125:2
**deposition** 1:4,13
1:17 5:8 6:11,15
14:25 15:4,24
16:8,14 17:17
18:6 38:11 49:24
52:10 53:24
55:16 58:17 64:2
89:25 93:20
107:16 109:4
128:6 138:10
143:18 156:13
156:18 157:10
158:20 160:10
166:6,19 167:20
190:17,20
191:12 192:6,8
193:3
**describing** 41:12
76:25
**designated** 27:15
**designation** 13:25
14:6
**designed** 97:1
103:18
**Desktop** 147:21
**detail** 45:25 75:6
80:15
**detailed** 132:20
**details** 79:5 130:3
130:3 157:4
**determination**
123:20 124:20
125:8
**determinations**
149:6 150:4
**determine** 24:13
35:6 76:15 96:20
137:11 149:5,15
**determined**

172:17
**determining**
84:21 97:15
172:20 178:13
**development**
38:18
**develops** 47:22
**differ** 91:1
**difference** 70:11
81:6 172:5
**different** 43:15
59:11 73:10,11
80:23 83:12 91:5
91:5,9 110:11,18
131:5 136:3
139:19 140:3
150:24 165:15
177:19 179:8,20
181:21 185:7
188:5
**difficult** 12:24
152:6
**dig** 47:14 48:14
**digital** 1:14
**direct** 59:8 80:7
123:5
**direction** 191:9
**directly** 32:12
80:8 122:16
**disagree** 151:5
177:17,22 179:9
179:16 180:15
180:18,25
181:17
**disagreed** 148:25
**discard** 147:4,4
148:8
**discharged**
187:11
**disconnect** 81:4
**discuss** 16:13
33:22 34:1
**discussed** 97:19
97:22 98:3 101:2
133:19 178:3,4
**discusses** 101:1

Enante Darout   10/18/2021

discussion 24:12
   87:9 90:5 104:18
   104:19 109:1
disfavors 170:24
disinterested
   192:14
dismissed 140:14
   142:8
disposed 20:8
dispositive 173:16
disputed 176:18
disregard 147:3
   170:18 175:18
disregarded
   132:21
distinguish
   132:23 136:24
   139:4
distinguishable
   104:6 141:1
district 1:1,1,21
   1:21 5:9,10
   156:17 172:16
   180:10,12 192:2
   192:2
diversity 175:13
   175:25
Division 1:2,22
Doctorate 9:17
doctrine 85:9
document 3:10,24
   38:10 39:23
   49:23 53:23
   55:15 64:1,18
   72:6 89:24 93:19
   107:15 109:3
   128:5 129:23
   138:9 158:19
   166:5,18 167:19
documentation
   152:10
documents 24:11
   35:5 70:16,24,25
   73:6 147:5
   153:25
Dog 21:9,10

dogs 164:1
doing 22:23 48:24
   130:21 144:16
   153:14,20,21
   162:8
dollar 77:20
dollars 117:25
double-spaced
   167:9
draft 31:25 33:24
   42:14,15 105:1
   108:13
drafted 15:5 45:3
   50:7 101:14
   102:10 140:20
   148:11 150:16
   150:18 151:11
   177:15 181:12
   181:14,19,22
drafting 75:10
   101:5 105:2
drafts 41:23
dreamed 148:15
drive 7:12 113:19
   174:16
driver 141:9
   174:7 176:17
driver's 141:8
drivers 115:13
driving 88:12 97:5
   173:1 174:12,17
   176:19
Dropbox 167:17
drops 73:24
due 76:23 159:23
   172:6
duly 6:4 191:6
dumbfounded
   183:11
duplicate 121:14
   122:12
duplication
   122:23
duties 19:22 37:15
   111:21,23

E

e- 152:18,24
   154:11
E 23:18 120:15,17
   121:13,21
e-mail 3:12 17:15
   25:18 26:5 28:8
   28:11 32:22,24
   33:12 52:10
   57:13,15,23,24
   58:9,9,13 59:5,7
   64:9,11 65:14,21
   65:22 66:4,12,13
   66:23 72:4,9,10
   72:11 73:10,15
   73:16,20,22,25
   74:5,8 76:12
   107:9 146:8
   155:13,18
   156:10
e-mails 17:14
   58:16,20 107:9
   152:9 153:9,19
   154:3,5,5,10,14
   156:3
earlier 41:13
   189:1
early 52:6
Eastern 1:1,21
   5:10 172:15
   180:12 192:2
Eaves 54:6 77:14
   77:18,22 79:4
   117:17 121:10
   122:6
Eaves' 80:1 119:2
   120:7
Eaves/USAA
   53:20
edits 34:3
education 8:13
   10:7 14:17,21
Effect 4:15
effective 109:8
effectuate 159:13

efforts 46:6
Eighteen 160:22
either 27:7 32:22
   42:4,16 57:24
   65:21 69:11 84:7
   105:3 107:25
   139:1 150:18,20
electronic 26:6
   147:13 152:10
element 121:15
elementary 182:1
elements 122:12
elevated 24:19
eligible 78:18
   117:3,20,21
   118:25 119:8
Elizabeth 7:6
   25:11
eloquently 177:15
else's 144:6
emphasizes
   171:19
employee 192:17
employees 26:1
   68:22
employers 13:12
employment 19:5
enable 113:3
Enante 1:1,13
   5:8 6:3,9 38:16
   38:18 43:8,18
   44:1,3,6,13 46:4
   46:6 47:14,20
   48:6 75:20,22
   169:8 182:13
   183:19 189:13
   189:22 192:8
   193:2,9,13
encompass 39:22
encounters 47:15
end-all/be-all
   142:24
ended 152:11
   157:1,5
endorsements
   111:1

ends 7:23 8:2,4
   136:17
enforcement
   170:15 177:3
engaging 170:17
   176:25
ensure 42:18
entailed 29:21
Enterprise 19:6
entire 42:3 59:19
   67:16
entitled 118:10
   122:11 166:11
   173:9
entries 111:7
equals 52:23
equate 29:18
equitable 159:13
Erie 85:8,8,11
errors 42:16
especially 47:16
essentially 12:23
   13:1 14:3 20:8
   20:11,13 22:10
   29:15,19 30:16
   78:19 83:10,11
   86:23 87:2 88:10
   104:12 105:13
   133:3
establish 95:19
established 171:4
   171:24
estate 173:9
estimate 145:12
et 31:20 33:17
   112:15 137:23
   139:4 159:4,5
   179:4,5
evaluated 42:22
evaluation 47:11
   48:16 130:13
   150:11 188:22
evaluations 150:3
evaluator 50:9
Eventually 18:22
evidence 157:13

Enante Darout   10/18/2021

201

157:17 158:3,5
exact 49:15 123:3
exactly 13:8 22:6
  32:7 59:9 71:1
  78:5 83:3 85:21
  124:10 134:19
  146:24 159:19
exam 10:18
Examination 3:5
  3:5 6:6 187:23
examined 6:5
  191:6
example 28:2
  117:16 138:22
  152:9 185:9
exceed 120:23
exception 85:25
  89:2 96:9,20
  100:10 101:23
  102:4,24 132:9
  170:8 172:18
  173:10,19,23
  174:1,24 175:9
  175:20 176:2
  177:11 178:3,8
  178:19
exceptions 96:22
excerpts 4:2
  108:24
exchanged 154:3
exclude 150:21
excluded 73:15
  122:1
exclusion 92:12
  93:16 97:21
  99:12 100:15
  103:9 161:13
exclusions 120:12
Excuse 50:16 52:3
  70:2
execution 92:23
  101:7
exercise 113:3
exhausted 118:23
  119:1,6
exhibit 3:9,11,14

3:17,22 4:1,3,5,8
  4:10,12,14,16,19
  4:21 38:6,12
  49:21,25 50:22
  51:6,13 52:1,9
  53:17,18,25
  55:13,17 56:9,18
  56:22,23 63:24
  63:25 64:3 72:3
  73:1 74:16 89:21
  90:1 93:13,21
  107:8,17 108:23
  109:1,5 120:15
  128:3,7 137:14
  137:14 138:11
  154:18 158:16
  158:18,21 160:9
  165:12 166:4,7
  166:10,20
  167:16,21,23
  168:2
exhibits 3:4,8 52:3
  160:8,9 187:20
  188:21
exist 165:19
exists 90:8
expense 112:13
  117:3
expenses 52:19
  62:5,14 63:19
  116:20
expensive 61:13
  63:6,18
experience 29:20
  30:18 41:21 42:8
  47:9 48:21 69:9
  107:24 108:1
  144:14
expertise 47:23
expires 191:15
  192:18 193:17
explain 14:1 54:11
  70:8 75:5 81:16
  82:18
explained 92:14
explanation 47:16

explanations
  48:15
explicated 172:13
express 161:12
expressed 150:25
expressly 116:5,6
  122:16 123:6
  127:2 161:22
extent 81:9,10
  120:18 143:16
  157:1,2
extra 149:4

―――― F ――――
face 47:16 48:15
  171:22
facilitate 20:4
facilitator 9:11
fact 42:11 44:21
  46:18 60:21
  81:13 82:15 83:2
  91:21 93:1 99:22
  104:11 136:3,12
  173:12
fact- 104:1
fact-find 104:11
fact-specific 91:4
  93:2 96:23
factor 142:16,20
  142:23 149:18
  173:18
factor-weighted
  104:2
factored 84:24
factors 63:22
  84:25 97:14
  101:1 140:10,24
  149:14 178:12
facts 86:25 88:5,8
  91:1,5 93:2
  104:9,12 125:1,6
  136:3 140:2,4
  150:20 159:2,6
  170:3 172:19
  174:22 176:10
  176:11 191:3

factual 79:4 89:11
  92:6
factually 104:5
failed 39:18
failing 159:3
fair 21:18 33:20
  40:8 81:6 85:25
  106:14 111:18
  152:7 159:13
  181:6
faith 159:12
fall 104:15 128:1
falling 83:14
falls 19:25 21:7
familiar 6:14
  32:25 49:3 53:2
  125:13 128:21
  165:14 166:16
family 8:9 109:24
  173:3
far 78:14 93:9
fast 39:7
father 174:13
fault 54:16 78:6
  117:11,13,18,19
  117:22,23
favor 150:4
  175:11
favorable 95:16
  149:6 150:8
  176:11
Fayette 160:14,14
  191:1
feature 26:12
February 36:11
  36:12
federal 1:18 4:6
  84:16 85:4
  137:16 160:15
  175:25 176:4
  180:6,6,7
feel 40:7 46:23
  47:3,6 48:17
  79:14 135:10
  148:17 182:18
feelings 40:12

feels 164:5
fees 12:25 13:2
fell 50:5 67:16
fellow 54:7
felt 129:8 139:3
  151:3
field 44:4,4
Fifteen 56:14
figure 23:25 33:18
  35:25 39:22 40:3
  49:20 52:20 70:7
  127:25
figured 186:6
file 16:25 35:4,4
  40:4,19 67:23
  69:25 70:4,5,12
  70:15,15,20,23
  71:8 79:9 129:9
  129:16 131:14
  143:12 147:13
  148:5 154:1,4,11
  154:21,25 155:8
  155:19
filed 1:18 38:10
  49:23 53:23
  55:15 64:1 89:24
  93:19 95:9,17
  107:15 109:3
  128:5 138:9
  153:10 158:19
  160:13 166:5,18
  167:19
files 67:1 144:12
final 108:15,18
  145:23 156:15
finalized 75:13
finally 163:12
  175:8
finance 9:24 62:23
  62:25 63:2,3
financial 63:14
  114:25 130:3
financially 192:16
find 7:20 18:21
  32:11 33:5,9
  34:16,18 35:8,19

56:22 66:13,14
87:23 107:25
134:18,21
167:25
**findings** 105:19
**fine** 12:17 18:17
164:18,24
182:20 190:1,2,9
**finish** 106:18
**Fire** 1:10 5:13,22
102:10 110:2,5
142:11 160:16
170:25 171:5
173:15,25 174:7
174:11,15 176:3
188:10 192:4
**Fire's** 92:21
**firm** 24:2
**first** 6:4 10:19,24
11:4 18:24 19:10
19:23 20:2 29:17
50:14 51:25
72:25 80:19,21
81:19 82:2 85:19
91:18 96:17
111:9,10,15
112:13 115:25
120:22 157:19
157:24 170:2,4
185:8
**five** 132:15 134:3
136:11,16,16
145:11 164:17
**Florida** 12:6,7
**focus** 38:17,19
102:2 114:17
136:25
**focused** 93:11
**focusing** 91:25
92:24 93:1
**folder** 52:1,2
**follow** 182:4
185:13
**following** 104:25
**follows** 6:5 114:24
**font** 73:8,10

**foregoing** 191:9
193:3
**foreign** 152:4
177:2
**foremost** 185:8
**foreseeable**
174:20
**foreseen** 174:15
**forever** 66:23
**forgive** 93:6 94:4
94:7 97:7
**form** 3:15 62:12
64:11 88:6 99:6
108:15 111:17
122:24 123:12
124:1,16 126:1
127:10 156:23
158:11 159:9
161:18,25 163:4
163:18 179:11
183:24 185:1
186:23 187:12
**formal** 14:21
64:17,21
**forming** 174:5
**forms** 125:14
**formula** 149:19
**forth** 52:7 90:9
160:21 191:13
**forum** 175:14
**forward** 48:5
156:2
**forwarded** 58:1
65:24 72:5 146:4
**forwards** 72:10,11
**fought** 156:12
**found** 19:7 42:17
86:24 90:15
99:10,19 137:20
150:9,9 170:25
**four** 74:10 111:15
132:9,15 134:3
136:11,16
**fours** 134:19
**frankly** 29:16
143:5 157:3

**FRCP** 5:7
**French** 8:21,23
**friend** 181:24,25
182:2 185:15
**friendly** 75:25
**friends** 182:15,16
**front** 179:16
**full** 123:16,17,22
124:13 125:24
126:12 150:9
168:14 188:13
**function** 26:5
**funeral** 116:21
**furnish** 189:24
**further** 143:22
176:18 190:12
190:13 192:13

_____ G _____

**gain** 141:15
**Galanski** 3:10,13
52:9 53:18 55:12
55:23 128:23
**Galanski's** 131:23
**gap** 9:6
**garage** 182:8
**garaged** 92:22
102:13,13,14,15
104:20 114:23
140:22 172:24
175:5
**general** 19:13,14
19:16 20:20,23
41:6 46:7,16
53:9 110:9,23
111:21 112:21
125:23 126:20
130:10 170:22
171:3,11 175:23
175:24
**generated** 48:4
**germane** 136:17
137:20
**Gess** 2:5 137:21
**getting** 24:1 57:10
58:3 73:12

101:22 112:2
114:2 122:5
144:21
**give** 6:22 145:11
151:24,25 167:6
169:7 184:3
188:20
**given** 14:7 18:6
24:9 31:21 46:24
47:1 51:7 191:10
193:3
**giving** 28:20 37:5
37:11 152:2
173:13 176:13
**GL** 43:18 44:13
**GMA** 137:22
**go** 6:17 11:14,16
13:16 26:6 36:16
37:2,21 41:3
43:13,16 44:10
44:12 46:8 50:16
51:11,16,17,23
52:3 57:12,14
59:23 62:12
63:19,22 68:13
69:13 76:19 79:3
79:10 81:1,23
84:2 86:8 88:7
99:6,14 103:2
105:15,16,17,17
105:18 108:23
112:10,21,22
115:14 120:15
122:25 123:13
124:3,17 125:11
126:2 127:11
133:9 135:7
137:14 140:7
153:15,20
158:11,12
159:10,18
160:21 161:18
161:25 162:11
163:5,18,23
164:8 167:23
171:17 179:12

181:7,11,24,25
181:25 182:24
183:3,25 184:8
185:2,23,24
186:13 187:15
**goes** 65:3 115:10
132:3,7,16 153:3
153:5 170:3
177:12 183:6
**going** 6:17 38:6
43:13 47:10 48:3
63:24 66:17 68:5
80:12 102:11
103:5 107:20
114:15 128:3
131:21 157:3
160:7 162:11,15
167:6,7 169:7,24
169:25 179:6
183:9 184:3
185:10,20,21
188:11
**golfer** 40:13,14
**good** 5:18,21 6:10
10:2,6,7 11:5,9
18:17 40:14
51:23 61:4 68:4
142:25 159:12
175:23 181:24
182:8,15,18
**Google** 35:19
**gotcha** 23:1 35:13
38:4 116:12
131:21 144:19
**gotten** 10:10
154:10,15,15,18
**govern** 57:2 72:1
127:21 128:1
**governing** 137:2
137:11
**governs** 76:16
84:20
**GP** 110:8
**GP-1** 110:9
**GP-3** 111:22
**grad** 8:15

Enante Darout   10/18/2021

graduated 10:11
  18:24,25
graduates 10:18
graduating 10:24
  18:20
grammar 34:3
granted 78:8
great 122:22
  162:8 182:19
Green 23:17,18
  23:20 25:3
Greg 141:12
group 9:11,12
  19:20 33:8
grow 7:7
guess 22:5,21
  26:23 41:16
  69:10 76:13
  105:5 113:18
  130:4 135:10
  150:15
guidance 35:8
guy 88:19 90:17
  92:5 168:1,21

**H**
H-e-e-b-n-e-r
  25:13
ha 182:24,24,24
habit 147:2
half 10:18,23 41:4
  87:8
hall 66:21
Halloween 74:18
hand 25:17
  146:21 183:6,12
  184:13,15,16,19
  186:8,20 191:17
handle 12:25 20:6
  21:6 46:25 47:2
  60:12
handled 153:16
handling 63:13
  154:25
hands 58:3 187:9
happened 36:15

66:16 79:6 99:18
  102:17 105:7
happens 59:3
  155:24
happy 186:4
hard 33:8 146:21
  151:11,22
  157:22 179:21
harmful 90:12
  92:4,9
Hartford 29:6
Harvey 168:22
head 117:17 126:4
  126:5,19 133:9
heads 184:11
  185:11
hear 163:9 164:2
heard 29:17
Heebner 25:11
held 147:17 173:6
help 35:8,22 41:1
  46:19 96:10
  103:15 112:19
  142:2
helpful 115:19
  131:14,15
helping 46:10
hereto 191:4
hereunto 191:16
hey 182:23
higher 115:2,4
highest 94:17
highlight 146:25
highlighted 80:10
  96:13 108:25
hired 30:15
hiring 22:25 61:15
  62:14
history 51:18 57:8
  134:6 136:6,9
hit 117:17
Hodgewick 15:15
Hodgkiss- 137:22
Hodgkiss-Warr...
  15:16 138:3
hold 58:21 81:21

147:20 153:22
  153:24,24
  154:20 155:3,4
  171:20
holds 42:7
home 7:12 9:12
homeowner 20:22
  21:6
honest 12:15
  184:10 185:11
Hood 137:19
  138:7,23 156:19
  180:1 181:15
Hood's 17:1,6,8
  17:10 139:2,7
  143:3 167:4
  169:22 179:10
  180:5
hope 164:13,13
Hopefully 52:2
hour 1:16 192:10
  192:11
hours 144:22,24
  144:25 145:1,10
  145:11,13
house 13:21,22,22
  13:24
housed 35:5 92:22
  97:11 115:23
how's 155:1
hubbub 157:8
huh 183:3
huh-uh 6:18
human 151:22
hundred 49:18
  50:4 79:21
  123:10,14,16,17
  123:22 124:13
  151:10
hurry 47:4
hurt 88:20 117:21
hurts 40:12
hypo 185:9
hypothetical
  124:7,8,19 125:6
  181:24 184:11

hypotheticals
  124:9,10,11,23
  132:14

**I**
icon 73:21
ID 191:25 192:24
idea 180:22
identification
  38:13 50:1 54:1
  55:18 64:4 90:2
  93:22 107:18
  109:6 128:8
  138:12 158:22
  166:8,21 167:22
Illinois 87:14,15
  87:19,24 88:11
  88:17,25 89:15
  89:20,23 90:9
  91:10 92:2,5
  98:9,14,15
immaterial 172:8
immediate 22:21
  22:22
impact 37:25
implicated 82:19
implies 40:14
important 133:14
  134:10 136:22
  138:4 173:18
in- 13:21
in-house 14:4
  61:14 62:5 63:6
  63:12
inability 112:5
inadvertent 77:15
  79:1
inapplicable
  139:21
incident 20:12
  99:19
include 80:4
included 45:10
  105:8 116:9
  123:8
including 60:14

136:18
inclusive 52:18
incorporated
  127:6
incorporation
  127:6
incorrect 177:18
  179:7 181:18
increase 62:6,16
incurred 112:13
  116:20 117:3
  130:4
indemnity 80:8
  123:5
independently
  34:12,16,18
  67:12
Index 3:1,3
Indiana 172:22,23
  172:24 173:5,6
indicates 73:9
influx 46:9
informal 75:24
information 27:17
  27:19 53:6,13,14
  106:16 129:18
  130:5,8 132:17
initial 149:1
  150:10 151:5
  178:18
initially 95:9
injured 88:19
  93:9 98:8,11,15
  98:16,20 99:2
  103:16 114:12
  124:12 136:21
  141:8 173:8,21
  174:25 176:15
  178:9,24 179:3
injuries 21:3
injury 52:17
  114:9 115:2
  116:22 118:4,12
  118:22 119:25
  120:20 121:5
  130:8 131:3

Enante Darout   10/18/2021

204

input 71:2
insert 26:9 27:18
insertion 39:13
instance 176:12
instances 174:23
instant 26:11
institute 159:22
instrumental 46:10
insurance 1:10
 4:2,9,11 5:13,23
 21:2 49:3 67:2
 69:14 80:2 82:20
 96:4,15 100:4
 110:3,18,19
 115:5,6 120:11
 125:14 142:12
 148:5 158:17
 159:3,6,23
 171:20 172:6,11
 172:22 173:2
 175:1 176:7
 177:8 192:4
insured 20:3
 81:12 82:15 83:1
 88:11,18,20 89:3
 91:7,20 93:3,5
 97:5,10 98:19,22
 102:2 109:7
 114:12,13
 116:24,24 117:4
 117:4 118:9,13
 119:15 120:19
 125:24 126:11
 128:24 140:13
 140:19 171:9
 174:3,6,16
 176:16
insureds 23:7 89:7
 90:19 91:12,14
 91:16 92:16
 96:11 99:18
 101:9,11,14
 102:7,8 103:20
 104:19 121:5
 159:22,25 173:4

188:13
insurer 174:4,10
 174:21
insuring 116:19
 118:8
interact 24:6
interchangeably 188:11
interest 140:13,19
 142:7 173:20
interested 192:15
 192:16
interesting 73:11
 129:19 130:14
 167:25 168:23
interfere 90:8
intermediate 94:17,19
intern 46:4
internal 25:18,21
 32:25 68:16
 154:10,13,19
 188:17
internally 154:19
International 15:18 140:8
interning 69:4
internship 30:5,8
 39:3
interpret 29:16
 114:23 127:4
 161:23 172:21
interpretated 162:3
interpretation 173:7 176:23
 177:10
interpreted 162:4
 162:5 181:18
interpreting 116:8
introduce 5:16
Introduction 3:4
investigate 20:3,8
involve 28:20 37:3
 37:4,10

involved 20:11
 34:13 45:19
 50:11,23 87:15
 89:13 90:11 92:3
 94:9 103:14
 123:20 124:4,20
 125:7 143:24
 153:18 164:12
 172:3,25 174:18
 176:14 179:3
involvement 66:2
 124:5 143:10,16
 144:8 156:25
 157:5
involving 51:3
 174:9,19
issue 17:2 31:25
 33:12 34:6 35:9
 50:12 55:25,25
 65:4 67:23 70:6
 71:24 72:2 76:16
 86:10 92:22
 95:11 97:3,4,18
 103:16 104:14
 134:15 150:19
 153:22 172:25
 174:5 175:15
issued 102:18
 142:18 172:22
 173:5
issuer 110:1
issues 30:24 47:15
 62:15 130:25
 153:24,24 155:3
 155:4
issuing 76:7 124:6
It'd 165:16
items 56:1 61:2
 69:24

—————————————
         J
—————————————
J 2:5
J.D 9:16
January 36:10
 48:1 191:15
Jersey 7:6,8 9:12

11:6,9 12:18,19
 13:1,2,4 22:11
jibes 118:17
job 13:14 17:19
 18:21,24 19:7,10
 22:16,18,20 23:2
 28:19 30:16 34:9
 37:3,3,4 144:6
jobs 47:8
Joe 39:19
John 2:19 5:4
 192:6,23
joined 44:3
Joseph 39:21
judge 17:1,5,6,8
 17:10 137:19
 138:23 139:2
 143:3 156:15,16
 156:17,19 167:3
 169:22 172:15
 177:18 179:10
 180:1,5,7,7,8,10
 180:12 181:15
judgments 118:24
jump 35:5
June 23:23 29:4
 36:8 43:25 49:11
Juris 9:16
jurisdiction 170:14 177:2
jurisdiction's 170:20 172:21
 176:22
jury 8:8 14:2 70:8
 75:5 78:4
justifies 171:1

—————————————
         K
—————————————
Katie 31:11,11,12
 31:23 32:10,10
 32:18 39:14,14
 39:21,25 41:7
 44:17,18 46:2
 59:17
keep 17:19,20,21
 17:24,24 18:3,5

147:9 162:15
keeps 43:19
Keller 2:10 3:5
 5:21,22 8:6
 16:15 17:14 60:8
 60:11 62:7,11
 66:11,24 68:2
 88:6 99:5,14
 103:2 122:24
 123:12 124:1,3
 124:16 126:1
 127:10 152:11
 154:15 156:22
 158:11 159:9,17
 160:4 161:18,25
 163:4,18 164:7
 164:18,24 165:5
 169:7,12 179:11
 180:13 181:3,7
 181:10 183:15
 183:19,24 184:8
 184:18,22 185:2
 185:5,17,22
 186:13,23
 187:12,15,24
 189:7,13,18
 190:4,9,14
Kentucky 1:1,15
 1:21 2:7,12 4:6
 5:10 8:10 14:9
 14:10,18,22 16:1
 50:23 51:3,8
 55:3,4,7 56:5
 60:5,9,14,18
 61:15 62:15,15
 63:8 67:5 68:17
 68:22 69:1,10
 78:13 80:23 81:2
 81:3 82:7,12
 83:11,18,24 84:1
 84:3,16,16,17
 85:3,5,18 86:15
 86:16 87:1,19,19
 87:23 89:1,14
 90:7,12,16,20
 91:15 92:4,8,16

Enante Darout   10/18/2021

205

| | | | | |
|---|---|---|---|---|
| 94:13,16 95:7,15 | 36:7 40:12,14 | 83:16 91:4 93:1 | 79:11,20 81:3 | 170:11,13,14,20 |
| 95:19,20 96:2,7 | 41:13 48:8 51:17 | 94:16 97:3 | 89:5 132:4,5 | 171:1 172:8,9,21 |
| 96:10,12 97:11 | 62:1 64:18 69:7 | 101:21 103:4 | 134:1,24 137:8 | 173:6,10,11,23 |
| 98:4,17 99:3,11 | 71:12 73:13,16 | 106:4,16,20 | 161:13 179:17 | 174:22 175:12 |
| 100:1 101:18 | 73:20,24 79:14 | 107:23 109:11 | **Lansing** 11:19 | 175:22 176:2,5 |
| 102:5,11 103:17 | 86:14 89:19 | 115:15 129:19 | **Large** 1:15 191:3 | 176:22,24 177:1 |
| 103:18 107:24 | 95:17 102:1 | 129:21,22 133:6 | 192:7 | 177:2,9 180:7,17 |
| 108:1 115:11,11 | 108:14 111:17 | 134:19 135:7,13 | **larger** 40:25 | **laws** 4:6 80:22,22 |
| 115:12,13 | 112:10,18 | 135:24 136:1,5 | **lasted** 36:8 | 81:6 103:17 |
| 124:13 136:15 | 115:10,14,21 | 140:12,17,24 | **late** 46:13 47:24 | 108:4 110:19 |
| 137:2,11,21 | 116:7 120:4 | 141:7,24,24 | 49:12 | 165:15,19 |
| 139:24 141:5 | 121:1,18 122:10 | 142:1,1,11,20,24 | **Laura** 1:4 5:11,20 | **lawsuit** 18:8 |
| 158:7,13,25 | 127:7 129:19,19 | 142:24 145:7 | 49:6 52:17 64:25 | 153:10 |
| 160:14,23 | 130:17 132:2,24 | 147:16,20,23,25 | 82:23 89:19 92:8 | **lawsuits** 21:2 |
| 165:14,23 | 137:15 138:5 | 148:2,2,5,13 | 92:13,25 93:3 | **lawyer** 22:19 |
| 170:11,12,18,21 | 141:14,22,22 | 149:1,10,14 | 98:4 101:12,21 | 30:21 124:22 |
| 170:22 171:1,3,6 | 144:20 147:12 | 151:9,18,21,23 | 103:25 104:6,18 | **lawyers** 9:17 |
| 171:10,13,14 | 148:21,24 | 153:4,23 154:20 | 114:10 118:25 | 14:13,14 |
| 172:2,8,8,12,14 | 149:21 152:10 | 154:22,23 155:2 | 119:8,18 122:21 | **lead** 155:17 |
| 172:16,25 173:1 | 155:7,19 156:4 | 155:5,9,11,24 | 123:11,22 125:1 | **leanest** 138:24 |
| 173:6,8,9,11,13 | 168:17,17,23 | 156:21 157:2,4,9 | 128:18 136:4 | **leapfrog** 22:8 |
| 173:14,20,23 | 169:1 182:24 | 157:11,13 158:3 | 157:14,18 164:5 | **learn** 30:15 |
| 174:9,9,16,17,18 | 183:3,10 186:5 | 158:5,24 164:8,9 | 174:5 176:16 | **learned** 58:16 |
| 174:19,19,22 | **kinds** 20:19 34:25 | 165:19,25 | 183:22 184:24 | **leave** 46:7,17 |
| 175:16,17,24,24 | 35:2 | 167:14 168:15 | 186:22,24 187:4 | **leaving** 52:23 |
| 176:1,2,3,4,5,9 | **knew** 38:1 | 178:1,8 179:2 | 187:5 192:3 | **ledger** 52:25 53:8 |
| 176:14,14 177:1 | **know** 10:14,17,22 | 182:15 184:9,12 | **Laura's** 118:18 | **left** 7:19 |
| 177:4,6,7,9,9,11 | 10:22,25 11:2,23 | 186:18,19 | 123:18 187:7 | **legal** 3:15 14:17 |
| 178:18 180:12 | 12:11 13:8 17:22 | 187:16 189:20 | **law** 9:2,6,13,25 | 18:24 28:20 29:6 |
| 180:17 191:1,3 | 19:25 20:22 21:8 | **KRS** 158:17 | 10:2,5,6,8 11:6,8 | 29:25 30:1,2,23 |
| 192:7 | 27:4,6,8,23 | 160:24 | 11:10 13:19 | 31:3 35:6 36:18 |
| **Kentucky's** | 32:13,18 42:16 | **KY** 191:22 192:2 | 14:11,18,22 | 36:19,21,23 37:5 |
| 103:17 158:8 | 42:18 43:15 | **KYNP4035** | 18:20 22:11 24:2 | 37:11 38:2,2,20 |
| 170:16,23 | 46:18 48:21 | 192:24 | 28:20 31:6 37:5 | 38:24 39:9,13,15 |
| 172:17 173:22 | 49:16,18 50:7 | | 37:11,22,24 | 40:5 41:6,11 |
| 174:24 | 51:20 58:9,14 | **L** | 50:12,23 51:3,8 | 43:21 44:2,3,14 |
| **kept** 24:13,16 | 59:1,3 60:1,3,4,6 | **LaCrosse** 4:9 | 56:5 57:2 62:15 | 44:22 45:20 |
| 129:14 | 60:19,25 61:16 | 15:19 87:10,14 | 63:1 69:10,21 | 48:13 57:21 61:7 |
| **key** 108:20 | 61:16 62:8,17,19 | 88:8 89:8,9,12 | 72:2,22 76:16,23 | 61:14 63:7 64:12 |
| **kicked** 119:13 | 65:8,10,11,13,19 | 89:14,22 91:6 | 78:13 84:17,19 | 65:20 69:1 |
| **kind** 6:20 7:9 | 65:21 66:5,6,7 | 93:10 97:24 98:8 | 85:13,14 86:12 | **legally** 79:23 |
| 13:16 14:13,20 | 67:14,19 68:15 | 138:22 | 87:14,24 90:9,10 | 118:10 121:7,17 |
| 17:21 19:19 | 68:18,20,24,25 | **LaFrange** 15:19 | 92:9 95:1,15,24 | 121:23 163:2,16 |
| 21:15,18,23 | 69:2,11 71:4,16 | 141:4,10,12,19 | 115:1,5 132:14 | **legislative** 171:25 |
| 22:19 24:7 30:15 | 72:13,15 74:17 | **land** 119:23,23 | 137:2,6,12,16,21 | **legislature** 176:4 |
| 31:15 33:19 36:1 | 78:8 79:6 83:12 | **language** 67:5 | 142:14 151:4 | 177:6 |

Collins Sowards Lennon Reporting, LLC
859-402-0900

Enante Darout    10/18/2021

206

lengthy 132:19
let's 33:10 34:10
34:12 37:2 52:3
69:13 72:24
74:15 83:24,25
93:12 106:24
108:23 110:9
116:12,18
119:21 123:21
124:7 125:11
126:6 136:10,12
136:12 137:14
153:16 156:12
160:21 162:15
162:15 164:25
167:15,15,23
169:3,3 179:18
letter 3:13,19 15:6
15:12 16:1 23:2
34:10 44:23 49:7
49:12,14,22
50:22 51:3 55:12
55:24 56:11,17
56:24 57:10 67:6
67:6 69:15,15,19
72:24 73:7 74:1
74:10 75:7,9
76:18 79:3 80:11
80:21 86:22,24
97:20,23 99:23
102:15 103:7
105:9,23 106:21
121:13 131:22
132:18 133:1
134:9,22 135:11
136:23 137:18
137:19,22 138:2
138:7,14,16,24
139:1,2,12
143:19,19
144:10 146:13
147:1 150:24
166:23 169:22
letter's 107:12
letters 23:3,4,5,6
31:1 49:8,13

50:23 61:6,14
62:6 85:1 108:4
130:21 150:6,13
letting 62:5
level 48:20
Lexington 1:2,22
2:7
liability 19:12,13
19:14,16 20:20
20:23 29:6 30:1
30:2 33:8 41:6
44:4 79:21,21
84:6 90:14
109:17 114:8,8
114:16,19 115:1
115:24 118:14
118:22,23 119:4
119:25 120:1,2,6
120:20,22 121:2
121:3 130:5,10
159:14 161:7
license 14:10 69:1
licensed 12:18
13:19,23 60:18
68:17 108:1
licenses 95:14
liens 52:19
light 176:10
likes 151:21
limit 52:21 53:19
77:5 115:3 120:2
120:6 121:3,3,13
122:19 141:9
171:9 188:12,14
limitation 123:19
123:23 124:15
limitations 122:1
limited 35:11,21
36:6 79:21 124:5
limits 52:8 57:4
79:20 83:17,18
83:19,22 84:3,5
109:16 115:1,4
118:21 119:1,25
121:2 135:4,5
161:16

limits-less-paid
141:6
Linguistics 8:19
link 167:17
list 4:7
listed 66:20 97:13
129:5 173:2
174:6 176:17
Listen 98:6,25
litigation 22:14
45:20 62:2
143:25 153:17
154:21 156:13
159:22 168:16
litigation/product
44:8
little 39:7,10
40:12 41:2 51:17
75:24 81:1 107:8
162:11,23
163:10 168:23
170:2
live 8:10 110:14
lived 13:1 88:17
88:25 89:1 92:5
98:16,18 99:3
157:14,18,25
living 11:5
LL.M 9:21 62:25
63:1
lo 78:16
loan 174:16
182:13 183:14
185:25 186:1,12
187:11
loaned 184:14
186:8,24
locale 112:4
located 70:19,21
98:14
location 59:11
78:12 127:7
long 12:16 16:9
18:23 58:17 66:8
68:5 106:20
107:14 145:10

187:13
longer 107:1
140:13 142:7
look 34:22 35:22
48:5 51:25 53:17
70:4 73:19 93:12
119:21 127:17
128:24 138:7,14
141:18 160:7
164:22 168:9
169:25 183:10
looked 58:11,13
72:18 127:12,14
129:6,7 130:17
131:24
looks 28:22 43:16
47:12,24 64:9
67:1 72:25 73:5
73:6 81:15 129:2
129:3,23 132:20
loss 20:2 55:7 56:6
76:24 84:15
111:21 113:4
114:18 121:15
122:13 127:7
158:7,25
losses 113:13
lost 52:19 106:25
163:10
lot 20:23 48:20
110:19 129:17
130:13 132:16
133:7 145:17
154:11 177:23
177:24 179:13
182:2
lots 11:8
Louisiana 140:8
Louisville 2:12
lunch 182:22
183:1,8,8 186:5
186:11

————————
**M**
Mackey 39:19,21
Madam 189:18

magistrate 156:15
156:16 180:8
mailing 96:2
100:2
mails 152:19,25
154:12
Main 2:12 7:16
maintain 115:6
maintenance
118:15
major 8:19,23
majors 8:25 9:1
making 68:4
114:12 149:5
150:3
Maloney 2:11
60:8 152:12
man 27:23
management 44:3
manager 24:13,20
25:4,6 26:20
27:5 28:5 39:18
65:5
managers 25:9
26:8 27:25 42:23
managing 41:7
62:1
mandatory 18:4
March 19:1,8
192:18
margin 62:18
marked 38:11
49:24 53:24
55:16 64:2 89:25
93:20 107:16
109:4 128:6
138:10 158:20
166:6,19 167:20
marketable 13:12
marketed 110:16
Marley 170:16
married 31:12
Mary 182:6 183:2
183:4,13 184:14
185:9,16,24
186:7,12 187:1,2

Collins Sowards Lennon Reporting, LLC
859-402-0900

Enante Darout   10/18/2021

187:3,3
Mary's 181:25
182:7
Marybeth 1:14
5:14 191:2,21
master's 62:22
material 15:23
16:19 53:10
147:1
materials 15:7,8
24:12 34:9,14,16
34:19 36:2 52:5
67:8 69:13
127:14 148:6
152:8
Matt 56:24 65:5
65:10,15,15,19
65:24 67:9 73:8
73:25 75:13,15
75:15 105:6
107:9 108:16
143:22 146:6
matter 8:7 17:23
17:23 20:4,6,14
31:25 32:20
34:12,23 45:7
57:3 59:20 63:13
64:8 65:13
117:22 127:15
153:16 170:12
175:23 176:13
192:9
matters 44:7
45:13 60:9,13
Mattingly 2:5
137:22
max 55:5
meal 186:7
mean 7:1 14:1
24:10 30:7 32:8
33:4 35:20 36:2
40:13 47:7 66:8
69:21 76:22 78:3
82:18 88:10
92:18 94:11,13
97:7 103:4

106:10,15
111:12 123:9
124:9,18,24
125:6 126:3,18
127:4 130:1
132:4 133:7,16
133:20 134:14
136:2 140:18
151:14,25
153:11 155:13
156:24 167:12
186:15
meaning 153:23
163:2,16
means 14:3 81:5
110:14 116:25
119:16,23
med 54:4,11,12
77:20 109:18
116:14 117:5
121:22,25,25
126:25 132:16
161:4,15 162:16
162:24 163:7,12
163:13
medical 20:9 46:7
52:7,18 54:17,19
78:10,16 109:18
112:4,15 116:13
116:21 117:3
162:18,25
163:14
medication 6:21
meet 16:13 46:10
182:6,22 186:4
member 173:3
memorandum 4:4
168:5
ment 29:12
mention 39:18
134:8 135:11
139:17
mentioned 17:4
21:6 59:21
132:18 166:22
180:20

merely 142:23
message 155:7
messages 26:6
messaging 26:12
met 75:25
Michigan 11:19
22:11
Middlefield 7:16
might've 152:16
166:22
Military 79:5
mind 12:3 15:21
22:25 148:24
minimum 115:9
115:13
minus 81:20 83:19
83:22
minutes 16:10
106:19 126:7
164:17 167:10
167:11,16 168:8
169:8,10 179:21
misquote 74:15
misrepresented
159:5
Misrepresenting
159:2
missed 37:8
missing 106:6,8
misstated 90:24
178:2
misstatement
77:15 78:24 79:1
misstating 94:7
mistaken 94:19
modified 43:8,10
43:10 141:11
modify 95:17,18
modifying 141:16
moment 188:20
Monday 1:15
192:9
money 52:16
90:17 92:10
172:6 184:6,14
186:24 187:3,7

188:5
monies 78:7
month 43:4
months 29:7 44:5
182:22 186:2,4,9
morning 5:18,21
6:10
Morris 133:4
171:18 172:1,2
179:24
motions 156:14
motive 188:1
motor 89:13
118:11,16
119:22,23,23
120:7,21 160:23
161:1,8 166:12
motorist 4:15,22
52:16 79:17
109:22 113:7
118:4 127:15
128:11,25
136:21
move 22:18 39:3
41:2 116:12
143:14 187:19
moved 28:23
30:15 36:21
94:21 95:7
moving 22:10
43:22
MP/PIP 52:22
multiple 156:14
Murray 89:14
MVRA 160:24

**N**

N 1:4 5:11 192:3
name 5:4 6:8,11
25:12 31:12
90:25 140:22
141:8 143:7
named 88:10,18
88:20 89:3,6
90:19 91:6,12,14
91:16,20 92:15

93:5 96:11 97:5
97:10 98:10,19
98:22 99:18
101:9,10,14
102:2,7,8 103:19
103:24 104:19
109:7 117:4
128:24 140:13
140:19 173:4
174:6,15 176:16
191:5
Nancy 188:23
narrative 73:14
narrow 135:8
National 142:11
nationwide
174:14 176:21
naturally 47:22
nature 14:21
20:25 23:11
144:1 151:23
necessarily 31:23
63:20 104:13
necessary 26:9
67:22 113:3
116:21
need 6:25 8:8,9
13:15,15 21:22
21:24 26:10 36:3
48:14,23 51:19
78:11 84:10
126:6 146:20
162:10,10
167:10 182:10
182:21
needed 7:19 33:10
33:17 34:3,9
46:19 48:22
131:1 148:18
needs 47:14 80:24
84:19
negative 148:25
negotiating 96:3
96:14 100:3
140:11 179:4
negotiation 101:4

Enante Darout   10/18/2021

208

neither 71:24 192:16
net 141:14
never 18:1 38:1,2 40:13 143:3,4 178:2
new 7:6,8 9:12 11:6,9 12:18,19 13:1,2,4 22:11 26:16 29:19,20 30:15,16,18,19 30:20 41:22 42:12 48:18,23 49:2 52:15 53:18
Newberry 4:2 67:2 69:14 89:6 90:20,24 128:24 161:6
Newberrys 111:11
Newberrys' 109:14
news 151:24 152:1 152:2
nice 129:20 182:25
nickel 119:7
nine 134:22 167:9
no-fault 77:24 78:3,19 80:4 122:2 124:14 160:24
non 97:4
non-Kentucky 98:1 103:14
nonfactual 80:20
nonpayment 12:23
nonresident 90:6 92:2 115:6,7
Nope 162:13
normal 47:7 67:15 67:19 75:11
normally 70:2 106:3
Notary 1:15 191:3

191:24,25 192:6 192:24 193:23
note 75:14 95:8
noted 15:11 97:9
notes 16:21,22,23 26:8,9 27:17 34:14 35:3 67:22 70:1,5,12,13,13 70:18,20 71:1,3 71:4,14,15 79:9 125:9 131:1,2,19 147:16 154:2,11 164:22
notice 1:5,18 5:9
notice-of-loss 27:6
notices 20:2
notwithstanding 170:9 177:5
Novem 74:14
November 44:24 49:12 51:6,12 56:17,25 74:17 107:12 154:17 191:18 192:19
number 34:21,21 47:4 49:15 64:24 123:4 128:20,21 151:11 152:6 153:1 161:12 163:21
numbers 7:21

─────────────
**O**
O-P-I-P 53:22 112:1 121:25 127:1
oath 6:4
object 99:5 122:24 123:12 124:1,16 126:1 127:10 156:22,22 158:11 161:25 179:11 181:3,8,9 183:24 186:23 187:12
objection 62:7,12

88:6 99:14 103:2 159:9,17 160:4 161:18 163:4,18 164:7 181:10 183:15 184:8,18 184:22 185:2,5 186:13
objections 187:19
objective 10:4
obligation 119:12 187:11
obviously 30:7 63:9 83:8 97:21 139:20
occasion 76:2
occupying 117:1,2 119:17,19
occur 53:13 113:14 175:4,6
occurred 90:7 96:4,15 100:4 101:20 102:16 125:1 172:25 173:13 176:14
occurs 113:22 114:21
October 1:16 5:2 52:11 53:7,16 55:13,22 64:24 65:16 74:16 107:10 129:4 154:17 192:9 193:4
odd 73:20 154:9
oddly 99:23
of-state 114:20
offer 3:10 52:15 52:18 54:6 57:3 131:23 183:9
offering 159:23
office 27:15 28:13 28:15 32:3 100:2 154:12 191:17
offset 56:1 67:5 95:16 133:15 135:21,22,24

184:7 185:1
offsets 57:3 90:13 90:16 126:25 133:16 149:2
offsetting 184:4
oftentimes 17:20 36:2 151:16
oh 16:11,22 39:17 41:10 67:15,17 69:23 131:8 138:15 139:5 143:8 145:25 146:16 164:2 182:9 183:5
Ohio 87:15,19,25 93:18 94:3,21 95:1,10,14,14,24 96:5,7 98:18 99:11,19,20 100:5 140:9
okay 6:17 8:1,4,6 8:12,13 9:2,5,9 9:13 10:2,9 11:8 11:19 12:10,12 12:20 13:14,18 14:6,9 15:1,22 16:5,13,16,22,24 17:1,25 18:8,15 18:20,23 19:2,7 19:10,14,17,22 20:16 21:7,10,10 21:10,14 22:7 23:6,12,15,22,25 24:20,23 25:1,3 25:6,9,21 26:3 27:17 28:4,7,11 28:16 29:22 30:14,14,19,19 31:1,9 32:6,9,24 33:3,10 34:8,20 34:25 35:10,13 35:17,24 36:15 36:20 37:2,18 38:21 39:8,20 40:16,18,18 41:12,15 43:4,7

43:12,20,22,24 43:25 44:10,12 44:13,15,19,23 45:24 46:24 48:11 49:2,5 50:3,6,11,21 51:16,21,22,25 52:14 53:12,16 54:3,11,17,24 55:6,9 56:8,14 56:20 57:8,22,22 58:5 59:2,14 60:1,16 61:11 62:4 63:24 64:6 64:9,14,17,21,23 65:3,10,14 66:3 67:8,17 68:3,6 69:7,7,13,23,23 70:8,18,22 71:5 71:14,19,19 72:3 72:17,24 73:19 74:10,13,14,21 74:21 75:14 76:4 76:17 77:9 78:22 78:25 79:2,10,10 79:16 80:12 81:8 81:24 83:24 84:7 85:15 86:2,8,20 87:5,7,18 88:13 93:24 94:12,14 94:20 97:20 98:12 99:1,20,22 100:6,23 101:24 102:21 103:11 103:23 105:10 106:12,14,24 107:2,21 108:6,9 108:20 109:13 109:16,24 110:5 110:8,8,13,23 111:14,20 112:19,21 113:25 114:2,7,7 114:7,15 116:10 116:12,12,18 117:9,25 118:3,8

Enante Darout 10/18/2021

209

| | | | | |
|---|---|---|---|---|
| 118:20 119:15 | ones 15:20 103:20 | ordering 156:19 | 82:5 102:18 | 45:6 47:13 61:3 |
| 119:21,21 | opens 182:9 | 156:20 | 115:11 120:22 | 68:12 69:17 |
| 120:12 122:15 | operator 118:11 | organization 9:12 | 121:4,9,22 123:9 | 70:18 73:13,14 |
| 122:21 123:9 | operator's 118:14 | 24:7 | 123:14,16,22 | 74:13 79:3,11 |
| 125:9,19 126:6 | opine 127:25 | organizations | 126:12 130:4 | 80:19,20,20 |
| 126:24 129:3,13 | opinion 4:4,9,11 | 79:23 121:6,16 | 135:5 149:18 | 81:15,19 82:2 |
| 129:17 130:7,11 | 10:3 15:5,12 | 163:1,15 | 160:22,25 161:4 | 85:19,19,24 |
| 130:12,15,20 | 16:2 17:1,7,9,10 | out- 114:19 | 161:6,7,15 | 86:11,11,21 |
| 131:8,10,18,21 | 23:3,4,5 31:1 | out-of-pocket | 162:17,24 | 89:19 91:13,17 |
| 132:2 133:23 | 32:1 33:11 34:7 | 52:19 | 163:13 166:14 | 91:18,18,20,21 |
| 135:6,14,17 | 38:2 41:23 42:12 | out-of-state 53:22 | 172:6 183:8 | 96:17,18,19 |
| 138:18 139:17 | 42:15,18,20 | 54:25 | 184:5,6,7,21,25 | 98:23 101:6,8 |
| 140:16 141:9,21 | 44:23 45:10 49:6 | outcome 47:17 | 185:10 186:10 | 111:8,9,17 |
| 143:2,17,24 | 49:7,13,20,22 | 170:10,18 177:5 | 186:12 187:6,9 | 114:18 127:12 |
| 144:9 145:14,23 | 51:3 55:11 61:14 | 192:15 | Pak 31:11,12 | 136:11 157:19 |
| 146:2,4,10,10,14 | 61:22 69:9 76:7 | outside 28:9 35:14 | 39:14,21 | 157:21,24,25 |
| 146:14 147:12 | 76:9,10 89:21 | 43:18 44:13 60:7 | panel 60:12 | 170:2,4,7 |
| 147:18 148:1,9 | 94:15,25 96:21 | 61:15,18,21 63:7 | paper 25:17 | partic 122:4 |
| 149:25 152:7 | 97:13 100:14 | 63:12 144:7 | 146:18,21 | participants |
| 155:6,21 156:2,8 | 101:11,21 104:9 | overlay 86:16 | 152:11 | 66:18 |
| 156:12 157:24 | 105:2,4,5 106:15 | owes 187:3,3 | paragraph 113:5 | participated 44:1 |
| 158:23 159:2 | 108:3 124:6 | owned 174:13 | 160:21 161:4 | particular 17:23 |
| 160:6,13 162:4,8 | 127:24 130:21 | owner 118:10,14 | 163:3 | 27:19 32:11 34:9 |
| 162:14,16,23 | 133:3 137:5,20 | Owners 4:9 | parcel 91:13 | 34:10,23 44:24 |
| 163:11 164:2 | 138:2 139:2,8,9 | ownership 118:15 | 98:23 | 45:7,19 56:6 |
| 165:1,5,22,25 | 143:3,22 144:7 | | paren 161:14,14 | 70:17 73:8 80:1 |
| 166:24,24 167:3 | 148:10 166:1 | **P** | parents 157:15,18 | 86:5 95:3 109:2 |
| 167:6,15 168:4 | 167:4,16 168:5 | P 2:4 161:5 | 157:25 | 110:20 111:16 |
| 169:2,6,11,12,20 | 169:22 170:2 | P-e-n-c-a-k 65:6 | park 182:7 | 112:3 122:4 |
| 169:24 177:21 | 177:14 179:10 | p.m 192:11 | parking 182:7,11 | 127:13 131:20 |
| 181:23 182:5,24 | 180:15 181:1,12 | P.O 96:2 | 183:14,14 184:6 | 138:1 144:5 |
| 185:15,22 | 181:14 188:1,8 | page 3:7 40:18 | 184:14,14,17 | 147:9 149:19 |
| 187:18 188:20 | 189:5 | 73:1,6 87:8,8 | 185:25 186:9,12 | 168:12 |
| 189:3,7,12,18 | opinions 16:4 41:9 | 89:20 95:8 110:9 | parse 167:12 | particularly |
| 190:4,10 | 63:7 150:18 | 112:22 120:16 | Parsons 3:19 | 107:24 136:17 |
| old 66:22 168:20 | 157:12 188:24 | 132:9 134:22 | 56:24 65:5,15,15 | parties 5:5 8:8 |
| older 24:2 139:25 | opportunity 30:17 | 163:3 170:1,7 | 73:25 74:4 75:15 | 20:10 28:8 |
| omitted 73:17 | 41:6,8,10,11 | pages 56:14 74:11 | 75:17,25 107:9 | 154:13 160:20 |
| 105:9 134:12 | 164:11 189:14 | 111:10,15,16 | 108:14 143:18 | 191:7 192:17 |
| once 10:11 13:14 | opposed 22:3 | 114:16,17 132:2 | 145:20,24 151:3 | partners 41:9 |
| 75:12 137:11 | 60:17 83:15 | 132:8,15 167:9 | Parsons' 76:20,25 | party 18:8 81:11 |
| 143:10 147:1 | 91:11 | 167:10 | 148:19 | 82:5,9 88:19 |
| 156:25,25 157:5 | option 189:16 | paid 13:1 30:7 | part 7:10 17:19 | 93:10 98:8,10,11 |
| 178:7 | order 4:4 66:1 | 54:15,15 55:3 | 20:22 23:1 32:8 | 98:15,16,20 99:2 |
| one's 40:19 43:4 | 156:19 167:12 | 77:14,17,21 | 37:15 38:8 41:5 | 103:16 114:11 |
| 87:9 | 168:6 169:22 | 79:22 80:2 81:10 | 42:11 43:17,19 | 114:12 136:21 |

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

173:8,16 174:25
178:24
pass 10:18,24
86:18
passed 11:4
passes 116:22
Pat 65:24
Pat's 66:2
path 155:17
Patricia 57:16,16
57:23 59:16,19
60:1,17 72:8
Patton-Gentert
188:23
Paul 52:9 168:21
Paula 89:6 90:24
91:11 96:23
102:5
Paula's 140:21
pay 10:11 54:4,11
54:12 77:20
109:19 112:6,12
116:14,19 117:5
118:9,21 119:12
120:17,17
121:22,25,25
123:17 126:25
132:16 161:4,15
162:16,24
163:12,13
182:10,14,21
184:16,24 186:2
187:11
payable 125:25
136:21 160:23
161:5,15 162:17
162:24 163:13
188:13
paying 104:20
payment 55:5
109:17 111:4
112:23,24,25
117:11,22
121:14,15
122:19 123:5,24
136:18 150:10

payments 52:21
78:10 80:8 81:20
81:20 83:21,23
109:18 116:14
118:24 122:12
payout 52:25
149:17
pays 124:13
PDF 67:3 167:17
Pencak 65:5,15
67:9 72:10
107:10
pending 1:20
52:16 172:17
Pennsylvania
12:18,21 13:4,16
people 21:3 26:6
26:21 27:23 28:3
33:3 42:23 62:5
69:3 90:12 92:4
110:14 154:19
181:20 186:15
186:16
percent 63:21
performance
140:11,12
148:25 150:3
188:22
performance-b...
149:21
performed 75:9
181:13
performing 96:4
96:14 100:3
period 9:6 19:3
46:14 49:18
109:10 113:12
113:14 144:23
150:7
permits 126:25
161:13
person 12:24
24:23 46:20
52:21 82:23 97:4
109:19 111:24
112:25 113:2

116:25 119:17
124:12 138:1
178:9,9 179:3
192:14
personal 6:25 7:1
156:3
personally 32:13
personnel 4:20
7:10 38:7 40:4,4
40:19
persons 79:22
121:6,10,16,23
163:1,15
pertaining 171:12
171:15 172:13
174:2 176:7
pertinent 79:14
108:25 129:8
159:6
Peter 23:13
Philadelphia
133:4 138:8
171:18,19
phone 7:21 27:12
28:12 32:22
33:13 105:2
photographs 71:9
physical 32:3
pick 8:8 67:18
186:6
pictures 52:7
piece 25:17
Pike 79:5
pilot 41:5
PIP 53:8,22 54:24
54:25 55:5 77:19
78:14 112:1,3,12
115:11,14,20
116:1,2,5 121:22
121:25 132:16
160:22,22
161:15 162:16
162:24 163:7,12
166:10
place 83:14 89:14
124:19 140:12

162:6 182:25
191:4
placed 6:4 135:18
places 22:12
plaintiff 1:4,5,14
2:2 5:12,20
88:16 92:1,1
99:17 103:16
Plaintiff's 3:9,11
3:14,17,22 4:1,3
4:5,8,10,12,14
4:16,19,21 38:11
49:24 53:24
55:16 64:2 89:25
93:20 107:16
109:4 128:6
138:10 158:20
166:6,19 167:20
plaintiffs 99:10
planning 143:25
Platform 25:24
26:7,16 27:9,11
27:18 33:1
155:10
played 174:4
player 148:21
Plaza 2:11
pleadings 17:2,3
156:14
please 5:15 6:8
38:15 40:25
52:24 55:19,23
57:4
pleasure 46:3
PLLC 2:11
plus 78:18
point 21:11 33:22
37:20 38:2 87:4
89:1,22 104:22
104:23 115:23
124:21 126:8
140:18 142:9
171:2 179:15
180:25 185:10
pointed 172:5
points 175:11

180:20
police 34:15 71:9
policies 110:19
118:23 120:1,20
125:14 176:7
177:8
policy 4:2 15:10
52:8,21,25 53:8
54:13 55:11
58:15,19 67:2,2
69:15,19 75:9
76:21 78:20
79:11,18 80:9,11
80:13 83:17
85:25 86:9,10,21
87:3 89:2,5
92:12,17,18,24
93:3,6,16 96:8
96:20,21 97:1,5
97:9,10,18,21
99:12 100:10,15
100:24 101:13
101:14,23 102:1
102:4,10,16,24
103:9 108:21,24
109:2 110:1,14
110:15,16 111:1
111:5,8 112:24
113:10,12,13,14
113:15,16 114:3
114:21,24 115:3
115:8 116:4
118:1 119:2,4
120:3 122:13
125:14 126:7,21
126:24,25 130:2
132:4,8 135:9
141:9,13,14
142:15,20 148:5
148:10 159:3,6
159:23 161:5,6
161:13,16,17
163:3,17 170:8
170:12,16,21,24
170:25 171:5,5,9
171:13,16,23

172:7,11,14,17
172:22 173:2,3,5
173:10,15,19,23
174:1,5,7,11,13
174:24 175:2,9
175:19,22,23
176:1,3,8,17,19
176:20,23 177:4
177:9,11 178:3,8
178:14,19
188:12,14,17
policy's 140:20
171:22
pop-up 155:12
popup 27:3
portion 22:16
42:1 82:6 125:7
131:2 142:25
position 19:23
28:24 29:3 30:21
31:4 36:8,22
37:9,10,14,16
45:16 61:24
76:21,25 77:2,6
82:3 96:10 149:1
188:5
positions 18:2
positive 105:6
possessions
113:17
possible 15:9 75:6
175:6
post 100:1
Potentially 113:24
114:6
practice 13:19
14:4,11 30:12
70:2
practices 4:18
158:9,16 165:13
165:15
pre 104:20
Precisely 13:10,17
59:25 62:3 71:11
71:13,18,20
114:1 146:9

153:7
prejudice 113:4
preliminary
156:15
premium 111:4,7
premiums 102:18
preparation 14:25
15:24 17:16
prepare 15:3
prepared 15:6
177:15 188:2,8
preparing 16:7
189:4
prescribes 78:13
prescriptions
54:21
presence 142:22
presented 36:3
96:1 191:12
preserve 153:9,18
preserved 27:19
154:1,2,6
preserving 153:15
press 10:9,12,15
pressure 47:3,5,6
47:7,9 148:18
pretext 184:20
pretty 132:19
133:13 134:9
136:22 138:3
152:1 157:5,6
168:13,15
prevail 76:22
prevails 77:10
previously 1:18
172:10
primarily 172:24
175:5
principally
114:23
print 73:22,23
146:15,20 148:6
printed 66:21
prior 16:14 49:13
51:6 58:2,3
188:21

privacy 18:11
private 24:2 30:12
privileged 73:7
privy 144:1
154:24
probably 23:6
32:13 34:20
44:17 48:9 60:13
105:22 106:22
158:14
problem 79:2
186:3 189:11
procedural 89:12
procedure 1:19
6:15 153:14,20
process 22:14,22
22:24 31:19 32:8
36:1 132:25
148:3
processes 83:11
produce 33:18
75:7
produced 129:11
producing 152:11
157:9
product 33:19
51:12,12,13
60:21 74:24
75:13
productive 46:5
profession 151:25
professional
21:15 26:10
65:5,12,12 70:14
71:2 76:7,10
108:17,18
188:25
professional's
152:4
professionals
151:14
profit 62:18 63:19
profits 62:6,16
63:23
program 27:9,12
29:5 59:19

progress 68:4
prohibits 86:9
158:16 172:9
project 107:14
projects 44:8
106:18,19
prompt 159:13
promptly 159:4
proof 112:6
proper 42:19
property 36:18,19
48:13,19 114:9
115:2
proposition 87:22
protect 97:1 99:12
103:18
protecting 173:21
protections 173:9
provide 30:23
35:8 111:5 112:5
115:4,8,21 116:5
121:22 122:2
125:24 126:11
150:20 152:7,9
152:16 189:22
provided 17:8
24:12 34:11
35:12 38:7 60:22
86:25 115:21
143:4 166:13
174:13
providers 162:18
162:25 163:14
provides 109:17
176:20
providing 44:5
47:21 96:1 100:1
province 114:22
114:25 115:8
provision 86:10
86:21 142:14,22
170:24 175:21
177:3
provisions 110:10
110:10,23,24
111:21 116:7

159:3,6 170:15
171:4,12,15
172:13 174:2
175:1,14 176:6
177:8
PSC 2:5
public 1:15 85:24
86:9,10,21 87:2
89:2 92:12 93:16
96:8,20,21 97:1
97:18,21 99:12
100:10,14,23
101:13,23 102:1
102:3,24 103:9
132:8 135:9
170:8,12,16,21
170:23 171:5,13
171:16,23
172:14,17
173:10,19,22
174:1,24 175:9
175:19,22 176:1
176:8 177:4,8,11
178:2,19 191:3
191:24 192:6
193:23
published 143:6,6
Puerto 113:17,18
pull 38:6 72:24
107:5 128:3
131:21 136:12
152:25
pulled 34:5
pulling 93:24
pulls 129:20
purchasing 179:3
purely 176:23
purposes 38:12
49:25 53:25
55:17 64:3 90:1
93:21 107:17
109:5 128:7
138:11 158:21
166:7,20 167:21
purse 182:9
pursuant 1:17,18

Enante Darout   10/18/2021

212

5:7,8
purview 22:23
104:15 128:2
push 162:12
put 49:21 70:14
73:16 76:17
108:14 150:15
151:11 152:6
154:20 155:8
183:11 184:13
184:15,19 187:9
puts 183:5 186:7

**Q**

qualified 62:14
quality 10:10
question 10:25
22:5 31:15 35:1
37:6 55:1 56:4
59:23 63:16,18
68:15 69:12
72:25 73:12
80:21 81:24 83:3
86:9 87:18 93:7
97:23 98:6,25
102:9 107:13
109:12 125:3
126:4 127:20,25
136:7 157:19
168:16 176:21
176:23 177:12
180:3,13,14
183:13 184:5,12
184:16 186:12
questions 7:1 8:12
14:24 33:23
47:21 68:14
157:22 167:8
168:18
quick 125:9
quickly 51:17
quite 29:16 40:15
143:4 155:14
157:2
quote 99:23
100:13 162:25

163:2,14,16
171:17
quotes 152:3

**R**

R-o-h 31:13
radio 168:1,21,21
raise 80:21
ran 82:23
rank 10:10
rationale 92:15
reach 32:20,21
150:7 189:4,21
reached 42:19
read 17:10 38:15
40:10,15,17,24
43:17 46:1,2
47:13 75:8,9
80:9 81:22 99:24
116:8 123:1
125:17 133:1,4
137:7 139:7,9,12
139:14,16 143:3
148:14 157:12
163:25 165:23
165:25 167:3,8
168:12 177:21
177:23 179:8
193:3
reading 81:18
93:18 115:16
133:9 135:1
145:15 163:21
167:13 177:25
191:13
reads 168:13,14
real 51:17 125:9
realized 95:15
really 10:7 13:5
19:24 21:11
37:14 69:16
101:25 102:25
107:23 132:3
142:8 145:19
146:23 151:11
154:9,18 182:2

184:1,7
reason 7:19 40:6
76:17 90:8 92:3
95:25 105:8
115:20 135:18
141:15 154:7
172:7 187:10
reason's 95:25
reasonable 116:20
181:13,15
reasonably 159:4
159:14
reasoning 92:7,15
reasons 78:9
142:5
recall 12:8,8,15,15
38:23 49:15
50:12 51:5,9,10
58:8 67:14,24
71:23 72:13,16
73:25 123:3
126:3,5,18
152:21 153:12
153:13 155:15
189:1
receive 20:1 57:12
67:20 101:11,12
101:22 117:5
122:12 124:14
148:24 149:4
received 24:4
47:18 49:6 70:3
72:7 77:13 150:2
172:10
receiving 58:4
83:9
recite 76:20 81:2
132:5
reciting 95:5
recognize 44:20
89:8
recognized 171:15
176:6 177:7
record 4:20 5:2
38:7 45:25 68:7
68:10 165:7,10

169:16,19
190:18 191:10
recording 192:8
records 7:10,11
7:22 17:20,21
20:9 34:22
108:10 112:4,15
112:15
recover 112:23
113:1 118:10
159:22 164:14
recovered 159:25
recovering 164:13
red 38:9 40:24
76:18 137:24
redlined 42:3
reduce 82:4 90:13
reduced 121:4
191:8
reduces 62:4,13
136:19
reduction 81:9,10
refer 75:15
reference 127:7
179:23 188:22
referenced 16:3
references 154:11
referral 15:10
33:22 44:14
45:18 59:22 64:7
64:12,14 65:25
67:20,20 69:19
71:25 72:6 75:8
referrals 46:9
referred 131:4,6
referring 45:9
49:9 70:15 79:25
112:1
reflects 171:7
refresh 15:13
refuse 170:13
regard 161:7
regarding 4:20
10:12 34:14
55:24
regardless 54:15

152:1 160:25
161:7
regards 136:2
registered 95:14
140:21
regular 108:3
157:15 158:1,4
regulate 14:14
reimbursement
161:14
rejected 141:6
rejecting 107:21
related 69:8 100:2
101:19 106:16
relates 70:17
relating 70:25
96:3 102:16
152:19 153:9,19
159:7
relationship 76:24
84:20 85:20 86:3
86:5 91:17 97:17
101:1,25 132:7
142:17 170:5,6
170:10,19
173:18 175:10
175:19 177:6
178:17 182:20
relative 192:16
release 52:25 53:9
125:24 126:11
released 189:15
relevance 183:15
relevant 176:11
186:19
remaining 57:4
remains 90:6
91:23
remember 12:3
27:1,3 38:22
43:16 50:25 51:1
58:1 66:1 69:16
69:16,24 72:20
74:20 75:10 76:4
85:13,14 89:4
91:10 107:13

130:7 133:24,25
134:14,17 135:1
139:1,2,20 140:1
140:4,17 141:3,9
141:11,25 142:4
142:4 145:21
152:16,22,23
**remembering**
87:16
**reminded** 39:17
**reminder** 85:16
**remove** 150:21
**removed** 133:25
134:23 160:15
**render** 31:25
37:23 41:9
**rendered** 38:2
76:11
**rendering** 188:1
**repaid** 183:13
**reparation** 111:23
111:24 112:2
166:14
**Reparations**
160:23 166:12
**repay** 184:13
**repeat** 10:21 37:6
157:21
**rephrase** 62:13
**report** 34:15 71:9
129:3
**reported** 29:5
**reporter** 1:15 5:14
5:25 62:9 181:8
189:19 191:3,22
**Reporter's** 3:6
**represent** 5:17
60:8
**represents** 52:20
76:13
**reputation** 61:1
**request** 3:15
32:10 64:12,18
**required** 31:3
55:3,6 115:9
141:17

**requirements**
46:11
**requires** 115:12
115:13 125:23
126:11 176:2
**requiring** 115:5
**research** 33:24
35:7 38:20 41:8
42:20 61:2 67:12
75:10 137:4
165:18 177:16
181:14
**researching** 35:9
**Reserving** 23:8
**resided** 88:11 91:8
91:9,12 98:8
**residence** 95:19
**residency** 94:6
95:21 173:15
**resident** 89:4,15
89:20 90:16 92:2
92:8 98:1,4
103:17 173:1,8
173:14 174:9,19
176:15
**residents** 89:7
90:20,21,25
91:15 92:16,17
93:17 95:10,11
96:7,9,12,23
99:11,19 101:10
101:15 102:6
103:14 141:5
172:23 173:5,21
**resides** 89:22
**resistant** 157:9
**resolve** 52:16
**resolved** 20:14
175:16
**resolving** 8:7
175:15
**resource** 131:13
**resources** 15:23
35:7,14
**respect** 18:11
177:14

**respectfully**
177:16
**respond** 48:16
**responded** 53:7
63:15
**responds** 53:16
**response** 52:9
131:22 132:19
**responses** 156:14
**responsibility**
22:16 114:25
**responsible** 54:7
79:23 81:11 82:5
82:9 117:19
121:7,10,17,23
161:1,8 163:2,16
**rest** 46:2 57:8
111:17 129:22
137:17 168:25
169:1
**restatement** 85:1
137:17,23 138:5
138:15,19
**result** 162:18
170:15 171:10
172:12 177:9
**results** 153:17
177:3
**retain** 60:4
**retention** 58:15,19
**return** 111:4
**review** 16:18,23
16:25 17:2,3,4,6
20:9 24:10,11
34:4 35:2 36:4
44:7 57:1 67:21
67:22,23 69:9
70:4,7 75:12
84:23 105:19
108:14,19 126:7
128:2 131:2
145:20 168:9
179:21 189:14
189:24
**reviewed** 15:5,23
15:25 37:22

68:12 69:14,17
71:21,23 72:21
75:8 86:23
108:21 131:24
133:2 142:25
145:19,21
178:12
**reviewing** 69:24
94:24 178:19,24
**reviews** 39:23
148:25
**revised** 75:3
**revision** 171:6,25
**revolved** 134:15
**rewarded** 188:4
**Richardson** 141:8
141:13
**Rico** 113:17,19
**Riggs** 137:23
139:14
**right** 5:24 13:5
15:17 22:1,4
23:9,12 28:18
29:13 36:5,7,13
39:3 40:7 41:3
41:16,23 42:14
42:14 43:20,20
45:2,3,7,12
48:13 52:4 53:22
54:4 56:2 67:7
72:7 73:3 74:5
74:11,22 75:21
76:8 79:25 80:24
82:12 83:20 84:4
84:11,15,17 85:3
85:6,6,7,9,10,11
85:19,21,22
86:16,18 87:15
88:9,10,13,13,17
89:19 93:7 94:20
94:23 100:7
101:2,9 102:19
103:22 104:1,2
104:10,17 105:3
105:4,23 106:6
106:11 110:21

110:22 111:1,2
112:23,25 113:2
113:7,9 114:13
116:1,15 117:6
117:15 118:1,6
119:5,12,14,15
119:18 120:8,9
120:11 121:23
122:1,7,7,9
124:4 125:4,15
126:23 128:21
133:23 134:4,4,4
134:18,20,23
135:22 138:19
141:19 145:17
146:7,7,18 147:8
151:17,20
155:23 160:18
163:22 166:2
178:10 179:22
183:7,12 184:5
184:21,25
186:10 187:8,10
**rights** 23:8 113:3
113:5
**rise** 173:13 176:13
**Riverfront** 2:11
**Roh** 31:11,13
32:10,10 41:7
44:17,18 59:17
**role** 22:16,19
29:19,20 30:18
30:19,20 31:10
48:13,23 49:9
174:4
**roles** 40:2
**room** 123:7
**roster** 33:3
**roughly** 23:23
28:23
**routine** 108:7
**rules** 1:19 6:18
**ruling** 156:15,16
**run** 141:22
**Rutgers** 8:15

Enante Darout   10/18/2021

214

| S | | | |
|---|---|---|---|
| **S** 2:19 192:6,23 | 22:11 85:13,14 | 134:2 168:11 | 55:12,13,22 | shelf 67:16 |

**S** 2:19 192:6,23
**Sanborn** 23:13
**satisfied** 55:9
**saved** 147:21
**saves** 63:19
**savings** 63:10
**saw** 7:11 12:20
22:12 86:25
**saying** 35:24 66:6
81:25 89:22
101:24 102:3
104:3,8 121:1,18
134:14 158:14
180:24
**says** 43:7 53:18
64:25 65:4,14
66:18 75:19
89:12,17 90:6
94:21 95:23
107:5 110:23
111:4,24 112:12
113:19,20
114:19 118:8,20
120:17,17 121:3
121:8,13 128:13
128:18,20 146:8
155:8 159:19
160:17,22
166:11,13 170:9
170:9 177:16
182:9,13,23
183:2,5,6,7
186:2,10
**scattered** 32:4,5
**scenario** 53:2
**Schardein** 172:19
172:20
**scheduled** 174:7
176:17
**Schiller** 2:11
**Scholar** 35:19
**school** 9:2,7,14
10:2,5,6,8,13
11:6 12:6 18:20

22:11 85:13,14
182:1
**schools** 11:8,10,11
11:12,25 12:1,2
12:9,13
**scoot** 46:8 162:23
170:1
**scope** 124:5
174:14 176:21
**screen** 43:19,22
44:11 49:21
106:25 112:18
169:25
**scroll** 39:5,10
**scrolled** 39:6
**seal** 191:17
**search** 152:18,24
**second** 29:12
37:16 41:4 42:10
81:14,22 82:6
85:24 86:11
91:21 96:17,19
100:13 157:21
157:25 163:11
**second-class**
174:3
**secondment** 29:4
29:8,9,10,15
31:10 36:7 37:3
37:9 41:5 45:16
49:9,16 50:8
59:19 61:21
**section** 80:11
109:17 110:24
110:25 111:20
111:22 112:23
114:8,8,19
115:24 116:13
116:25 119:16
121:3 122:10
123:4 125:11,22
125:23 126:9
132:13 136:10
136:18
**sections** 110:25
122:4 127:5

134:2 168:11
**see** 7:23 22:7,17
26:15 27:11 38:8
39:6 40:5,20
44:11 48:1,5
52:24 55:14,23
56:22 61:18,23
62:16 63:25 73:3
73:21 74:15
76:18 81:5 89:15
91:22 92:6,11
94:22 95:21
104:19 106:24
107:6 109:7,7
110:3,3,9 112:11
115:17,23
116:18 120:16
128:4 132:11
136:10 156:12
167:24 168:9
169:10 179:18
179:23 181:16
**seeing** 130:9 189:1
**seeking** 91:8
103:20 111:24
173:14,16
**seen** 52:11 53:9
56:8,12 57:6
61:20 65:1 155:6
155:10,13,21,25
157:14 160:10
160:17 167:1
**sees** 189:25
**segment** 168:24
**select** 68:16
**selected** 41:5 60:2
111:6
**seminars** 14:17
**send** 24:3 32:9
73:20 75:11 76:8
76:8 108:17
145:20,24 190:8
**senior** 180:12
**sense** 46:21 48:21
82:18 145:6
**sent** 52:5 53:6,6

55:12,13,22
57:13,15,23
65:14,21,22
75:13 105:5
108:16,19
143:19 145:25
146:3,5 167:17
**sentence** 42:2,10
42:11 48:5 137:9
**separate** 52:2
**September** 52:6
53:6
**seriously** 176:15
**services** 36:22
116:21
**set** 22:25 90:9
171:21 191:13
191:16
**set-off** 4:13
**setoff** 76:16 90:11
90:11 92:3
161:14 166:11
166:15 170:24
171:4,11,15
172:4,6,7,9,13
174:1 176:6,6
177:7
**setoffs** 52:23
**settled** 119:10
**settlement** 4:15
4:18 20:17 52:15
158:8,15 165:13
165:15
**settlements**
118:24 159:13
**seven** 29:7 159:21
160:6 183:7
186:11
**severely** 141:7
**share** 7:9 29:5,18
37:10
**share/secondme...**
44:1
**shared** 43:2 52:1
56:20
**sharing** 107:1

shelf 67:16
**short** 2:6 67:25
164:17
**short-staffed**
46:14
**shortage** 46:22
**shortest** 138:24
**shorthand** 191:8
**shortly** 39:2 80:17
**should've** 35:24
**show** 47:11 63:24
97:13 112:4,4,13
158:15
**shown** 97:13
111:6 113:14
115:3
**shows** 39:14
**shredder** 147:7,8
**sic** 100:2 120:15
171:24 176:18
**signature** 3:7 53:1
191:13 193:1
**significant** 76:23
84:20 85:20 86:3
86:4 87:2 91:17
97:16,17 100:25
101:1,25 132:6
135:11,16
142:17 170:4,6
170:10,19
173:17,17,20
175:10,18 177:5
178:17
**silent** 142:21
**similar** 30:6 90:10
96:12 115:1,5
121:19 130:9
172:18 176:5
**similarly** 135:24
**simple** 70:8
179:19
**simply** 22:23 24:9
32:20 35:11
37:25 42:13
71:25 72:1 78:7
125:5 179:19

Enante Darout   10/18/2021

215

single-spaced
167:10
sitting 84:16 85:5
139:20 175:13
175:25
situation 111:16
118:18 122:8,22
six 29:7 44:5
159:12,19
size 73:8,11
skim 169:21
skimmed 179:14
skip 114:15
slice 103:5
slide 107:5,8
slip-and-falls 21:3
slips-and-falls
20:21,24
slowly 43:23
small 112:18
snatch 184:21
snatched 184:15
snatches 183:7,12
186:10
snippets 40:19
snuff 130:17
somebody 60:17
66:20 107:25
116:22 144:6
152:14
somebody'd 186:6
somebody's 21:8
sorry 8:22 10:20
10:20 11:1,15,16
15:15 16:11,22
37:6 38:3 39:6,8
41:10 43:19,22
44:8 50:15 58:12
60:11 62:9,11,24
67:15 75:22
81:21 83:13
90:23 94:10
102:5,12 107:2
109:11 112:10
112:17 121:24
123:14 124:2

125:10 138:13
147:4,14 148:12
157:24 162:6,7
163:9,10 164:12
181:4,9 186:25
sort 6:19 34:4
54:21 59:14
80:19 81:4 127:6
140:15 141:25
146:18 154:16
187:25
sound 36:13 42:21
53:2 61:3
sounds 21:14
46:13,16,18
75:24
Sowards 1:14
2:19 5:4,15
190:3 191:2,21
192:6,23
speak 76:9 139:8
143:17,18
speaks 63:11
115:21
special 78:17
specialist 19:11
24:5,8 28:17,19
30:20 37:4 192:1
192:6
specific 15:9
104:2 126:4,9
168:11 179:15
specifically 60:24
72:21 180:18
specified 115:4
specifying 115:1
spectrum 20:1
speculating 125:5
speculation 164:8
speed 130:18
spell 25:12
spelled 71:25
spend 16:7 107:14
144:24,25
spends 62:20
spent 55:10

106:20 108:10
144:10 145:1,7
spine 89:18
split 39:16
spoke 57:25
163:25
spot 151:16
staff 46:22 61:14
63:6
stance 188:12
stand 181:18
standard 1:10
5:12,22 32:24
92:21 102:9
110:2,5 160:16
170:25 171:5
173:15,25 174:7
174:11,15 176:3
188:10 192:4
stands 57:3
star 146:25
start 22:1,9 86:2
89:11 160:20
started 9:2 18:25
21:15 29:4 36:8
49:11 168:17
starting 9:6
starts 42:2 46:1
73:7 170:7
state 1:15 4:6 5:16
6:8 14:5,13 72:1
76:16 87:1 91:9
108:4 113:22
114:21,24 115:7
127:21 128:1
137:2,6,12,15
160:13 165:17
165:17,18 175:7
175:15 181:17
191:1,3 192:7
state's 84:19
87:24
State-at-Large
191:24
stated 16:1 78:5
80:9 85:21 88:9

92:17,18 101:17
106:3 110:24
122:17 123:6
137:13 142:14
142:15 161:22
171:11 180:20
181:16 191:3,4
statement 42:7
71:10 77:16
104:14
states 1:1,20 5:9
13:8 14:14 60:14
86:15 110:18,20
113:16 165:15
165:20 192:2
stating 143:1
171:17
Station 7:12
statute 4:13,15,17
80:7 81:3 123:3
133:22 134:3
136:8,12,13,15
136:25 137:9
141:18 165:23
166:1,10,17
171:7,10,25
statutes 16:1,2,3
72:22 141:11
146:20
statutory 132:13
stayed 9:20
Stefan 2:5 5:19
164:23
step 178:18,23
Stephen 2:4,10
5:21 16:15 60:11
190:8
steps 67:24
Steve 5:18 6:11
164:19 184:10
185:10 187:17
189:20
stick 162:2
sticks 142:1
Stoltz 2:4 3:5,12
5:18,19 6:7,11

67:25 68:3
164:16,21,25
165:3,11 166:4
169:3,11,14
180:14 185:20
187:18 189:9
190:2,7,10,13
Stonewall 137:23
stop 88:13,13
178:16
stored 70:17,25
story 12:22 22:9
24:7 31:18
132:22 168:25
169:1
strategy 143:25
Street 2:6,12 7:16
strikingly 172:18
struck 141:7
stuff 69:22 71:12
72:18 96:16
130:2,14 143:18
148:7 156:9
styled 5:11
subject 111:4
161:1,8 162:19
187:18
subjective 10:3
submitted 105:4
143:21
subrogated 113:1
subrogation
113:10
Subscribed
193:12
subsection 136:19
subsections 80:10
subsequent 77:19
subsidiaries
109:25
substantially
159:24
subtitle 166:13
subtracting 83:15
successful 8:7
successfully 44:6

Enante Darout   10/18/2021

216

sue 21:4
suggest 157:14
suggested 158:6
suggesting 157:17
suit 20:4 142:8
Suite 2:6
sum 119:24
  129:19 176:1
summary 129:20
sums 121:4
supervised 57:18
supervising 39:17
  40:3 59:18
supervision 41:7
  44:2
supervisor 23:12
  23:14,15 24:24
  24:25 25:2 31:9
  59:15
supervisors 38:22
  42:23
supplemental
  75:2
supplied 67:9
support 92:12
  93:15
supported 43:18
  44:13 182:19
supposed 83:10
  101:17 102:9
Supreme 171:14
  172:3,12 175:17
sure 8:14 10:22
  12:5 15:2,25
  27:10 32:7 37:7
  37:9 39:1 40:9
  41:1 49:20 55:20
  59:9 60:20,25
  65:23 68:2 80:16
  102:10 104:24
  128:17 131:17
  132:21 133:1
  136:14 139:7
  146:22 148:16
  159:11 164:20
  164:24 165:17

168:22 180:4
  183:16
surprised 186:6
surround 11:9
surrounding
  150:20
suspended 12:21
sustained 116:23
  118:12
swallows 175:10
swear 5:25
switched 18:2
sworn 191:6
  193:12
system 25:19,22
  25:22

——————
T
——————
tacked 78:6
Tacoma 92:19
  109:13 113:21
  119:19 157:15
  158:1,4
tailored 110:20
tails 184:11
  185:11
take 29:19 35:22
  41:5 51:20,21
  53:19,21 57:2
  67:25 96:8 104:8
  104:10 113:18
  114:3 122:14
  127:22 129:25
  141:18 164:16
  164:25 168:8,8,9
  169:3,4 179:1
  182:12 183:9
  184:6 187:8,9
taken 1:4,13,17
  14:20 68:8 84:21
  84:22 87:3 97:14
  113:22 122:10
  165:8 169:17
  191:8
talent 29:5,18
  37:10 44:1

talk 33:16 45:24
  66:24 79:4 80:17
  100:11 105:20
  105:20 124:8,19
  124:22 132:3
  151:20 164:23
talked 76:1
  100:17 140:10
  140:25 161:21
  166:9
talking 28:16
  41:24 42:1,3
  45:5,11 46:16
  63:14 68:11 72:4
  76:4 82:9 93:25
  107:22 118:5
  120:4 124:7,25
  142:9 165:12
  170:8 171:20
  188:16
talks 111:22 123:4
  132:5 135:8,9
  170:3
task 32:11
tasked 172:20
  175:13
teach 41:21 42:9
team 44:4 46:5
  148:21 151:20
technical 19:11
  24:5,8 28:17,19
  30:20 37:4 38:18
  47:23
telephone 71:16
  76:5 105:25
tell 11:10 12:22
  18:11 22:9 24:7
  31:18 57:9,10
  76:13 88:8
  100:19 105:10
  128:17 132:22
  140:2,5 141:24
  145:9 147:24
  153:8 179:25
  185:12,14,14
  189:3

telling 125:4
template 39:4,12
  39:24 40:22 48:1
Temporarily 19:6
ten 78:18 164:25
  182:10,13,23
  183:5 186:1,1
ten-dollar 183:11
  184:19 186:8
ten-minute 68:1
tendency 146:19
tendered 77:5,6
term 29:17 161:13
terms 7:2 24:1
  26:11 27:4 42:10
  66:2 70:9 84:19
  111:5 113:25
  142:21
territories 113:17
territory 113:12
  113:15,16 114:3
  176:20
test 84:21 85:3,18
  85:18 86:3,21
  96:17,19 97:16
  97:17 101:1,25
  102:25 104:16
  132:7 138:6
  142:17 170:4,5
  170:10,19
  175:10,19
  178:17
testified 6:5 41:13
testifying 157:8
testimony 6:22
  191:7,10,16
tests 86:18 104:5
text 74:7
thank 5:24 12:17
  38:4 55:21 85:16
  112:20 115:19
  163:11 164:16
  165:11 169:14
  189:8,9 190:5
thanks 54:3 183:6
that'd 115:19

Thaxton 4:11
  15:20 87:11,12
  87:15 93:12,25
  96:1,6 97:24
  98:16 99:2,8,21
  100:1 138:22
Thaxtons 93:17
  94:21 95:7,8
Thaxtons' 95:20
thereto 192:12
thing 6:19 11:23
  21:23 26:24 48:8
  54:22 56:16 72:5
  73:11 86:14
  110:10 121:19
  127:5 144:13,16
  151:5 154:16,18
  177:24 182:11
  184:23 185:4
  186:21
things 20:24 23:10
  34:25 35:2 41:20
  42:8 83:13 95:6
  108:20,25
  129:14 131:13
  135:25 142:12
  142:19 144:11
  144:13,17 157:3
  179:1
think 10:3,5 33:6
  40:8 42:7 43:14
  47:1 48:2 59:5
  63:11,15,20 68:4
  71:21 72:14
  76:22 80:9 81:5
  81:19 83:7 84:25
  85:1 88:9 89:6
  91:1,2 92:14,24
  94:3,3,5,9 96:19
  97:2,21 100:17
  100:25 101:24
  102:14 104:14
  105:24 106:15
  107:10 108:25
  109:9 110:2
  112:9 114:9,11

115:10,20,21
116:6 117:14
122:9,14,17
123:1,2,2,2,6,6
126:14,16 127:2
127:3 128:15
133:13,18 134:9
134:11,13
136:16 137:1,10
139:10,14,14,23
140:6,14 141:10
141:13,15,20
142:9,14 146:13
147:20 150:2
155:12 161:21
161:22 163:24
164:5 167:25
168:9,10 177:23
177:25 178:1,4,6
178:12,17,23,25
179:6,7,23,24
180:10,19,20,24
181:2,12,13
183:18 185:17
186:18 190:2
**thinking** 38:20
**thinks** 55:25 56:1
**third** 28:8 114:11
114:12 154:13
**Thirty-one** 168:3
**this'll** 185:22
**thorough** 137:4
188:25
**thought** 22:15,22
22:24 91:13
132:25 135:12
137:20 140:3,25
142:5,15
**thousand** 78:9
117:25
**thousand-** 77:19
**three** 16:10,11
28:23 55:10
66:22 69:24
89:20 111:15,16
114:17 134:2,3

136:11,16 138:4
**threshold** 175:15
**throw** 147:6
170:20
**tie** 63:21
**ties** 178:10
**time** 5:3 10:19,24
11:4,24 16:7
17:20,21,21,24
18:1,3,5,23 19:2
22:25 25:4,8
28:15 29:17
31:12 33:8 34:6
40:9 41:22 42:6
43:15 46:4,6,11
46:25 49:16,18
49:19 51:20
56:21 59:13 61:9
68:6,10 76:5,10
92:22,23 108:10
108:10 120:1
121:24 124:23
144:11,20 145:7
148:17 150:7
155:14 163:21
165:1,10 167:7
168:22 169:8,19
182:9 185:23
187:13 190:17
191:4
**times** 42:13 103:4
151:2
**title** 13:22 29:22
**titled** 38:24 39:6,9
39:15 40:5 44:22
**to-the-extent**
134:1,23
**today** 6:23 16:8
36:25 139:20
152:24 165:22
166:17 180:25
**today's** 5:2,4
14:25 15:3
**told** 151:22
185:18
**top** 73:13 126:4,5

126:18 133:8
**tortfeasor** 52:22
77:18 81:13
82:16,20 83:2
**tortfeasor's** 84:6
**total** 83:15 136:20
144:20
**totals** 52:22
**Toyota** 109:13
113:21 119:19
157:15 158:1,4
**traffic** 34:14
**trailer** 119:24
**trails** 73:13
**training** 21:23
**trans** 101:15
**transaction** 86:5
96:4,15 100:4
101:20 178:10
178:14,25
**transactions**
101:19 102:16
**transcript** 189:14
189:23
**transmit** 108:13
**transmitted**
105:25
**trash** 147:6
**Traveler** 40:23
123:21 158:25
**Travelers** 7:9,19
13:15 14:4 16:19
17:22 18:1 19:1
19:8 24:6 25:19
25:22,25 27:15
27:20 28:9 29:1
34:13 38:8,8
43:12,13 46:1
47:10,11 49:8
52:6 56:1 58:15
60:7,12,16 61:13
62:4,13,16,19,21
63:6,19 68:15,17
68:22 73:2 78:20
109:24 114:4
115:11,12 121:8

123:9,22 124:13
125:14 129:11
129:12 130:4
144:4 149:6
150:14 154:12
154:12,13,19
156:12,20 159:5
159:15,19 160:1
162:17 164:6
183:22 184:23
186:21,24,25
187:1,2 188:6,10
188:12,21
**Travelers'** 62:6
77:2 119:11
147:13 150:4
158:9
**traveling** 79:5
**treated** 164:6
**tree** 21:7
**trial** 8:8 20:17
90:13 94:25,25
**tried** 95:18 98:16
**trigger** 133:12
**triggered** 119:14
120:24
**trips-and-falls**
20:24
**truck** 109:14
**true** 10:17,23 11:2
11:4 42:8 47:16
64:10 77:14
99:16 139:14
154:14 161:10
161:20 162:19
163:6,20 170:12
174:5 191:4,10
193:5
**truly** 19:24 164:14
167:12
**truthful** 6:22
**try** 103:5 107:2
124:12 136:23
167:15,15 169:4
170:1 185:21
**trying** 35:25 70:6

70:7 72:17 81:17
82:2 83:4,5,7
95:17 103:6
104:22 107:5
134:21 135:23
139:10,23 140:1
178:4,11,21
**turnaround** 46:11
**turned** 168:19
**Twenty** 145:13
**Twenty-eight**
3:24 50:18,18
**Twenty-one**
162:16,21
**two** 16:11 55:10
58:20 63:20
66:22 73:5 87:9
87:22 97:12,18
97:23 100:11
103:12 106:22
106:22,24
107:20,20
111:15 113:4,6
115:4 116:23,25
118:13 119:16
119:16 121:21
132:7 141:5
144:10,16,19
145:3 153:2
183:2,3 186:5
188:11
**two-** 85:18
**two-week** 144:23
**two-year** 58:15
**type** 79:11 106:1
119:24 126:21
155:11 170:24
**types** 115:9
**typewriting** 191:9
**typical** 35:25
**typically** 35:1,2
35:14 147:3
**typo** 77:10 78:21
81:15 138:18,19

**U**

Enante Darout   10/18/2021

218

**U.S** 32:5 180:10
**uh-huh** 6:19 23:20
24:17 41:17
42:25 54:2 66:19
70:10 74:23
75:16,23 79:24
80:14 82:13,22
84:12 85:12,17
85:23 86:19
87:12,13 88:15
91:19 93:8,14
94:23 98:7 99:9
99:25 100:12
103:8,13 131:9
132:12 135:3
138:21 145:18
180:2 187:6
**UIM** 57:4 77:5
79:21 81:3,12
82:14,19 83:1
90:11,11,13 91:8
92:3 103:21
107:25 113:10
115:22 116:7
120:5 125:22
126:22,22
127:22 132:6
133:22 134:3
136:12,13
139:24 141:11
141:13,16,18
161:16 165:25
171:7,7,8,12,15
171:22,25
172:10,13 174:2
174:3 176:7
188:13
**UIM-2** 120:16
163:3
**ulterior** 188:1
**ultimately** 137:19
159:24 174:14
**un** 128:13
**un-** 79:16 113:6
118:4 125:12
**uncertain** 27:7

**undergrad** 8:15
**underinsured**
4:15 52:16 79:17
81:14 82:16,19
82:21,24 83:2
88:23 109:22
113:6 118:4,11
118:16 119:1,7,8
119:11,12,22
120:7,11,21
125:12 128:11
128:12 136:20
**underline** 146:15
146:25
**underlined** 38:9
41:19 43:17 44:9
47:13 137:10
**underlining** 76:18
**underlying** 120:6
120:22
**understand** 18:2
19:11 38:4 54:12
55:1,4 72:19
81:14 82:17 83:9
91:7 103:6
115:23 127:25
134:13 137:9
146:23 167:13
181:23 183:20
185:9,18
**understanding**
54:10 103:1
181:19
**understood**
135:18 137:8
139:13
**undisputed**
176:12,12
**undue** 47:5,8,9
**unfair** 4:17 158:8
158:15 165:13
165:14 174:2,22
174:24
**unfathomable**
174:10
**unfavorable**

150:14
**unforeseen** 175:1
**unfortunately**
101:21
**uninsured** 4:22
118:11 127:14
128:10,12,25
136:20
**Union** 142:11
**unique** 86:14 97:2
111:10
**unit** 24:20 25:3,6
25:9 26:8,20
27:5,23,25 28:5
36:18 39:18 65:5
149:20,20
**United** 1:1,20 5:9
113:16 192:2
**universe** 72:18
**unknown** 174:4
174:10,25
**unofficial** 189:23
**unpersuasive**
139:22
**unpublished**
94:14
**update** 39:25 40:1
40:4
**uploaded** 27:9
153:25 154:3
**use** 28:8 35:20
85:4 92:7 118:15
146:14 150:17
175:19 188:11
**uses** 115:7
**usual** 116:19
**usually** 24:3 35:3
70:15 73:20 76:6
148:8 153:22
**utilize** 35:14

_____ **V** _____

**v** 4:9,11
**value** 47:16 48:15
**varies** 91:4
**various** 20:10

22:12 78:8 97:14
140:24 144:12
165:20
**vary** 165:17
**vehicle** 89:13
92:18 97:6 115:7
118:12,16
119:23,24 120:7
120:7,21 130:3
160:23 161:1,8
166:12 176:19
**vehicles** 172:23
173:2 174:12
175:4
**versus** 5:12 17:23
133:4 138:8
171:18
**victim** 88:16 90:6
90:15 92:1,25
93:9 96:25 97:1
97:8 98:1
**victims** 99:18
**video** 5:2 68:10
165:10 169:19
192:1,6,7
**videoconference**
1:14 2:3,9,17
**videoconferenci...**
5:6
**videographer**
2:15 5:1,5,24
68:6,9 165:1,6,9
169:13,15,18
189:12 190:5,11
190:16
**Videographer's**
3:6
**videography** 1:14
**view** 106:10,13
135:8 139:21
148:19 150:25
151:6 171:7
177:20 179:19
181:17 188:24
**viewing** 176:10
**views** 179:8

181:21
**violate** 171:5,12
171:16,23
172:14 176:8
177:8
**violates** 170:21
175:21 177:4
**violation** 159:7,16
160:1
**VS** 1:7

_____ **W** _____

**wages** 52:19
**waitress** 183:1
186:5
**walk** 80:12
**walked** 66:21
**Wallace** 139:15
**want** 8:12 14:24
18:10,10 23:25
26:22,23,23 42:4
51:11,16,25
53:17 66:3,12,13
66:23 74:15
109:25 114:17
114:17 126:8,8
150:15 155:15
164:21,22,22
168:17,18
169:24 181:23
185:19 189:13
189:20,21 190:7
190:7
**wanted** 7:22 34:4
42:17 68:13
**warm** 182:17
**warning** 155:19
**Warrick** 137:23
**wasn't** 22:21,22
32:8 33:8 35:11
36:6 37:14 59:17
87:3 118:25
123:20,23 124:4
124:20 125:7
127:23,24
135:15 137:4

**Collins Sowards Lennon Reporting, LLC**
**859-402-0900**

142:5,14 154:25
178:22
**Watts** 139:15
**way** 13:11 39:25
40:3,15,17 51:19
63:21 73:23 83:8
83:9,12 84:7
121:1,18 123:22
145:9 146:24
150:16 175:16
188:4 192:14
**ways** 30:6 64:15
64:16
**we'll** 8:8 45:24
51:21 168:8
169:4,4,9,10
**we're** 5:1 28:16
32:25 43:13 57:2
66:25,25 68:3,7
68:9 73:2 80:12
103:5 110:8
118:5 124:25
162:11 165:6,9
169:15,18,20
183:10 186:11
190:18
**we've** 69:14 84:7
96:13 112:22
137:22 140:10
154:10,14,15,18
**weeks** 55:10
106:19,22,23,24
107:20 144:10
144:16,19 145:3
**weigh** 104:11
**weight** 84:23
104:16
**weighted** 84:24
104:16
**weird** 183:3
**well-versed** 37:24
**well-written**
137:4 188:24
**went** 8:15 9:13
22:11 65:19
131:2 133:21

134:5 141:15
**weren't** 21:11
24:10 35:21
46:24 48:24
139:3
**West** 2:6,12
**Westlaw** 35:5,15
143:7 146:14
156:24
**What'd** 9:9 19:2
**where'd** 7:7 36:16
**whereof** 191:16
**willingness**
175:18
**Windsor** 7:12,12
**wish** 164:15
**witness** 1:11 6:1
71:10 124:2
169:6,9 181:4
189:11,17
190:15 191:5,11
191:13
**wonder** 154:20
**wondering** 132:18
132:24 134:10
134:12 138:25
151:21
**Woods** 1:4 5:12
5:20 49:6,12,14
49:22 50:4,7,21
51:4,14,25 52:1
52:3,10,18 53:20
55:25 56:22,23
64:25 78:15
82:23 89:19
90:18 92:8,13,25
93:3 98:4 101:21
103:25 104:6,18
114:10 117:2,16
119:18 128:18
136:4 138:6
152:19,25,25
154:21 157:14
157:18 160:8,9,9
162:17,25
163:14 164:5

170:11,23 171:2
174:3,6,10
176:16,18
183:23 184:24
186:22 187:4
192:3
**Woods'** 109:14
122:21 123:11
125:1
**Woods-related**
156:9
**word** 7:16 105:12
105:12 110:1
112:3 129:25
**wording** 116:7
**words** 73:14,15
76:14 102:25
112:2 117:18
118:25 150:9,17
**work** 9:9 20:5,6
20:13,21 22:14
24:2,21 31:23
33:19 41:11
42:24 44:14 45:7
47:8 48:22 51:12
51:14 59:10,21
60:21 61:1,4
74:13,25 106:19
112:5 144:12,13
156:3
**worked** 9:8 19:4,6
23:22 45:14
60:23
**workers'** 133:14
133:16,20
134:15 135:21
136:2 171:21
172:4
**working** 13:9
17:22,22 28:17
46:3 47:20 48:6
106:20 108:10
131:25 144:11
144:17,18
**works** 24:1 26:25
148:3

**worksheet** 4:22
127:15,23
128:11,25 131:3
**worksheets**
130:21
**would've** 105:7
106:3 109:10
117:20,21 131:2
153:12
**wouldn't** 30:11,13
31:22 62:8 72:14
101:11,22
108:16 131:11
135:15 154:24
156:8,9
**wreck** 34:13,15
54:7 71:7
**write** 31:1 34:10
54:13 57:10
61:14 63:7
100:20 108:3
150:24
**writing** 17:16 23:2
38:20 40:24
44:15,17 45:6
52:14 55:11 58:6
73:17,25 144:24
145:1
**written** 15:23 17:5
38:21 39:14
47:12,24 48:2
49:19 51:2 72:12
72:15 74:5 76:21
111:12 140:20
181:19
**wrong** 12:8 26:14
26:24 151:22
152:15 155:17
158:14 180:16
**wrote** 23:6 43:5
56:12,25 74:7,7
133:3 139:1
144:21,23
150:13 188:23

---
**X**

---
**Y**

**YCS** 9:11
**yeah** 18:16,17
21:10 28:16
33:10 34:25
35:17 37:21 48:4
48:12 49:11
69:23 70:25 71:6
74:12 81:23 83:5
88:20 90:4 93:4
96:25 97:2 101:3
112:10,17 114:6
122:21 130:1,12
131:17,17
133:11 134:2,16
134:25 135:9
137:1 138:19
141:4,4 143:9
144:15 145:5,17
146:17 148:15
148:17 151:2
153:8 155:4,16
157:20,24 160:6
160:20 162:9
163:9,10,23
166:22 183:5
186:3,3 187:14
**year** 7:2 9:20
39:16,22 40:2
41:4 156:14,18
**years** 12:4 18:13
28:22,23 58:20
66:22 153:2
180:6,9,11 182:3
182:3,16 183:7
186:11
**yellow** 91:22
**Yep** 36:14 41:2
76:19 85:23
130:7,7 134:24
154:8
**you-** 182:24
**you-all** 33:16
46:14 59:10
146:12 182:6,15

Enante Darout   10/18/2021

220

| | | | | |
|---|---|---|---|---|
| 189:21 | **11:21** 68:10 | **2** 3:3 | **27** 3:14 43:8 63:25 | **4** |
| **young** 41:20 42:7 | **12** 169:5 | **2:10** 169:5 | 63:25 64:3 72:3 | **4** 3:4 |
| **younger** 12:24,24 | **128** 4:21 | **2:11** 169:19 | 74:16 154:18 | **401** 2:12 |
| 24:3 | **138** 4:5 | **2:40** 190:18 | **28** 3:17 49:21,25 | **40202** 2:12 |
| **your-all's** 149:20 | **1396** 129:12 | 192:11 | 50:22 51:6,13 | **40507** 2:7 |
| | **14** 180:9 | **20** 36:20 44:7 | 56:18 72:25 73:2 | **45** 180:6 |
| **Z** | **14th** 53:7 | 145:11 160:9 | 74:17,17,21 | **49** 3:17 |
| **zero** 119:12 | **15** 132:2 167:10 | 161:12 167:11 | 107:6,13 145:6 | **49,000** 119:10 |
| 141:14 154:10 | **15-page** 56:11 | 167:15 168:8 | **28th** 51:6,12 | **49,999** 119:11 |
| **zoom** 55:19 | 69:15 | 169:8,10 179:20 | 56:17,25 107:12 | |
| | **158** 4:16 | **2004** 8:17 | **29** 3:22 107:8,17 | **5** |
| **0** | **16** 52:1,3,9 109:9 | **20041D**115 | | **5** 3:4 |
| **0553** 8:2 | **1600** 2:11 | 191:23 | **3** | **5:18-cv-658-JMH** |
| **06455** 7:17 | **166** 4:12,14 | **2009** 8:17 9:6 | **3** 3:3,4 192:19 | 1:2 5:11 192:4 |
| **0668** 8:4 | **167** 4:3 | **201** 2:6 | **30** 4:1 16:10 | **50** 44:6 45:13 |
| | **17** 167:9 | **2011** 9:3,7 | 106:18 108:23 | 49:17 50:3,9,10 |
| **1** | **18** 1:16 5:3 36:9 | **2013** 9:21 | 109:1,5 | 52:22 60:13 |
| **1** 3:2 119:8 | 38:25 40:20 43:5 | **2014** 9:21 18:25 | **30(b)(4)** 5:7 | 82:24 151:10,10 |
| **1,000** 54:4,18,20 | 43:16 44:20,24 | **2015** 19:1,8 22:20 | **304.12-** 158:17 | **50-plus** 150:6 |
| 109:19 117:5 | 49:11,12 52:6 | 25:5 28:7 | **304.12-230** 4:17 | **50,000** 53:20 |
| **1:32** 165:2 | 55:14 64:24 | **2018** 23:23 29:4 | **304.39** 160:24 | 77:17 80:1 119:5 |
| **1:44** 165:10 | 65:16 129:4 | 39:5,13,24 43:9 | **304.39-250** 4:13 | **500,000** 89:18 |
| **1:49** 169:13 | 153:5 160:21 | 43:25 46:13 | 166:10 | **53** 3:9 |
| **10** 112:6 183:14 | 167:9 192:9,18 | 52:11 56:17 | **304.39-320** 4:15 | **55** 3:11 |
| 184:3,13 187:7 | 193:4 | 74:18 154:17 | **30th** 55:13,22 | **5th** 52:11 53:7,16 |
| **10,000** 53:21 55:5 | **187** 3:5,5 | **2019** 47:12,25 | **31** 4:3 64:24 65:16 | 129:4 |
| 77:19 78:11 | **188** 138:19 | 48:9 49:1 | 74:16 107:10 | |
| 115:14 184:4,25 | **19** 36:11 56:22,23 | **2020** 48:1,6 | 167:17,18,21,23 | **6** |
| 187:7 | 161:4 | 153:16 | 168:2 180:11 | **6** 3:4,5 |
| **10/30/18** 3:13 | **190** 3:5 | **2021** 1:16 5:3 | **32** 4:5 137:14,14 | **609** 7:16 |
| **10/31/18** 3:15 | **191** 3:6 | 191:18 192:9,19 | 138:11 | **61** 78:22 |
| **10/5-30/18** 3:13 | **192** 3:6 | 193:4,14 | **33** 4:8 89:21 90:1 | **61,000** 52:23 |
| **100** 63:21 77:5 | **193** 3:7 | **2023** 191:15 | **34** 4:10 93:13,21 | 77:13 |
| 109:22 151:9 | **1963** 40:23 | **2024** 192:18 | **35** 4:12 166:10,20 | **613817** 191:25 |
| **100,000** 52:20 | **1964** 43:12 | **21** 162:20 | **36** 4:14 166:4,7 | **64** 3:14 |
| 53:19 | **1970** 43:13 | **213** 73:2,2 | **37** 4:16 158:16,18 | **6th** 40:20 56:25 |
| **102** 2:6 | **1971** 46:1 188:21 | **216** 73:2 | 158:21 165:13 | |
| **107** 3:22 | **1972** 47:10 180:8 | **22** 162:23 | **38** 4:19,19 38:6,12 | **7** |
| **109** 4:1 | **1975** 38:8 | **23** 163:12,22 | **38a** 123:3 | |
| **11** 78:18 170:1,7 | **1976** 180:8,9 | **230** 158:18 | **39** 4:21 128:3,7 | **8** |
| 191:15 | **1986** 7:4 | **2356** 56:23 | 187:20 | **8/14/19** 4:4 |
| **11,000** 52:22 | **1988** 133:22 171:6 | **25** 3:9 53:17,25 | **39,000** 52:15,24 | **80** 144:24,24,25 |
| 78:15 112:6 | **1990** 180:9,11 | 145:13 187:20 | 54:6 57:4 77:6 | 145:1 |
| 124:14 187:8 | **1997** 47:11 | **25,000** 141:13,14 | 131:23 151:4 | **8122** 7:24 |
| **11/28/18** 3:20 | | **26** 3:11 50:14 | **3rd** 191:17 | **88** 136:9 |
| **11:08** 68:7 | **2** | 55:13,17 56:9 | | **89** 4:8 |

Enante Darout   10/18/2021

221

| 9 | | | | |
|---|---|---|---|---|
| **9:45** 1:16 5:3 192:10 **93** 4:10 **98** 109:13 136:10 136:15 | | | | |